IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

JEFFREY JAY HAWKINS,

       Petitioner,               No. CIV S-96-1155 MCE EFB DP

   vs.

ROBERT K. WONG[1], Warden,      <u>FINDINGS AND RECOMMENDATIONS</u>

       Respondent.         **DEATH PENALTY CASE**

_____/

      Petitioner is an inmate on California's Death Row pursuant to a sentence imposed in 1990.  In this petition for writ of habeas corpus, he seeks review of his convictions and sentence on numerous grounds.  By order dated November 2, 2004, this court determined that petitioner's Claims C-I, K-Q, T-DD, and FF-HH were amenable to resolution by summary adjudication.  The parties have accordingly submitted cross-motions for summary adjudication.  Respondents seek summary adjudication of each claim noted in the court's order, and petitioner seeks summary adjudication of Claims C-I, L-O, Q, T-V, Z-DD, and FF-HH, contending that the remaining claims (K, P, V, W, X, and Y) are not amenable to resolution by summary adjudication.

---

[1] The Court hereby substitutes Robert K. Wong, Warden of the facility where petitioner is currently located, as the respondent.  *See* Rule 2(a), Rules Governing § 2254 Proceedings; Fed. R. Civ. P. 25(d).

1   Petitioner seeks an evidentiary hearing on claims A-B, J-K, P, R-S, and W-Y.  Claims EE and II,

2   which allege cumulative error, are not at issue in the pending motions.  For the reasons that

3   follow, the undersigned finds that summary adjudication of Claims C, D, E, F, G, H, I, J, K, L,

4   M, N, O, P, Q, T, U, V, X, Y, Z, AA, BB, CC, DD, FF, GG, and the trial court error sub-claims

5   of Claim W should be granted in favor of respondent.  The undersigned therefore recommends

6   that respondents' motion for summary adjudication be granted as to those claims and otherwise

7   denied and that petitioner's motion for summary adjudication be denied.  The undersigned

8   further finds that an evidentiary hearing is appropriate on Claims A, B, R, S, and the ineffective

9   assistance of counsel sub-claims of Claim W, and petitioner's motion for evidentiary hearing

10  should therefore be granted as to those claims and otherwise denied.

11                                          BACKGROUND

12          On the morning of March 4, 1987, John Hedlund's body was found in a ditch near Galt,

13  California.  Reporter's Transcript on Appeal (hereinafter "RT") 3655-59.  Mr. Hedlund had

14  perished from two gunshot wounds.  RT 4257, 4279.  Six days later, Herman Hicks was shot and

15  killed, and Jerry Stevens was shot, by the perpetrator of a robbery at Sonny's Market in Rancho

16  Cordova.  RT 3799-3807, 4294.

17                                         I.  The Trial

18          Sacramento County prosecutors filed an information against petitioner on November 12,

19  1987, charging him with responsibility for the murders of Hedlund and Hicks (California Penal

20  Code § 187(a)), the attempted murder of Stevens (California Penal Code §§ 664 & 187), and the

21  robbery of Sonny's Market (California Penal Code § 211).  Clerk's Transcript on Appeal

22  (hereinafter "CT") 111-15.  The information further alleged two special circumstances rendering

23  petitioner eligible for the death penalty: (1) robbery murder (California Penal Code

24  § 190.2(a)(17)(I)) and (2) multiple murder (California Penal Code § 190.2(a)(3)).  Id.  Other

25  sentencing enhancements were also alleged.  Id.  At his arraignment on November 13, 1987,

26  petitioner plead not guilty to all charges and denied both special circumstances.  CT 119.

2

Trial commenced on March 9, 1989.  In its opinion on petitioner's direct appeal, the California Supreme Court provided a summary of the evidence adduced at trial.  That recitation, which is entitled to deference from this Court absent a showing that it is unreasonable in light of the evidence of record (28 U.S.C. § 2254(d)(2); *Taylor v. Maddox*, 366 F.3d 992, 999-1000 (9th Cir. 2004); *see Sumner v. Mata*, 449 U.S. 539, 545-46 (1981)), follows:

At the guilt phase the prosecution presented evidence that defendant was responsible for two murders in separate incidents, one of which also involved robbery and attempted murder.  Each of these incidents will be discussed in turn.

1. *The Hedlund Murder*

The prosecution introduced evidence tying defendant to the murder of John Hedlund.  Hedlund was last seen alive on the night of March 3, 1987, at a bar called the Uptown Saloon in Galt, a town in southern Sacramento County.  Hedlund had been a regular customer at that establishment.  The bartender at the Uptown Saloon, Connie Sue Trottie, and a customer, Jill Gibbs, identified defendant as present at the saloon, playing pool with Hedlund on the night in question.  Defendant, who at the time was living nearby at his uncle's house, had apparently frequented that bar for several weeks before March 3.  According to Gibbs, defendant had left the bar around midnight, a few minutes after Hedlund's departure.  Hedlund had left behind a half-finished pitcher of beer and a pack of cigarettes, which according to Trottie was unusual for him.  Hedlund's automobile was parked outside the bar but, according to one of the bar patrons who had done mechanical work on the automobile, its engine was in disrepair and it was inoperable.

Hedlund was found dead at 8 a.m. on the morning of March 4 in a ditch in an open field some three miles east of Galt.  His body was wrapped in a bloodstained horse blanket on which were found traces of horsehair, bird feathers, and bird feces as well as some vegetation debris, possibly straw.  His pants were unzipped and lowered down to the midthighs.  Several beer cans were found in the vicinity of the body.  One witness who lived nearby testified that he had heard no gunshots and that his dogs, who usually barked at loud noises, had not barked that night.  The coroner determined that the cause of Hedlund's death was two gunshot wounds to the back of the neck and base of the head, one of which was fired at a range of less than a foot.  The body also had minor abrasions on the forehead, nose, chin and left thigh, and a seven-and-a-half-inch abrasion along the front part of the neck that was consistent with a fingernail gouge.  Subsequently, ballistics experts determined that a projectile removed from the body was fired from the same gun used to murder Herman Hicks, a crime to which defendant was tied by eyewitness evidence, as will be discussed below.  The prosecution argued that the position of the entry wounds and the close range at which they were inflicted strongly implied a deliberate "execution" style killing.  The prosecution also pointed to the numerous bullet fragments found in Hedlund's head and neck, suggesting the murderer's use of particularly lethal "hollow point" bullets that tend to explode and diffuse on impact.

The other piece of evidence linking defendant with the Hedlund murder was that defendant had stayed for some time the previous month at the home of Carmen Greenfield, a woman who raised horses and various rare birds on a ranch outside of Galt. The blanket with traces of horsehair and bird feathers could have come from Greenfield's ranch, although the origin of the blanket was never established with certainty.

Defendant presented evidence from some of those present at the bar on March 3, 1987, calling into question whether Gibbs, the one witness who had reported that Hedlund and defendant had left the bar around the same time, had herself been present at the bar that night. Defendant further pointed to the fact that Gibbs had testified that he and Hedlund had left from separate entrances as evidence that they had not met up with each other after they left the bar. He also introduced into evidence articles by a criminalist raising questions as to the scientific exactitude of ballistics identification evidence.

2. *The Hicks Murder*

Jerry Stevens, manager of Sonny's Market in Rancho Cordova outside of Sacramento, identified defendant as the man who had robbed the store while Stevens worked at the market on March 10, 1987, about 7:50 a.m., and who shot him and fatally shot one of the store's customers, Herman Hicks. According to Stevens's testimony, defendant walked up to the checkout counter of the store with a can of beer. The store was empty but for Stevens, defendant, and Hicks. Defendant drew a handgun on Stevens and told him to empty the cash register and put the money in the paper bag containing the beer. He testified to a deliberate effort to closely scrutinize the robber as a means of later identifying and apprehending him. Defendant told Stevens not to look at him, and then instructed him to get down on his knees behind the counter. Defendant shot Stevens in the right side of the chest, with the bullet exiting from his armpit beneath his right shoulder. He fell to the floor and lay still, as though dead. While lying on the floor he heard two more gunshots, neither directed at him.

Shortly thereafter, Stevens arose from behind the counter. Defendant had fled the store. Hicks lay on the floor in a pool of blood: he died from a single gunshot wound to the head, most likely fired from two to three feet away. Robert Johnson, another customer, entered the store at approximately the same time defendant was leaving. Stevens, fearing a loss of consciousness or death, had Johnson write down Stevens's description of his assailant: a white male between 32 and 35 years of age, 5 feet 10 inches tall, weighing approximately 170 pounds, a gold stud in his left ear, and a tattoo of a skull or a rounded figure on his neck. Stevens later made a positive identification of defendant in a police lineup, as well as identifying him in a photographic lineup. Johnson was apparently not initially contacted by police, but identified defendant in a photographic lineup two years later, the day before he testified at trial.

Defendant had been stopped earlier that morning, around 5:25 a.m., in downtown Sacramento, and had been cited by the Sacramento police for driving the wrong way down a one-way street. He was in possession of the driver's license of one Malcolm Centers, who apparently resembled him, but it was stipulated that it had indeed been he who had been stopped and cited that morning. The driving time

4

between the place where he was cited and Sonny's Market is approximately 15 minutes.  The automobile he was driving was registered in the name of Katherine Taylor, who was identified as having been his girlfriend or ex-girlfriend at that time.  The description of the automobile by the officer who issued the citation was somewhat at variance with that of Johnson's description of the vehicle driven from Sonny's Market.

Defendant was apprehended on March 16, six days after the Hicks murder in Corona, in Riverside County, where his brother, father, and stepmother resided. The day of his arrest, he assaulted his brother, Gerald Hawkins (hereafter sometimes Gerald), a homeless resident living in the Corona area.  According to a statement taken from Gerald shortly after the assault, and reiterated approximately 10 days later in a tape recording introduced in evidence, defendant met Gerald on a street in Norco outside Corona, and they spent a number of hours drinking and talking together.  Defendant told Gerald that he had shot a store clerk and a "black guy" during a robbery when he was up north, and that he was "looking at death row."  Hicks was a Black man.  Defendant further told Gerald that one of the witnesses to the murder survived and that he was thinking of going back to Sacramento County to "take care" of that person.  Gerald apparently advised defendant against this course of action and an argument broke out between them.  Shortly thereafter, Gerald went to use the restroom of a nearby filling station, and upon exiting was attacked by defendant with a small knife and seriously injured.  The police were called to the scene and took Gerald's statement incriminating defendant.  Police apprehended defendant that same day.

Defendant challenged the reliability of the eyewitness identifications, pointing to the discrepancy between Stevens's initial description of his assailant and his actual appearance: he is five feet seven inches rather than five feet ten inches; he assertedly did not have long hair at the time and did not wear a gold stud on his ear – facts that were disputed at trial; the description of the tattoo on his neck was also assertedly inaccurate.  Defendant pointed as well to Johnson's initial profession of inability to identify the robber when questioned by police shortly after the Hicks murder occurred as evidence of the unreliability of Johnson's eyewitness testimony.  Further, he introduced the testimony of a psychologist who called into question the general reliability of much eyewitness testimony.

Moreover, defendant attempted to impeach the testimony of his brother Gerald with his prior inconsistent statements.  Gerald had denied at the preliminary hearing in October of 1987 the truth of his earlier statements to the police regarding defendant's admission of the murder of a Black man and attempted murder of a store clerk, although he again reversed himself at trial and attested to the truth of his earlier tape-recorded testimony.  Defendant also sought to impeach Gerald by showing that the latter, as a homeless man and alcoholic with a long-term addiction to inhaling paint fumes, could not be relied on for accurate testimony.  He himself did not take the stand.

*People v. Hawkins*, 10 Cal.4th 920, 933-37 (1995).

On April 10, 1989, the jury found petitioner guilty of first-degree felony murder of Hicks, attempted murder of Stevens, and robbery of Sonny's Market.  CT 298-304.  On April 13, 1989,

the jury found the robbery murder special circumstance true.  CT 313, 316.  On April 17, 1989, having deliberated for four days after returning the initial verdicts, the jury found petitioner guilty of the first-degree murder of Hedlund.  CT 313, 315.  At the same time the jury found the multiple murder special circumstance true.  CT 313-14, 317.

The penalty phase of petitioner's trial began on May 1, 1989, but ended in mistrial when the jury deadlocked eight-to-four for death.  CT 324-31.  After impanelment of a new jury, the penalty phase retrial commenced on October 30, 1989.  CT 373-82.  The evidence adduced during this phase of trial was summarized by the California Supreme Court as follows:

> Defendant stipulated to eight prior felony convictions arising out of six separate incidents: robbery in 1974; unauthorized use of a vehicle (Veh. Code, § 10851) in 1976; assault with a deadly weapon in 1978; battery with serious bodily injury in 1980; two counts of possession of a firearm by a previously convicted felon in 1981; and one count each of assault with a deadly weapon on a police officer and unauthorized use of a vehicle in 1983.

> The prosecution also introduced evidence of uncharged crimes: a 1974 incident, in which defendant allegedly resisted arrest for robbery and struck a police officer; a 1980 incident, in which a convicted drug dealer testified that he was beaten by defendant and three other people, and then shot by defendant, during a drug transaction; a 1981 incident in which he allegedly resisted arrest and fought with a police officer over the surrender of his firearm; the 1987 assault on his brother shortly before he was arrested; and a 1989 incident in the Sacramento County jail where he resided during trial, in which he allegedly drank contraband alcohol, joined other inmates in clogging up the toilet, and threatened the lives of the guards attempting to restore order.

> The circumstances of the Hicks offense were also presented in some detail. Evidence of the Hedlund murder, other than the fact of conviction itself, was not introduced, with one exception: forensic evidence regarding the condition of Hedlund's body when it was discovered shortly after his murder was presented to show that the murder had been committed in an execution style.

> Defendant for his part claimed in mitigation that his violent acts were attributable to his own violent upbringing.  His mother testified that his father was frequently drunk, and would beat her when in this condition.  She also testified that she was sent to federal prison for cashing a stolen check when defendant was four years old, and he was sent off to foster homes and thereafter to his father.  Defendant's father testified that he himself had a history of mental instability that caused him to attempt suicide while in the Army and to spend some time in a mental institution.  He further testified that he regularly hit defendant, that he had used firearms in the house in defendant's presence, and that he had neglected the care of his children.  He also stated that he sometimes had locked defendant in the house, the basement or the closet in order to prevent defendant from running

away.  Defendant's grandmother also testified to his difficult childhood.  His uncle testified that he had not received proper care, that his mother had been a frequent drug user, and that his parents generally neglected him.  Defendant introduced evidence showing that the abuse and neglect visited on him and his two brothers had taken a serious toll on each of them: defendant became a career criminal; his brother Gerald became a homeless alcoholic and substance abuser and his other brother, Danny, had attempted suicide and was eventually killed in a boating accident caused by his father's intoxication.

There was also a stipulation that in 1966 defendant fell out of a tree and possibly sustained a concussion.  No evidence was presented as to the long-term effect of such an injury.  Defendant did not testify in his own behalf.

*Hawkins*, 10 Cal.4th at 937-38.  The second penalty-phase jury fixed petitioner's penalty at death for both counts of first-degree murder.  CT 429-31.  On January 31, 1990, after denying petitioner's post-trial motions, the trial court imposed the death judgment.  CT 476.

## II.  Post-Conviction Proceedings

The California Supreme Court affirmed petitioner's convictions and death sentence on July 20, 1995.  *Hawkins*, 10 Cal.4th 920.  The U.S. Supreme Court denied review on May 13, 1996.  Petitioner filed a habeas petition with the California Supreme Court, which that court denied on August 30, 1995 in a brief order.  *In re Hawkins*, No. S039950, 1995 Cal. LEXIS 5198 (Cal. S. Ct. Aug. 30, 1995) (denying the petition "on the substantive ground that it is without merit" and finding several claims procedurally barred as repetitive of petitioner's appeal).

On July 8, 1996, this court granted petitioner's request for counsel and stay of execution.  Dckt. No. 3.  The Court then equitably tolled the habeas limitations period, and petitioner filed his federal habeas petition on October 28, 1997.  Dckt. Nos. 28, 42, 53.  That petition was held in abeyance pending exhaustion of certain claims; petitioner filed an amended (and currently operative) petition on March 9, 1999, the same day that petitioner's second California Supreme Court petition (containing the unexhausted claims) was denied in a brief order.  Dckt. No. 101; *In re Hawkins*, No. S06540, 1999 Cal. LEXIS 1335 (Cal. S. Ct. Mar. 9, 1999) (denying the petition "on the merits" and finding several claims procedurally barred).

////

1    Currently pending are the parties' cross-motions for summary adjudication, Dckt. Nos.

2    170, 182, and petitioner's motion for evidentiary hearing, Dckt. No. 215.

3                                    ANALYSIS

4                    I.   The Cross-Motions for Summary Adjudication

5    A.   Summary Adjudication Standards

6          Rule 12 of the Rules Governing § 2254 Cases in the United States District Courts

7    provides that "[t]he Federal Rules of Civil Procedure, to the extent that they are not inconsistent

8    with these rules, may be applied, when appropriate, to petitions filed under these rules."

9    Consistent with Rule 12, summary judgment motions have been found appropriate in habeas

10   corpus proceedings. *Blackledge v. Allison*, 431 U.S. 63, 80 (1977); *Clark v. Johnson*, 202 F.3d

11   760, 764-65 (5th Cir. 2000) ("As a general principle, Rule 56 of the Federal Rules of Civil

12   Procedure, relating to summary judgment, applies with equal force in the context of habeas

13   corpus cases.").   Nonetheless, the court is not bound in habeas proceedings to "systematically

14   apply traditional rules governing civil proceedings when to do so would be inconsistent with the

15   overriding purpose of the federal habeas corpus statute" to safeguard "individual freedom against

16   arbitrary and lawless state action."   *Brown v. Vasquez*, 952 F.2d 1164, 1169, 1166 (9th Cir.

17   1991) (internal quotation marks omitted).

18          The standard that applies to a motion for partial summary judgment in a case, also known

19   as summary adjudication, is the same as that which applies to a motion for summary judgment of

20   an entire case.   *See* Fed. R. Civ. P. 56(a); *Mora v. Chem-Tronics, Inc.*, 16 F. Supp.2d 1192, 1200

21   (S.D. Cal. 1998).   Summary adjudication of a claim is appropriate when it is demonstrated that

22   there exists "no genuine issue as to any material fact and that the movant is entitled to judgment

23   as a matter of law."   Fed. R. Civ. P. 56(c)(2).   In the special posture presented by habeas corpus

24   actions, in which the court is provided a full record of trial proceedings to review, a claim may

25   be resolved via summary adjudication where the parties do not dispute the underlying facts and

26   no additional evidence is required to resolve the claim.

B.  <u>Standards of Review Applicable to Habeas Corpus Claims</u>

Federal habeas corpus relief is not available for any claim decided on the merits in state court proceedings unless the state court's adjudication of the claim:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

Under § 2254(d)(1), a state court decision is "contrary to" clearly established United States Supreme Court precedents "if it applies a rule that contradicts the governing law set forth in [Supreme Court] cases, or if it confronts a set of facts that are materially indistinguishable from a decision" of the Supreme Court and nevertheless arrives at a different result.  *Early v. Packer*, 537 U.S. 3, 8 (2002) (internal quotation marks omitted).

Under the  "unreasonable application" clause of § 2254(d)(1), a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from the Supreme Court's decisions, but unreasonably applies that principle to the facts of the prisoner's case.  *Williams v. Taylor*, 529 U.S. 362, 413 (2000).  A federal habeas court "may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly.  Rather, that application must also be unreasonable."  *Id.* at 411; *see also Lockyer v. Andrade*, 538 U.S. 63, 75 (2003).

In determining whether the state courts have run afoul of § 2254(d), a federal court looks to the last reasoned state court decision.  *Avila v. Galaza*, 297 F.3d 911, 918 (9th Cir. 2002).  The state court is not required to cite the controlling Supreme Court precedent so long as its decision is not "contrary to" or an "unreasonable application" of that precedent.  *Early*, 537 U.S. at 8.

////

1   Where the state court has denied a petitioner's claims of error but provided no reasoning to

2   support its conclusion, the federal court must independently review the record to determine

3   whether the state court decision was objectively unreasonable.  *Himes v. Thompson,* 336 F.3d

4   848, 853 (9th Cir. 2003); *Delgado v. Lewis*, 223 F.3d 976, 982 (9th Cir. 2000).  Such

5   "[i]ndependent review of the record is not de novo review of the constitutional issue, but rather,

6   the only method by which we can determine whether a silent state court decision is objectively

7   unreasonable." *Himes*, 336 F.3d at 853.

8          Where a constitutional error is established, the Court must determine whether the error

9   was "structural" (i.e., it affected the petitioner's substantial rights) or "trial-type." *Neder v.*

10   *United States*, 527 U.S. 1, 8-9 (1999).  While structural errors, which are rare, require automatic

11   relief, trial-type errors must be reviewed to determine whether they were harmless.  *Id.*  On

12   federal habeas review, a court conducting harmless error review must determine whether the

13   state court conducted a harmless error analysis that was contrary to, or an unreasonable

14   application of, the analysis provided for by *Chapman v. California*, 386 U.S. 18, 24 (1967) and

15   (if the state court erroneously applied *Chapman* or did not reach the issue of harmlessness)

16   whether the error had a substantial and injurious effect or influence in determining the jury's

17   verdict.  *Invathong v. Lamarque*, 420 F.3d 1055, 1059-61 (9th Cir. 2005) (reconciling *Chapman*

18   harmless error standard applicable on direct review with *Brecht v. Abrahamson*, 507 U.S. 619,

19   637 (1993) harmless error standard applicable on federal habeas review).

20   C.  <u>Analysis</u>

21          I.      <u>*Claim C – Trial Counsel's Failure to Move to Sever*</u>

22          In Claim C of the Amended Petition, petitioner argues that his trial counsel rendered

23   ineffective assistance by failing to move to sever the Hedlund murder count from the counts

24   arising from the events that occurred at Sonny's Market (murder of Hicks, attempted murder of

25   Stevens, and robbery).  According to petitioner, such a motion would have been successful.

26   ////

1  Petitioner further contends that, if the counts had been severed, there is a reasonable probability

2  that he would have been acquitted of the Hedlund murder and spared from the death penalty.

3  The parties agree that this claim is amenable to resolution by summary adjudication.

4  　　　　The U.S. Supreme Court has clearly established that the Sixth Amendment right to

5  counsel is violated by counsel's ineffective assistance where:

6  　　　　　(1) counsel's performance was deficient; i.e., it fell below an objective standard
   　　　　　of reasonable competence; and
7

8  　　　　　(2) the defendant suffered prejudice from counsel's deficient performance; i.e.,
   　　　　　that "there is a reasonable probability that, but for counsel's unprofessional errors,
   　　　　　the result of the proceeding would have been different. A reasonable probability
9  　　　　　is a probability sufficient to undermine confidence in the outcome."

10 *Strickland v. Washington*, 466 U.S. 668, 687-96 (1984).  The parties agree that the California

11 Supreme Court's rejection of this claim on petitioner's direct appeal provided the last reasoned

12 state court decision and thus must be reviewed under the deferential 28 U.S.C. § 2254(d)(1)

13 rules.[2]  That court held that petitioner could not show that he was prejudiced by counsel's failure

14 to move to sever, because petitioner failed to show a reasonable probability that, had his trial

15 counsel made the motion for severance, a more favorable verdict would have resulted.  The court

16 noted that it would have been within the trial court's discretion to deny the motion and that the

17 trial court would not have abused its discretion by denying it.  More importantly, the state court

18 found that evidence of the Sonny's Market counts would have been not only admissible at, but a

19 critical part of, a separate Hedlund murder trial.  The state court noted specifically the testimony

20 of two ballistics experts which linked the gun used to murder Hicks at Sonny's Market with the

21 gun used to murder Hedlund.  Thus, the state court found, it was more than probable that much

22 of the evidence of the Sonny's Market counts, including Jerry Stevens's incriminating

23 eyewitness testimony, would have been admitted at a separate trial on the Hedlund murder to

24

25 　　　　　[2] In the remainder of this opinion, the reader may presume that the California Supreme
   Court's opinion on direct appeal provided the last reasoned decision on many the claim under
26 discussion unless otherwise noted.

prove defendant's possession of the murder weapon six days after that murder occurred. The

state court explained its reasoning as follows:

> Joinder and severance of different criminal counts against the same defendant are governed by [California Penal Code] section 954, which states that an "accusatory pleading  may charge two or more different offenses connected together in their commission . . . of the same class of crimes or offenses . . . provided, that the court in which a case is triable, in the interests of justice and for good cause shown, may in its discretion order that the different offenses or counts set forth in the accusatory pleading be tried separately or divided into two or more groups and each of said groups tried separately."  The severance provisions of section 954 reflect "an apparent legislative recognition that severance may be necessary in some cases to satisfy the overriding constitutional guaranty of due process to ensure defendants a fair trial."  (*People v. Bean* (1988) 46 Cal. 3d 919, 935 [251 Cal. Rptr. 467, 760 P.2d 996].)
>
> ***
>
> This leaves the question whether defendant suffered an impairment of his Sixth Amendment right to effective assistance of counsel due to his attorneys' failure to make a motion for severance.  To establish ineffective assistance, defendant bears the burden of showing, first, that counsel's performance was deficient, falling below an objective standard of reasonableness under prevailing professional norms.  Second, a defendant must establish that, absent counsel's error, it is reasonably probable that the verdict would have been more favorable to him.  (*Strickland v. Washington* (1984) 466 U.S. 668, 687-694 [80 L. Ed. 2d 674, 693-698, 104 S.Ct. 2052]; *People v. Ledesma* (1987) 43 Cal. 3d 171, 216-218 [233 Cal. Rptr. 404, 729 P.2d 839].)  As will appear, defendant cannot show in this instance a reasonable probability that, had trial counsel made the motion for severance, a more favorable verdict would have resulted.
>
> Defendant argues that a motion to sever, had it been made, should have been granted because the joinder of the Hedlund murder with the Sonny's Market counts unfairly prejudiced him due to the relative weakness of the evidence in the former case.  Whereas the case against him in the Sonny's Market counts was supported by the testimony of two eyewitnesses identifying defendant at the crime scene, the Hedlund murder depended, defendant contends, on relatively inconclusive circumstantial evidence – chiefly ballistics identification evidence and testimony that Hedlund and defendant left a bar at about the same time on the night of the murder.  The fact that the jury knew from the Sonny's Market crime that defendant was capable of extreme violence, he argues, would unfairly predispose it to decide the Hedlund murder count against him.
>
> "A ruling on a motion to sever is based on a weighing of the probative value of any cross-admissible evidence against the prejudicial effect of evidence the jury would not otherwise hear, but in the weighing process the beneficial results of joinder are added to the probative value side."  (*People v. Bean, supra*, 46 Cal. 3d at p. 936.)  In this case, the trial court would certainly not have abused its discretion by denying a motion to sever.  Evidence of the Sonny's Market counts would have been not only admissible at, but critical to, a separate Hedlund

murder trial.  The essentially unrebutted testimony of two ballistics experts linked the gun used to murder Hicks at Sonny's Market with the gun used to murder Hedlund six days earlier.  It was therefore more than probable that a substantial portion of the evidence of the Sonny's Market counts, including Jerry Stevens's highly incriminating eyewitness testimony, would have been admitted at a separate Hedlund murder trial to prove defendant's possession of the Hedlund murder weapon six days after that murder occurred.  (*See People v. Johnson* (1988) 47 Cal. 3d 576, 587-591 [253 Cal. Rptr. 710, 764 P.2d 1087] [separate incidents of murder and rape tried together and motion for severance denied where rape victim identified defendant as the rapist, and where a handgun and cartridges believed to be taken from the murder scene were present at the scene of the rape].)

Because much of the incriminating evidence in the Sonny's Market counts would have been used in a separate Hedlund murder trial to prove the identity of the murderer, the trial court would not have abused its discretion by refusing to grant a motion to sever had such a motion been made.  We therefore have no basis for concluding there was a reasonable probability that a motion for severance would have been granted.  Ipso facto, we cannot conclude there was a reasonable probability that counsel's request for severance would have resulted in a verdict more favorable to defendant.[2]  Defendant's ineffective assistance of counsel claim is therefore without merit.

FOOTNOTES

[2] Defendant also argues that, had the trial been severed, he might have been able to sanitize the evidence of the Sonny's Market counts to minimize the prejudice to him in the trial of the Hedlund murder.  Such a speculative claim makes defendant's post hoc argument for severance no more meritorious.  Had the trial been severed, in the Hedlund murder trial defendant would have faced serious practical problems in attempting to limit the eyewitness testimony identifying him as the one who fired the gun at Sonny's Market.  The availability of this "sanitization" argument, therefore, does not alter our conclusion that there was no reasonable probability that a motion for severance would have been granted, and therefore no reasonable probability that the making of such a motion would have affected the verdict in defendant's favor.

*Hawkins*, 10 Cal.4th at 940-41.

Petitioner argues that the above analysis was objectively unreasonable because the California Supreme Court "mischaracterized the evidence and unreasonably ignored its own prior holdings."  Pet'r's Cross-Mot. for Summ. Adj. at 7.  He takes issue with the court's statement that the ballistics evidence was "essentially unrebutted," because the defense subjected the prosecution's two ballistics experts to cross-examination which showed that bullet comparison "is not an exact science."  *Id.* at 12.  However, the defense put on no affirmative

evidence showing that the ballistics experts had incorrectly concluded that the bullets from the two crime scenes matched.  Thus, the California Supreme Court's conclusion that the ballistics evidence was "essentially unrebutted" was not unreasonable.

Petitioner also claims that the court mischaracterized Stevens' eyewitness testimony as "highly incriminating" when, in fact, it was "tainted by improper identification procedures." *Id.* Petitioner does not challenge Stevens' identification in a separate claim, but suggests in Claim I (regarding Johnson's identification) that Stevens' identification was "questionable" due, in part, to "the fact that petitioner was the only person whose face was seen in [a] photographic lineup [shown to Stevens] and again in [a] live lineup." Pet'r's Cross-Mot. for Summ. Adj. at 46. Petitioner does not allege that Stevens' identification of him was so unreliable as to deprive him of due process, however, and it was not unreasonable for the California Supreme Court to conclude that Stevens' testimony was highly incriminating despite any flaws in the identification procedures noted by the defense's identification expert.

According to petitioner, the California Supreme Court also ignored its own prior holdings in concluding that he would not have been entitled to severance, even if a motion to sever had been made.  Petitioner points out that the court focused solely on the cross-admissibility of evidence, but that prior cases also considered three other factors in determining whether a court's failure to grant a motion to sever was an abuse of discretion: (1) whether one set of counts is "unusually likely to inflame the jury against the defendant"; (2) whether "a weak case has been joined with a strong case, or with another weak case, so that the spillover effect of aggregate evidence on several charges might well alter the outcome of some or all"; and (3) "any one of the charges carries the death penalty." *Frank v. Super. Ct. (People)*, 48 Cal.3d 632, 639 (1989).

Petitioner's argument fails, however, because the California Supreme Court is the final arbiter of issues of California law, and this court must defer to its construction of its penal statutes unless that construction is untenable or a subterfuge to avoid federal review of a constitutional violation. *Aponte v. Gomez*, 993 F.2d 705, 707 (9th Cir. 1993); *see also*

14

*Wainwright v. Goode*, 464 U.S. 78, 84 (1983) ("[T]he views of the State's highest court with respect to state law are binding on the federal courts."); *Estelle v. McGuire*, 502 U.S. 62, 67-68 (1991) ("[I]t is not the province of a federal habeas court to reexamine state-court determinations on state-law questions."); *Himes*, 336 F.3d at 852.  It was therefore the province of the California Supreme Court to revise its analysis of proper joinder under California Penal Code § 954 to emphasize cross-admissibility to the exclusion of other factors, as that construction is tenable and there is no indication that it was adopted as a subterfuge to avoid federal review of a constitutional violation.[3]  Accordingly, this court must defer to the state court's conclusion that, as a matter of California law, petitioner was not entitled to severance.

Had a motion to sever been made, however, federal constitutional considerations would have impacted the trial court's severance determination in addition to the state law factors listed above.  Due process requires that separate counts be severed where a joint trial would "result in prejudice so great as to deny a defendant his Fifth Amendment right to a fair trial."  *United States v. Lane*, 474 U.S. 438, 446 n.8 (1986); *see also Bean v. Calderon*, 163 F.3d 1073, 1084 (9th Cir. 1998).  Similar to California, in evaluating whether joinder resulted in a fundamentally unfair trial under the federal Constitution (i.e., joinder had a substantial and injurious effect or influence on the verdict), "the Ninth Circuit focuses particularly on the cross-admissibility of evidence and the danger of 'spillover' from one charge to another, especially where one charge or set of charges is weaker than another."  *Davis v. Woodford*, 384 F.3d 628, 638 (9th Cir. 2003).

The California Supreme Court determined, as quoted above, that much of the evidence on the Sonny's Market counts would have been admissible in a separate Hedlund murder trial.  This court has no reason to disagree.  Indeed, the record strongly supports that conclusion.  The issue of the identity of Hedlund's killer was critical, the ballistics evidence indicated that the same

---

[3] Indeed, since petitioner's case, the California Supreme Court has clarified its analysis further, holding that only where a court determines that evidence on the counts would *not* be cross-admissible in separate trials should the court then consider additional factors in analyzing whether severance is necessary.  *People v. Soper*, 45 Cal.4th 759, 775 (2009).

1   weapon was used in both crimes, and several witnesses (Stevens, Johnson, and Gerald Hawkins)

2   testified as to petitioner's identity as the person who used that weapon at Sonny's Market.  Thus,

3   the admissibility of the evidence of the Sonny's Market charges in a separate Hedlund murder

4   trial "dispels the prejudicial impact of joining all counts in the same trial."  *Sandoval v.*

5   *Calderon*, 241 F.3d 765, 772 (9th Cir. 2000).  Moreover, because much of the evidence was

6   cross-admissible, petitioner cannot show that severance of the Hedlund count would have led to

7   a more favorable verdict on that charge.

8       Because the evidence was cross-admissible, the court need not consider the "danger of

9   spillover. " *United States v. Johnson*, 820 F.2d 1065, 1071 (9th Cir. 1987) (instructing that,

10  where evidence is *not* cross-admissible, a fair trial may still be had where "the jury can

11  reasonably be expected to compartmentalize the evidence so that evidence of one crime does not

12  taint the jury's consideration of another crime.").  Even considering this factor, however, the trial

13  court would not have run afoul of the Constitution by denying a motion to sever.  While some

14  danger of "spillover" is inherent in any joint trial, such danger does not arise to constitutional

15  magnitude where the charges are roughly similar in strength, the trial court provides an

16  appropriate instruction regarding the jury's consideration of the evidence of each charge, and the

17  evidence is distinct and straightforward.  *Davis*, 384 F.3d at 639; *Johnson*, 820 F.2d at 1071.

18      Here, the evidence on the Hedlund murder charge and the Sonny's Market charges was

19  not disproportionate.  On the Sonny's Market charges, the evidence consisted of the eyewitness

20  testimonies of Stevens and Johnson, Gerald Hawkins's testimony that his brother had admitted to

21  him that he killed a black man and shot a clerk while robbing a store, the parties' stipulation that

22  petitioner received a traffic citation while using a false identification in Sacramento in the early

23  morning before the Sonny's Market crimes, and the ballistics testimony which indicated that the

24  same gun used to kill Hedlund had been used to kill Hicks.  On the Hedlund charge, the evidence

25  consisted of the testimony of Jill Gibbs that petitioner was that last person seen interacting with

26  Hedlund on the night of the murder and left the bar within minutes of Hedlund, the testimony of

Connie Sue Trottie that petitioner had played pool with Hedlund in the bar that night, evidence that Hedlund was found wrapped in a horse blanket with horse and bird matter on it and petitioner had been staying at a horse ranch whose owner raised birds, the ballistics testimony that the same gun used to kill Hedlund had been used to kill Hicks, and the testimonies of Stevens, Johnson, and Gerald Hawkins indicating that it was petitioner who used that gun to kill Hicks. Despite petitioner's efforts to argue that the evidence on the Hedlund charge was much weaker than that on the Sonny's Market charges, the court concludes that the evidence was roughly similar in strength, especially given the admissibility of evidence from the Sonny's Market counts identifying petitioner as possessing the gun used to kill Hedlund one week after his death.

In addition, the trial court further limited the prejudicial impact of joinder by instructing the jury: "Each count charges a distinct offense. You must decide each count separately. The defendant may, of course, be found not guilty or guilty of any or all of the offenses charged." RT 5029; *Davis*, 384 F.3d at 639 (finding that any prejudice from joinder was limited by an instruction to the jury to consider each count separately); *Johnson*, 820 F.2d at 1071 (same). The prosecution presented the evidence on each set of counts separately, for the most part.[4] While the evidence with regard to the two sets of counts was somewhat interwoven on the issue of identity through the ballistics evidence, it was relatively straightforward and simple and thus the jury could reasonably be expected to compartmentalize it. *Davis*, 384 F.3d at 639 (finding joinder proper, in part, because the evidence on each crime was simple and distinct); *Johnson*, 820 F.2d at 1071 (same).

Thus, joinder of the Hedlund murder count with the Sonny's Market counts was proper both under California law and the federal Constitution. Accordingly, the California Supreme

---

[4] The prosecution presented the evidence regarding the Sonny's Market crimes sandwiched between evidence on the Hedlund murder, apparently as a result of scheduling concerns.

1    Court's conclusion that petitioner has not shown a reasonable probability that, had the motion

2    been made, severance would have been granted and he would have been acquitted of the

3    Hedlund murder charge and spared the death penalty was not contrary to, or an unreasonable

4    application of, the *Strickland* test.  Rather, that court reasonably concluded that petitioner had

5    not shown that he was prejudiced by counsel's decision not to move to sever the counts, and

6    summary adjudication of Claim C should be granted in favor of respondent.

7         ii.    *Claim D – Jury Instructions Regarding the Use of Sonny's Market Evidence*
                 *in Deciding Guilt for Hedlund Murder*
8

9         In Claim D of the Amended Petition, petitioner raises four related claims of error.  First,

10   he contends that the trial court rendered his trial fundamentally unfair by failing to give an

11   instruction limiting the jury's use of evidence of the Sonny's Market charges in determining his

12   guilt on the Hedlund murder charge.  Second, he contends that the trial court further violated his

13   constitutional rights by providing a misleading instruction to the jury concerning its use of the

14   evidence of the Sonny's Market counts in determining guilt on the Hedlund charge.  These

15   claims rest on petitioner's assertion that the federal Constitution prohibits use of evidence of

16   criminal propensity to show guilt.  Pet'r's Cross-Mot. for Summ. Adj. at 18.  Third, he contends

17   that trial counsel was ineffective for failing to request such an instruction.  Fourth, he contends

18   that trial counsel was ineffective for failing to object to the allegedly misleading instruction.  The

19   parties agree that this issue should be summarily adjudicated on the record.

20        The Court will address first the claims of trial court error.  On this issue, the court has

21   had some difficulty identifying the relevant clearly established federal law governing petitioner's

22   claims.  Petitioner has cited *Michelson v. United States*, 335 U.S. 469 (1948), Federal Rule of

23   Evidence 404(b), and *Old Chief v. United States*, 519 U.S. 172 (1997).  These authorities,

24   however, do not hold that a jury's consideration of evidence to show criminal propensity (or a

25   trial court's failure to limit such consideration) violates the Constitution or some other federal

26   law binding on the states, but instead are concerned solely with federal evidentiary law, which is

1   not binding on the states and is therefore not a proper source of federal habeas relief.  *Middleton*

2   *v. Cupp*, 768 F.2d 1083, 1085 (9th Cir. 1985) ("A writ of habeas corpus is available under 28

3   U.S.C. § 2254(a) only on the basis of some transgression of federal law binding on the state

4   courts.").  Petitioner also cites *Montana v. Egelhoff*, 518 U.S. 37 (1996).  *Egelhoff* is equally

5   inapplicable – the case did not address the constitutional implications of criminal propensity

6   evidence but rather whether a state could permissibly limit a jury's consideration of voluntary

7   intoxication evidence to negate mens rea.  Lastly, petitioner cites *Garceau v. Woodford*, 275

8   F.3d 769, 782 (9th Cir. 2001) (O'Scannlain, J., concurring).  *Garceau*, as a Circuit Court

9   decision (applying pre-AEDPA law), is not clearly established federal law for purposes of

10  federal habeas review.

11        The court's own research has revealed that, in fact, there is no clearly established federal

12  law holding that the use of evidence to show criminal propensity violates the Constitution.  The

13  U.S. Supreme Court has reserved the issue, and the Ninth Circuit has consequently and squarely

14  held that no clearly established federal law exists on the issue.  *Estelle v. McGuire*, 502 U.S. at

15  75 n.5 ("[W]e express no opinion on whether a state law would violate the Due Process Clause if

16  it permitted the use of 'prior crimes' evidence to show propensity to commit a charged crime.");

17  *Mejia v. Garcia*, 534 F.3d 1036, 1046 (9th Cir. 2008) (holding that "admission of the propensity

18  evidence was not contrary to clearly established law"); *Alberni v. McDaniel*, 458 F.3d 860, 863-

19  67 (9th Cir. 2006) (same).  The California Supreme Court denied petitioner's claims that the trial

20  court erred by failing to sua sponte provide a limiting instruction and that the trial court's

21  instruction regarding the use of the evidence on the Sonny's Market counts allowed the jury to

22  impermissibly use that evidence as evidence of petitioner's criminal propensity.[5]  As no clearly

23

24        [5] The court reasoned:

25        Defendant also contends that the trial court failed in its duty to provide sua sponte
          an instruction limiting the jury's consideration of the Sonny's Market crimes in
          deciding the Hedlund murder.  But we have held that the trial court has no such
26        duty to provide limiting instructions regarding evidence of past criminal conduct,
          either of uncharged criminal activity or of prior convictions.  (*People v. Milner*

1    established federal law provides to the contrary, petitioner is not entitled to federal habeas relief

2    on these claims.

3         On petitioner's claims that counsel rendered ineffective assistance by failing to request a

4    limiting instruction on the use of the evidence of the Sonny's Market counts to determine guilt

5    on the Hedlund charge, the California Supreme Court correctly identified the governing

6    _____

7    (1988) 45 Cal. 3d 227, 251-252 [246 Cal. Rptr. 713, 753 P.2d 669].)  Similarly,
     the trial court does not have the sua sponte duty to furnish a limiting instruction
8    on cross-admissible evidence in a trial of multiple crimes.

9    ***

10   Defendant further faults the trial court for failing to adequately respond to an
     inquiry from the jury regarding the use of the evidence in the Sonny's Market
11   counts in deciding the Hedlund murder count.  After the jury had found the
     defendant guilty on the Sonny's Market counts, but had not yet resolved the
12   Hedlund murder count, the jury made the following written request to the court:
     "We, the jury in the above entitled action, request the following:  One juror needs
13   to know if we can consider evidence from Counts 1, 2, 3 in with the evidence
     from Count # 4. . . . [P]  This is in regards to our Count 4 decision. [P]  This juror
14   heard the judge admonish us that we were now to forget Counts 1, 2, 3."

15   In open court, and in the presence of counsel, the trial judge responded to the
     jury's inquiry as follows: "Very simple to answer in words of one syllable. You
16   may consider all evidence that you had on the case on any consideration. I pulled
     yesterday's proceedings to see what it was that sounded like I was telling you to
17   forget it, and the only thing I come to is this . . ., whereafter having taken verdicts
     that you completed as to three counts, I said: [P] 'Very well. Those three verdicts
18   have been read into the record . . . . We had those verdicts, and you needn't give
     those matters . . . further consideration.' [P] So I said you need not give them
19   further consideration.  I simply meant we took the forms off your hands relieving
     [the jury  foreman's] concern about security of forms.  That in no sense restricts
     you.  I am not trying to carve out anything of evidence that you are no longer to
     consider.  The evidence is all before you for whatever singular or cumulative,
     direct or circumstantial value it may have."

20   The trial court's statement is, understood in its proper context, correct.  The
     statement was intended to correct the specific misapprehension of one of the
21   jurors, who believed he had heard the judge admonish the jurors "to forget about
     counts one, two and three."  Since, as discussed above, there was evidence
22   presented in the first three counts relevant to the Hedlund murder, it was proper to
     instruct the jury that such relevant evidence was appropriately considered.

23   Defendant contends that the trial court's comments were overbroad and could
     have misled the jury to believe that it could use the fact of his culpability for the
24   Sonny's Market counts as character evidence in deciding the Hedlund murder
     count.  We disagree that the trial court's remarks, taken in context, were
25   susceptible to this misunderstanding.  Further, defendant's failure to request a
     clarification of the trial court's statement waives the issue on appeal. (*See People
     v. Terry* (1970) 2 Cal. 3d 362, 398 [85 Cal. Rptr. 409, 466 P.2d 961].)

26   *Hawkins*, 10 Cal.4th at 942-43.

20

1    *Strickland* standard.  The court held that counsel did not render deficient performance in failing

2    to request the instruction, because "[a] reasonable defense counsel may have concluded that the

3    risks of issuing a limiting instruction – the risk, for example, that such an instruction may

4    suggest to the jury that the evidence supporting the Sonny's Market counts was relatively strong

5    – was not worth the questionable benefits such instruction would provide." *Hawkins*, 10 Cal.4th

6    at 942.  That holding is not contrary to, nor an unreasonable application of, *Strickland.*  As the

7    Ninth Circuit has recognized, generally "the decision not to request a limiting instruction is

8    solidly within the acceptable range of strategic tactics employed by trial lawyers in the

9    mitigation of damning evidence." *Musladin v. Lamarque*, 555 F.3d 830, 846 (9th Cir. 2009)

10   (internal quotation marks omitted).  While it may be deficient performance not to request a

11   limiting instruction where the prosecution has drawn attention to the damning evidence and

12   invited the jury to consider it for an improper purpose, petitioner has not alleged that such

13   circumstances occurred in this case, and the court's review of the prosecutor's closing argument

14   reveals that he did not invite the jury to use the evidence on the Sonny's Market counts to show

15   that petitioner had the criminal propensity to murder Hedlund.

16           The California Supreme Court also denied petitioner's remaining claim that counsel

17   rendered ineffective assistance by failing to object to the trial court's answer to the jury's

18   question regarding the use of the evidence on the Sonny's Market crimes in determining guilt on

19   the Hedlund charge.  As summarized by the California Supreme Court and quoted in footnote

20   five, *infra*, the jury indicated to the court that a single juror was under the impression that,

21   having turned in the verdict forms on the Sonny's Market counts, the jury was no longer to

22   consider the evidence presented regarding those counts.  The trial court clarified that it had not

23   intended, by telling the jury that it need not consider the Sonny's Market counts any further, to

24   limit the jury's consideration of evidence in determining petitioner's guilt on the Hedlund

25   charge.  The court stated:  "You may consider all evidence that you had on the case on any

26   consideration. . . .  The evidence is all before you for whatever singular or cumulative, direct or

1   circumstantial value it may have." RT 5075.  The California Supreme Court found no

2   ineffective assistance, implicitly concluding that counsel had not been deficient and/or that

3   petitioner had not been prejudiced by counsel's failure to object:  "[B]ecause the trial court's

4   comment to the jury was reasonably clear, counsel's failure to request such clarification does not

5   constitute ineffective assistance." *Id.* at 943.  This court agrees.  While the trial court's answer

6   to the jury's question, when viewed in isolation, could be construed as allowing the jury to

7   consider the evidence on the Sonny's Market charges as evidence of petitioner's criminal

8   propensity, it is clear from the context of the jury's question that the trial court was simply

9   correcting one juror's misunderstanding that the evidence on the Sonny's Market charges should

10   not be considered *at all* with respect to the Hedlund charge.  As the California Supreme Court

11   noted, much of that evidence was relevant and essential to the Hedlund murder case against

12   petitioner and was properly considered on that charge on the issue of petitioner's identity as

13   Hedlund's killer, and the trial court properly instructed the jury not to limit its consideration of

14   it.  There is no indication from the jury's question that it was concerned with whether it could

15   consider the Sonny's Market evidence as criminal propensity evidence, and no suggestion was

16   made to the jury that it use the evidence for that purpose.  It is therefore not reasonably probable

17   that the jury understood the trial court's answer as an instruction to consider the Sonny's Market

18   evidence to show criminal propensity, that the jury actually used the evidence for that purpose,

19   and that such improper use of the evidence convinced it to convict petitioner on the Hedlund

20   charge when it would otherwise have acquitted him.  Accordingly, the California Supreme

21   Court's conclusion that petitioner's counsel's failure to object to the trial court's answer did not

22   amount to ineffective assistance of counsel was not contrary to, nor an unreasonable application

23   of, *Strickland*.

24        For the foregoing reasons, petitioner is not entitled to relief on Claim D, and summary

25   adjudication of this claim should be granted in favor of respondent.

26   ////

iii.  *Claim E – Placement of Petitioner in a Security Chair*

In Claim E of the Amended Petition, petitioner claims that he was improperly shackled in the presence of the jury in violation of his due process rights. The parties agree to summary adjudication of this claim.

On January 24, 1989, when the parties appeared for trial prior to jury selection, the bailiff informed the court of his wish to restrain petitioner in a security chair during trial pursuant to the Sacramento County Sheriff's policy of restraining all defendants in capital cases.  RT 1018-19. The court responded that it would require a showing of need before allowing the restraint.  RT 1019-20.  Three days later, Sacramento County Sheriff's Department Sergeant Beers appeared and testified that, due to petitioner's "assaultive behavior" in the county jail, as well as his history of assaulting peace officers while resisting arrest, it was Beers's opinion that courtroom security required either the use of the security chair or the assignment of an additional escort officer to petitioner (for a total of two officers).  RT 1062-63, 1067-72.  He submitted evidence of four rules violations committed by petitioner while in the jail – three fistfights with other inmates and one for having a syringe in his cell.  RT 1076-77.  On cross-examination, Sergeant Beers conceded that it was the Sheriff's Department's general policy to restrain all capital defendants in security chairs.  RT 1074.  He did not know whether petitioner had actually ever disrupted any prior court proceeding.  RT 1074-76.  His request was based equally on the department's policy and petitioner's "specific criminal history" and confinement history in the jail.  RT 1076.

The chair worked to restrain its occupant through a concealed waist chain attached to the chair, leaving the hands and feet free to move.  RT 1099-1100.  The chair was identical to the others in the courtroom except for a flap in the back, which hid the waist chain.  *Id.*  Petitioner's counsel stipulated that the restraint was not visible to the jury.  RT 1069.

After taking the matter under submission, the trial court relied on the three fistfights in granting the sheriff's request:

> [I]t's for those rather recent expressions of short fuse that I'm constrained to bend over in favor of the Sheriff's request.  I think I can probably justify either direction I went right at the moment, and absent further showing I am going to elect, at the Sheriff's specific request, the relatively unobtrusive and unnoticeable sanction of the security chair.

RT 1098.  The court indicated its willingness to reconsider its ruling at a later time.  RT 1098-99.

The defense apparently chose not to revisit the issue, and petitioner was placed in the security

chair for the remainder of trial proceedings.

Petitioner relies on *Illinois v. Allen*, 397 U.S. 337, 344 (1970), *Holbrook v. Flynn*, 475

U.S. 560, 568 (1986), *Spain v. Rushen*, 883 F.2d 712 (9th Cir. 1989), and *Deck v. Missouri*, 544

U.S. 622 (2005) in asserting that, "[i]n the absence of exceptional circumstances, a defendant in

a criminal case has a right to be free from physical restraint and that right is an essential

component of a fair and impartial trial."  Pet'r's Cross-Mot. for Summ. Adj. at 21.  *Spain,* as a

Circuit Court opinion pre-dating AEDPA, has limited utility in determining petitioner's claim as

it does not constitute clearly established federal law for purposes of AEDPA.  Furthermore,

*Spain* is highly distinguishable from the instant case in that the defendant there

> was subjected to maximum restraints: he wore leg irons, a waist chain to which each hand was bound by individual chains about eight inches long, and chains that apparently held him to his chair.  Moreover the shackles were conspicuous; the jury was able to appreciate the full extent of the chaining.

*Spain*, 883 F.2d at 722.  Accordingly,  *Spain* does not support petitioner's claim for relief.

The court next addresses the Supreme Court authorities cited by petitioner.  *Deck*, which

was decided after petitioner's conviction became final (indeed, after all his state proceedings had

ended), also cannot be the basis of habeas relief for petitioner, as it was not clearly established

federal law at the time the state court's rendered their decisions in his case.  *Wiggins v. Smith*,

539 U.S. 510, 520 (2003) (noting that, on habeas review, the court must look to the law that was

clearly established at the time of the state court's decision); *Williams v. Taylor*, 529 U.S. at 390

(stating that review under AEDPA looks to law that was clearly established at the time the

petitioner's state court conviction became final); *Libberton v. Ryan*, 583 F.3d 1147, 1161 (9th

1  Cir. 2009) (same).

2         However, while not controlling of the outcome of petitioner's claim, *Deck* is instructive

3  on what was clearly established by prior Supreme Court cases.  In *Deck*, petitioner Carman Deck

4  challenged his placement in leg irons, handcuffs, and a belly chain during the penalty phase of

5  his capital trial on due process grounds.  544 U.S. at 625.  The Court stated that "[t]he law has

6  long forbidden routine use of visible shackles during the guilt phase; it permits the State to

7  shackle a criminal defendant only in the presence of a special need," citing Blackstone's

8  Commentaries on the Laws of England and other 18th century authorities along with multiple

9  state court opinions from the 19th and 20th centuries.  *Id.* at 626-27.  As a matter of federal

10  constitutional law, the Court noted that it had, in the past, "suggested that a version of this rule

11  forms part of the Fifth and Fourteenth Amendments' due process guarantee."  *Id.* at 627.  The

12  Court then discussed the authorities relied on by petitioner here, *Allen* and *Holbrook*, as well as

13  *Estelle v. Williams*, 425 U.S. 501 (1976).

14         In *Allen*, "[t]he Court wrote that 'binding and gagging might possibly be the fairest and

15  most reasonable way to handle' such a[n unusually obstreperous] defendant," but that

16  contemplation of binding and gagging "'arouses a feeling that no person should be tried while

17  shackled and gagged except as a last resort.'"  *Id.* at 627-28 (quoting *Allen*, 397 U.S. at 344).  In

18  *Holbrook*, the Court upheld a special courtroom security arrangement that placed four uniformed

19  security guards in the first row of the spectator section, "stating that the deployment of security

20  personnel during trial is not 'the sort of inherently prejudicial practice that, like shackling,

21  should be permitted only where justified by an essential state interest specific to each trial.'"  *Id.*

22  at 628 (quoting *Holbrook*, 475 U.S. at 568-69).  In *Estelle*, the Court held that forcing a

23  defendant to appear at trial in identifiable prison garb "poses such a threat to the 'fairness of the

24  factfinding process' that it must be justified by an 'essential state policy.'"  *Id.* (quoting *Estelle*,

25  425 U.S. at 503).  According to the Court in *Deck*, these authorities

26  ////

1
2
3
4
5

> gave voice to a principle deeply embedded in the law.  We now conclude that those statements identify a basic element of the 'due process of the law' protected by the Federal Constitution.  Thus, the Fifth and Fourteenth Amendments prohibit the use of physical restraints *visible to the jury* absent a trial court determination, in the exercise of its discretion, that they are justified by a state interest specific to a particular trial.  Such a determination may of course take into account the factors that courts have traditionally relied on in gauging the potential security problems and the risk of escape at trial.

6    *Id.* at 629 (emphasis added).  Thus, while the Court, prior to *Deck*, had suggested in dicta that

7    shackling may, in some instances, run afoul of due process, the Court did not expressly so hold

8    until *Deck*.  Accordingly, the California Supreme Court's decision that petitioner's shackling in

9    the security chair was not unlawful was not contrary to or an unreasonable application of any

10   clearly established federal law existing at the time of his conviction or state court review.

11   However, this court does not rely on that basis alone.  Even if this court were to find that the pre-

12   *Deck* cases clearly established that shackling may violate a defendant's due process rights, the

13   shackling that occurred in this case did not violate the Constitution.

14        In *Allen*, the Court recognized three consequences of shackling that caused it concern: (1)

15   the possibility "that the sight of shackles and gags might have a significant effect on the jury's

16   feelings about the defendant"; (2) that binding and gagging a defendant is "something of an

17   affront" to the dignity and decorum of the trial; and (3) the possibility that restraining a

18   defendant could affect his ability to communicate with his counsel.  397 U.S. at 344.  In

19   subsequent cases, the Court reiterated its concern regarding those three factors.  *Estelle*, 425 U.S.

20   at 503-05 (stating that a jury's view of a defendant in shackles may impair their ability to

21   presume his innocence); *Holbrook*, 475 U.S. at 567-569 (holding that, while the presumption of

22   innocence is central to a fair trial, not "every practice tending to single out the accused from

23   everyone else in the courtroom must be struck down."); *see also Deck*, 544 U.S. at 630-32

24   (basing the conclusion that shackling may violate due process in part on the three factors

25   enunciated in *Allen*, with the additional consideration that shackling may impede the defendant's

26   ability to participate in his own defense in ways other than impairing his communication with

1  counsel).

2    In this case, the trial court found, and defense counsel stipulated, that the waist chain

3  attaching petitioner to the security chair was not visible to the jury.  While petitioner now argues

4  that "the jury would undoubtedly realize he was shackled" because the chain prevented him from

5  rising when everyone in the courtroom was instructed to rise, the court disagrees that the jury

6  would necessarily infer that petitioner was shackled.  Rather, there is a wider range of inferences

7  that a juror could reasonably draw from petitioner's failure to rise with the rest of the courtroom,

8  such as disability or a belief that the defendant is not required to rise.  *See Holbrook*, 475 U.S. at

9  568-69 (holding that deployment of uniformed security personnel at trial was not an inherently

10  prejudicial practice because jurors would not necessarily infer from their use that the defendant

11  was particularly dangerous or culpable).  Or, the jury may not have thought anything at all of

12  defendant remaining seated.  *See id.*  The jury similarly could have drawn multiple, non-

13  prejudicial inferences from defense counsel's own request for a recess so that petitioner's jacket

14  could be removed to show his tattoos without exposing the jury to the waist chain (a request

15  designed to *prevent* any prejudice to petitioner by preventing the jury from seeing the chain).

16  RT 4674-75.  Indeed, on other occasions during trial, petitioner stood at counsel's requests

17  without any recess (apparently having been released from the constraint prior to the jury's entry

18  into the courtroom).  *E.g.*, RT 3807, 4790-91.  The impact of petitioner's restraint on the dignity

19  and decorum of the trial was also limited by the concealment of the shackles.

20    As for the impact of the waist chain on petitioner's ability to communicate with counsel

21  and otherwise participate in his defense, petitioner conclusorily states that the restraint affected

22  "his appearance, mental capacity, and communication with counsel" and "embarrassed,

23  distracted and frustrated him," but describes no specific examples nor provides record citations

24  showing how the security chair prevented him from speaking with his lawyer or participating in

25  his defense.  The trial court found that the restraints left petitioner's hands and feet free to move.

26  ////

1    Accordingly, the court concludes that the invisible, or nearly so, shackling employed in this case

2    is not the type of inherently prejudicial practice, like visible binding and gagging, which requires

3    a finding that the practice furthers an essential state policy.

4         Furthermore, even if the concealed shackling that occurred here were considered

5    "inherently prejudicial" under the Supreme Court's precedents, which this court doubts, it was

6    justified by the trial court's findings regarding courtroom security, which is an essential state

7    policy.  *Deck*, 544 U.S. at 624 (stating that courtroom security is an essential state interest); *see*

8    *Estelle*, 425 U.S. at 505 (stating that physical restraints may serve an essential state policy, such

9    as the need to control contumacious defendants).  The trial court held a hearing on the necessity

10   of the security chair, at which Sergeant Beers testified about several incidents of violent behavior

11   by petitioner while housed in the jail and submitted corroborating incident reports.  RT 1062-65,

12   1071-72, 1076-77, 1097-1100.  The trial court concluded that, due to those "recent expressions

13   of short fuse," the security chair was warranted.  RT 1098.  The California Supreme Court, in

14   upholding that finding based on California cases (which require a showing of manifest need for

15   restraints), stated:

16        [D]efendant's three reported fistfights in prison, together with his extensive
          criminal history, are sufficient to support the trial court's order to shackle
17        defendant, inasmuch as they demonstrate instances of violence or nonconforming
          conduct while in custody.  The trial court was therefore within its discretion to
18        order the shackling of defendant.

19        Defendant argues that three fistfights in jail after being housed there for one and
          one-half years is not unusual and was insufficient to justify the shackling.  He
20        claims rather that shackling is justified only when a defendant has attempted to
          disrupt courtroom proceedings or to escape from jail, citing as example *People v.*
21        *Stankewitz* (1990) 51 Cal. 3d 72, 95-96 [270 Cal. Rptr. 817, 793 P.2d 23].  We
          have never placed such preconditions on the trial court's exercise of its discretion.
22        When, as in this case, there were multiple instances of violent and nonconforming
          behavior while in jail, as well as an extensive background of criminal and violent
23        activity, we will generally not second-guess the trial court's decision to restrain a
          defendant.
24

25   *Hawkins*, 10 Cal.4th at 944 (internal quotation marks omitted).  That conclusion is not contrary

26   to the U.S. Supreme Court cases discussed above, which emphasize the need to allow trial courts

discretion to address the particular concerns presented by each case. *Deck*, 544 U.S. at 632 ("We do not underestimate the need . . . to give trial courts latitude in making individualized security determinations."); *Allen*, 397 U.S. at 343 ("[T]rial judges confronted with disruptive, contumacious, stubbornly defiant defendants must be given sufficient discretion to meet the circumstances of each case."). Given the trial court's express finding that the restraint of petitioner in the security chair was warranted by petitioner's violence while in custody, the California Supreme Court's upholding of petitioner's restraint was in line with U.S. Supreme Court authority. *See Deck*, 544 U.S. at 632 & 634-35 (stating that due process requires a trial court to consider the circumstances of the particular case before requiring a defendant to be tried in visible shackles).

The court further rejects petitioner's claim that shackling may not be employed where there is a less restrictive alternative (here, employment of two courtroom security personnel rather than one). No U.S. Supreme Court case holds that due process is violated where concealed shackling is used in spite of a less restrictive alternative. While the Court in *Allen* stated that contemplation of the complete binding and gagging of a defendant "arouses a feeling that no person should be tried while shackled and gagged except as a last resort," that statement does not control here, as it was dicta and concerned visible binding and gagging, a technique not employed in this case. Additionally, as respondent notes, the Court subsequently indicated that trial courts were not required to employ the least prejudicial method for maintaining security. *Holbrook*, 475 U.S. at 572 ("[O]ur task here is not to determine whether it might have been feasible for the State to have employed less conspicuous security measures in the courtroom.") Indeed, in *Deck*, the Court did not impose a "least restrictive alternative" requirement on trial courts, but merely held that, to impose visible shackles, a trial court must make defendant-specific findings of an essential state interest justifying their use. *Deck*, 544 U.S. at 624.

Petitioner argues that trial counsel rendered ineffective assistance by failing to argue that the use of two bailiffs was a less restrictive alternative to the security chair and also by

stipulating that the shackling was not visible to the jury.  According to petitioner, "[r]easonably competent counsel would have realized that the security chair would severely restrict petitioner's movements and leave jurors with the impression that petitioner was shackled."  Pet'r's Cross-Mot. for Summ. Adj. at 26-27 n.3.  Because the court has concluded that the law did not require the trial court to impose the least restrictive method for maintaining courtroom security, petitioner's trial counsel did not render deficient performance in declining to so argue.  *See Juan H. v. Allen*, 408 F.3d 1262, 1273 (9th Cir. 2005) (stating that counsel is not ineffective for failing to raise a meritless objection).  And because the court has concluded that the jury could make a number of reasonable, non-prejudicial inferences from his failure to rise along with others in the courtroom, he cannot show that, had counsel refused to stipulate to the non-visibility of the restraint, he would have obtained a more favorable result in his trial.

In sum, in upholding the trial court's decision to impose a concealed restraint on petitioner during his trial, the California Supreme Court did not contradict, nor unreasonably apply, clearly established federal law.  And because his counsel was not ineffective for failing to argue for the use of a less restrictive alternative to the restraint or for stipulating that the restraint was not visible to the jury, summary adjudication of petitioner's Claim E must be granted in favor of respondent.

  iv. *Claim F – Denial of Petitioner's Motion to Continue*

 In Claim F of the Amended Petition, petitioner asserts that the trial court violated his due process rights by refusing to extend a continuance to allow certain visible injuries petitioner had incurred to heal.  The parties agree to summary adjudication of the claim.

Claim F arises from events that occurred during jury selection in Spring 1989.  The California Supreme Court summarized the relevant facts as follows:

> On February 27, 1989, during the jury selection process, defendant appeared in court with numerous abrasions and bruises on his face, and with a swollen and bandaged right eye.  Apparently, he had gotten into a fight with prison guards the previous day after consuming unlawfully obtained alcohol, stopping up a toilet, and refusing to vacate his cell after the guards ordered him to do so.  He requested

a continuance on the grounds that cuts and abrasions on his face, obviously the result of a fight, would dispose the prospective jurors to view him as prone to violence.  The trial court granted a two-day continuance.  After the two days, defendant requested an additional one-week continuance.  The trial court noted that the cuts and abrasions on defendant's face were hardly noticeable, except for his blackened right eye, which was showing a greater sign of discoloration than previously.  The court also informed counsel that it would admonish the jury to disregard the black eye if so requested, and that it was less inclined to grant the additional continuance because defendant's injuries were apparently the result of his own provocation.

*Hawkins,* 10 Cal.4th at 944-45.  Defense counsel declined the offer.  RT 2707-11.

Counsel then informed the court that petitioner wished to waive his presence for the following day of jury selection so that a new panel of jurors would not see his injuries and because he had incurred bruised ribs that made him uncomfortable.  RT 2926-34.  The trial court granted petitioner's request to waive his presence, and jury selection went forward in his absence on March 3, 1989.  CT 192.  Petitioner now claims that he was forced to waive his presence by the trial court's erroneous refusal to extend the continuance, and that he was thereby deprived of his due process right to be present at trial.  While petitioner casts his claim as a violation of his right to be present at trial, the claim rests preliminarily on his assertion that the trial court improperly denied his request for an additional continuance.  If petitioner was not entitled to a continuance, his decision to waive his presence for one day of jury selection was not "forced," but rather his own tactical election.

It is clearly established federal law that, where a petitioner claims that the trial court's denial of his request for a continuance compromised his constitutional rights, a federal habeas court will grant the petition only where the denial of the motion constituted "an unreasoning and arbitrary 'insistence upon expeditiousness in the face of a justifiable request for delay.'" *Morris v. Slappy*, 461 U.S. 1, 11-12 (1983) (quoting *Ungar v. Sarafite*, 376 U.S. 575, 589 (1964)).

There are no mechanical tests for deciding when a denial of a continuance is so arbitrary as to violate due process. The answer must be found in the circumstances present in every case, particularly in the reasons presented to the trial judge at the time the request is denied.

*Ungar*, 376 U.S. at 589.  In rejecting Claim F, the California Supreme Court reasoned:

> "The granting or denial of a continuance during trial traditionally rests within the sound discretion of the trial judge." (*People v. Howard* (1992) 1 Cal. 4th 1132, 1171 [5 Cal. Rptr. 2d 268, 824 P.2d 1315].)  Here, the trial court determined that defendant's appearance would not likely result in prejudice and that whatever prejudice might occur would be curable through admonition.  The trial court also implicitly determined that the minor detriment to defendant in appearing before the jury panel was outweighed in this instance by the need to proceed expeditiously with his trial.  We cannot say the trial court abused its discretion by denying the second motion for a continuance.  Nor is defendant able to demonstrate that, had the one-week continuance been granted, there is a reasonable probability that the outcome of the trial would have been more favorable to him.[3]  We further find that none of defendant's federal constitutional rights were violated from this failure to grant the continuance.
>
> FOOTNOTES
>
> [3] Defendant raises on appeal for the first time that he was deprived of due process because he was placed on medication, presumably in connection with the injuries resulting from the incident discussed above, and the effects of the medication may have impaired his ability to assist in his own defense. At trial, there was only a passing reference by defense counsel to the fact that defendant was on medication. There is no evidence in the record before us that the medication was used throughout the trial, or that it actually impaired defendant's ability to think or concentrate. Therefore, inasmuch as defendant seeks to base his claim of error for failing to grant his second request for a continuance on the fact that he was medicated and unable to function at the time the continuance was requested, we must reject the claim as without evidentiary basis.

*Hawkins*, 10 Cal.4th at 945.  In finding that none of petitioner's federal constitutional rights were violated by the trial court's denial of his second request for a continuance, the California Supreme Court implicitly found that the denial was not an unreasoning and arbitrary insistence on expeditiousness in the face of a justifiable request for delay.  This court agrees.  Petitioner's injuries were the result of his own refusal to obey the justified demands of jail security officers and, as described by his own counsel, *see* RT 2699, 2934, were not so serious that they would impair his ability to participate in his defense to any meaningful degree.  The trial court reasonably concluded that any prejudice in the eyes of the jurors could be cured, and petitioner cannot now complain of his attorney's reasoned tactical decision to decline a curative comment.  The trial court thus provided a reasonable explanation for its denial of the motion to continue, and petitioner's request for delay was less than entirely justifiable, as he himself created the

1    situation through his misconduct.  Accordingly, the California Supreme Court's denial of

2    petitioner's Claim F was not contrary to, nor an unreasonable application of, clearly established

3    federal law, and summary adjudication of the claim should be granted in favor of respondent.

4           v.      *Claim G – Denial of Petitioner's For-Cause Challenges to Two Prospective*
                    *Jurors*
5

6           In Claim G of the Amended Petition, petitioner alleges that the trial court deprived him of

7    due process and his right to an impartial jury when it denied his for-cause challenges to two

8    prospective jurors.  The parties agree to summary adjudication of Claim G.

9           According to petitioner, the trial court should have granted his for-cause challenges to

10   prospective jurors Deanna Major and Jeffrey Smith.  Major stated during voir dire that her best

11   friend had been shot during a robbery and suffered extensive brain damage and that another

12   friend had been raped.  Clerk's Supplemental Transcript on Appeal (hereinafter "CT Supp.")

13   487; RT 1717-1719.  She expressed doubt in her ability to be objective toward petitioner due to

14   her friends' experiences.  RT 1737-39.  Major made further statements suggesting that she may

15   not be able to follow the law with regard to certain defenses, mitigation factors, and defendant's

16   election not to testify, and expressed a pro-law enforcement bias.  CT Supp. 488-94; RT 1715-

17   28, 1742.  Smith expressed some pro-prosecution bias and disdain for mitigating factors.  RT

18   3292-3316.

19          Defense counsel challenged both Major and Smith for cause; the trial court denied both

20   challenges.  RT 1755; 3319-20.  Petitioner used one peremptory challenge to excuse Major.  RT

21   1838.  As it was seated when the defense had used 19 of its 20 peremptory challenges, the jury

22   did not include Smith, who remained in the pool of prospective jurors to be called as seated

23   jurors were excused.  The seated jury did include Ronald Creighton, a juror who the defense

24   viewed as "unfavorable," but was forced to accept because, had it used its remaining peremptory

25   challenge to remove him, Smith could have been called to replace him.  Pet'r's Cross-Mot. for

26   Summ. Adj. at 37.  Petitioner conceded before the California Supreme Court that Creighton was

1    not challengeable for cause, but argues that Creighton's "impartiality [sic] and inability to carry

2    out his sworn duty to apply the law and facts to the case was borne out by the misconduct he

3    committed during deliberations," as alleged in Claim O of the Amended Petition. *Id.* at 38;

4    Document Lodged Mar. 28, 1997 at Dckt. No. 21 (Pet'r's Cal. S. Ct. Reply Br.) at 47 (stating

5    that Creighton "was not excused for cause because he stated that he could probably set aside his

6    personal views and make an impartial judgment on the evidence."). Thus, at bottom, petitioner's

7    claim is that the trial court erroneously deprived him of two of his peremptory challenges (one he

8    had to use to excuse Major and one he had to hold for Smith), with the result that a biased juror

9    was seated.

10       The U.S. Supreme Court has clearly established that the Sixth and Fourteenth

11   Amendments to the federal Constitution entitle a capital defendant to an impartial jury. *Ross v.*

12   *Oklahoma*, 487 U.S. 81, 85 (1988); *Gray v. Mississippi*, 481 U.S. 648, 657 (1987). However, the

13   Court has "reject[ed] the notion that the loss of a peremptory challenge constitutes a violation of

14   the constitutional right to an impartial jury." *Ross*, 487 U.S. at 88. Peremptory challenges

15   themselves are not of constitutional dimension, but are rather one method of obtaining an

16   impartial jury. *Id.* "So long as the jury that sits is impartial, the fact that the defendant had to use

17   a peremptory challenge to achieve that result does not mean the Sixth Amendment was violated."

18   *Id.*

19       The California Supreme Court applied *Ross* in rejecting petitioner's Claim G on his

20   direct appeal. In doing so it concluded that any error in denying the challenges to Major and

21   Smith was harmless because the jurors that were seated were not challengeable for cause.

22   *Hawkins,* 10 Cal.4th at 938-39. This conclusion is not contrary to, nor an unreasonable

23   application of *Ross.* Although petitioner now claims that Creighton was biased, as evidenced by

24   his alleged misconduct in using his experience with ballistics comparison in evaluating the

25   evidence (raised separately as petitioner's Claim O), for the reasons discussed below regarding

26   that claim this court concludes that Creighton did not commit misconduct, *see infra.* Petitioner

1   has therefore not shown that the denial of his challenges to Major and Smith led to the seating of

2   an unqualified juror.  *See Rivera v. Illinois*, __ U.S. __, 129 S. Ct. 1446, 1454 (2009) (noting

3   that, where no juror is removable for cause, the jury is impartial for Sixth Amendment purposes).

4   Accordingly, petitioner has not shown entitlement to relief on Claim G, and summary

5   adjudication of the claim should be granted in favor of respondent.

6           vi.     *Claim H – Admission of Gerald Hawkins' Testimony Regarding his Stabbing*

7           In Claim H of the Amended Petition, petitioner argues that the trial court violated his

8   constitutional rights by receiving testimony that petitioner had stabbed his brother, Gerald

9   Hawkins, Jr., later in the same month as the Hedlund murder and Sonny's Market events.

10  According to petitioner, admission of the evidence "was unduly inflammatory and established

11  petitioner's propensity to commit violence and therefore violated not only state evidentiary law,

12  but petitioner's constitutional rights, including his right to due process, to a fair trial and to a

13  reliable determination of guilt and penalty."[6]  Pet'r's Cross-Mot. for Summ. Adj. at 40.

14          Claim H fails for the same reasons as petitioner's Claim D subclaims regarding

15  propensity evidence failed – there is no clearly established federal law holding that the use of

16  evidence to show criminal propensity violates the Constitution.  *Estelle v. McGuire*, 501 U.S. at

17  75 n.5; *Mejia*, 534 F.3d at 1046; *Alberni*, 458 F.3d at 863-67.  As for petitioner's claim that

18  admission of the evidence violated state evidentiary law, such claim is not cognizable on federal

19  habeas review.  *Estelle v. McGuire*, 502 U.S. at 67-68 & 72 (holding that the state court's

20  incorrect application of state evidentiary law to allow evidence of prior bad acts did not present a

21  claim cognizable by a federal habeas court).[7]  Accordingly, summary adjudication of Claim H

22

23          [6] The trial court instructed the jury to limit its consideration of the stabbing evidence to
    "shed[] such light as you the jury may find on the circumstances of defendant Jeffrey Hawkins[']
24  meeting with his brother Gerald in Riverside County in March, 1987" and not to consider the
    evidence "to prove that he is a person of bad character or that he has a disposition to commit
25  crimes."  RT 4863-64.

26          [7] The California Supreme Court rejected petitioner's claim that admission of Gerald's
    testimony about the stabbing had violated state evidentiary law:

                                                    35

1

2   Gerald testified that he was approached by defendant on March 16, 1987, and the two of them spent the day together getting drunk. Defendant told Gerald that he

3   had committed a murder in the course of robbing a grocery store. Defendant also told his brother that he was going to hitchhike back to Sacramento to "take care

4   of" the eyewitness to the Hicks murder – presumably referring to Jerry Stevens. Gerald attempted to dissuade defendant from this course of conduct. After

5   returning from the rest room of a gas station near where the two had been drinking, Gerald was attacked by defendant, who stabbed him in the side of the

6   throat with a knife and seriously injured him. After stabbing Gerald, defendant departed before the arrival of the police officers called to the scene. Gerald

7   repeated for the police officers defendant's admission of the murder and robbery in Sacramento.

8   Defendant now contends that evidence regarding his attack on Gerald, as a prior uncharged crime, should have been excluded under Evidence Code sections 1101

9   and 352 because it was impermissible evidence of his character and his propensity to commit acts of violence, and because whatever probative value it had was

10  outweighed by its highly prejudicial nature. He claims that the trial court erred in permitting this testimony over defendant's objection, [footnote omitted] and that

11  such error violated his right to due process and a fair trial under various provisions of the United States and California Constitutions, requiring reversal of one or both of his first degree murder convictions. We disagree that the

12  admission of this testimony was error.

13  To understand the probative significance of Gerald's testimony regarding defendant's assault, the testimony must be taken in its proper context. Gerald

14  admitted at trial that during the preliminary hearing he had denied that defendant had told him about the robbery and murder. This testimony squarely contradicted

15  the earlier statements he had given police. He attributed this discrepancy in his testimony to the fact that he had been in the same jail as defendant at the time of

16  the preliminary hearing, having been arrested for matters unrelated to the present case, and was afraid of the repercussions if defendant and other prisoners had learned that he had become a "snitch."

17  On cross-examination, defense counsel sought to emphasize this inconsistency between Gerald's current testimony and his testimony at the preliminary hearing

18  as a means of undermining his credibility. On redirect examination, the prosecutor attempted to bring to light the precise circumstances of the argument

19  between Gerald and defendant leading to Gerald's statement to the police, including defendant's assault against Gerald. It is evident that the prosecution did

20  so to lend credence to Gerald's testimony that he had been frightened of his brother, and that when he recanted at the preliminary hearing his earlier statements against his brother, he did so out of that fear.

21  The trial court has the discretion to admit evidence of crimes committed by a defendant other than the one for which he is charged, if such evidence is relevant

22  to prove some fact at issue, and if the probative value of the evidence outweighs its prejudicial effect. (*People v. Daniels* (1991) 52 Cal. 3d 815 [277 Cal. Rptr.

23  122, 802 P.2d 906].)  "When reviewing the admission of evidence of other offenses, a court must consider (1) the materiality of the fact to be proved or

24  disproved, (2) the probative value of the other crime evidence to prove or disprove the fact, and (3) the existence of any rule or policy requiring exclusion

25  even if the evidence is relevant. [Citation.] Because this type of evidence can be so damaging, '[i]f the connection between the uncharged offense and the ultimate fact in dispute is not clear, the evidence should be excluded.' [Citation.]"  (*Id.* at

26  p. 856.)

1    should be granted in favor of respondent.

2        vii.    *Claim I – Counsel's Failure to Object to Johnson's Identification of Petitioner*

3        In Claim I of the Amended Petition, petitioner argues that trial counsel was ineffective by

4    failing to object to the testimony of Sonny's Market witness Robert Johnson.  The parties agree

5    to summary adjudication of Claim I.

6        Claim I is governed by the familiar *Strickland* standard exposited with regard to Claim C,

7    *supra*.  According to petitioner, Johnson's identification of petitioner as the Sonny's Market

8    perpetrator was obtained through a procedure so impermissibly suggestive as to violate his right

9    to due process, and counsel's failure to object was therefore incompetent.  Had counsel objected,

10   petitioner argues, it is reasonably probable that the trial court would have stricken Johnson's

11   testimony, which would have lessened the impact of Stevens' identification of petitioner (already

12

13           The People argue in this case that testimony regarding defendant's stabbing of his
14       brother was relevant to rehabilitate the credibility of the latter's testimony, a
         material issue in the case.  We agree.  First, there is no question that Gerald's
15       credibility was a material issue.  His testimony as to defendant's admission of
         culpability for the Sonny's Market crimes was key to the prosecution's case.
16       Defense cross-examination concerning Gerald's prior inconsistent statements at
         the preliminary hearing had called his credibility into question.

17           Furthermore, evidence of the stabbing was relevant to the credibility issue.  As
         one commentator has stated:  "[T]he prosecutor may introduce uncharged
18       misconduct on redirect to explain a prior inconsistent statement mentioned during
         cross-examination.  Just as the defendant's uncharged misconduct may make the
19       witness hesitant on the stand, the misconduct may have motivated the witness to
         make an inconsistent statement before trial.  The misconduct serves as the
20       explanation for the contradictory statement." (Imwinkelried, Uncharged
         Misconduct Evidence (1994) § 6.23, p. 58, fns. omitted.)  Here, Gerald's
21       testimony regarding his stabbing served to confirm his statements that fear of
         defendant motivated his untruthful testimony at the preliminary hearing.  The
         testimony thereby served to rehabilitate Gerald's credibility.

22           In sum, Gerald's testimony about defendant's attack on him had considerable
         probative value in rehabilitating his contested but quite critical testimony.  Under
23       these circumstances, the trial court did not abuse its discretion in concluding that
         the evidence was relevant, that it was introduced to prove matters other than
24       defendant's character, and that the probative value of this testimony outweighed
         its prejudicial effect.  Accordingly, this testimony was properly admitted, and
25       defendant's claim of error, under Evidence Code sections 352 and 1101, is
         without merit.  Because we find no statutory error, defendant's related
         constitutional claims also fail.

26   *Hawkins*, 10 Cal.4th at 950-52.

37

weakened by cross-examination and the defense's identification expert), and thus weakened the prosecution's entire case against petitioner as the person who perpetrated the Sonny's Market crimes with the Hedlund murder weapon, leading to acquittal on all charges.  Respondent counters that any such objection would have been denied as meritless.  Thus, argues respondent, petitioner cannot show that he was prejudiced by his counsel's failure to object to Johnson's identification – there simply was no basis for the objection.

The U.S. Supreme Court has clearly established that an identification procedure may be so prejudicial as to amount to a denial of due process.  *Simmons v. United States*, 390 U.S. 377, 383 (1968).  A challenge to an identification procedure is reviewed under the totality of the circumstances.  *Id.*  Convictions based on an eyewitness's identification at trial which followed a pre-trial identification by photograph will be set aside only if the photographic identification procedure was so impermissibly suggestive as to give rise to a substantial likelihood of irreparable misidentification.  *Id.* at 384.  "[R]eliability is the linchpin in determining the admissibility of identification testimony."  *Manson v. Brathwaite*, 432 U.S. 98, 114 (1977).  In determining whether identification testimony is reliable, a court must weigh "the corrupting impact of the suggestive identification" against five factors:

(1) the opportunity of the witness to view the criminal at the time of the crime;

(2) the witness' degree of attention;

(3) the accuracy of the witness' prior description;

(4) the level of certainty the witness displays at the time of the identification; and

(5) the time between the crime and the identification.

*Id.*  In weighing those factors, the court's ultimate goal is to determine whether, under all the circumstances, there is a very substantial likelihood of irreparable misidentification.  *Id.* at 116.  Short of that, the identification testimony is properly received and any flaws in the procedures used are for the jury to weigh.  *Id.*

////

The underlying facts are as follows:  Johnson, who was entering Sonny's Market as the gunman was leaving, described the gunman to police later that day as a white male in his mid-30s, between 5'8" and 6' tall, with dark hair, a medium build, memorable eyes, a grease smudge on the right side of his neck, and a strange scared expression.  RT 4140-42.  He observed the gunman for approximately ten seconds.  RT 4150-51.  He told police he was not sure he could recognize the gunman because he was still in shock.  RT 4151.  The authorities did not contact Johnson again for two years.  RT 4152.  On March 14, 1989, the day before he testified at petitioner's trial, the prosecutor and Sheriff's Department showed him 22 or 23 photographs.  RT 4113-14.  He was instructed to look through the stack of photos twice, slowly, and pull any that looked familiar or caught his attention, although the suspect's photo might not be in the stack.  RT 4113, 4117, 4143.  Johnson immediately pulled petitioner's photo, the eyes of the person in the photo being "the clincher."  RT 4118, 4145, 4147.  He also pulled a second photo, because the hair of the person in the photo was similar to that of the gunman.  RT 4116, 4145-46.  On the stand, Johnson identified petitioner as the gunman, again noting the familiarity of his eyes.  RT 4157-58.  Johnson was positive about the identification.  RT 4158.  Defense counsel did not object or move to strike the testimony as tainted by the photographic lineup that occurred the prior day.

In rejecting petitioner's claim, the California Supreme Court reasoned:

Defendant relies on *People v. Nation* (1980) 26 Cal. 3d 169 [161 Cal. Rptr. 299, 604 P.2d 1051] in support of his claim.  In that case, we found ineffective assistance of counsel for failure to object to highly questionable eyewitness testimony regarding the identity of a perpetrator of a lewd and lascivious act.  In one instance, three of the witnesses were permitted to confer and come to an agreement concerning which of several mugshots was that of the perpetrator. They did not independently identify defendant and were unable to identify defendant in a subsequent police lineup.  (*Id*. at p. 180.)  Another witness was initially given a single photograph of defendant and asked if he was the man the witness had seen near the crime scene on the evening in question.  These "impermissibly suggestive" procedures would likely have led to the exclusion of this identification evidence had a timely objection been made, and failure to make such an objection constituted ineffective assistance of counsel.  (*Id*. at p. 181.)

////

1

2

3

4

     In the present case, no such comparable police or prosecutorial practices tainted Johnson's identification evidence.  In fact, Johnson did provide police with a description of the man he had seen leaving Sonny's Market.  Johnson merely informed police at the time that he was "unsure" he could identify the man fleeing Sonny's Market, due in part to his being in a state of shock.  There is, moreover, no evidence that Johnson's failure to testify at the preliminary hearing was owing to his inability to identify defendant.

5

6

7

8

9

10

11

     Nor was the showing of photographs to Johnson the day before his testimony an "impermissibly suggestive" practice.  Johnson was shown 22 photographs and made a positive identification of the photograph of defendant as the man who had fled Sonny's Market on the day of the crime.  He also selected another photograph that he said bore some similarities to the Sonny's Market perpetrator, but he did not identify the person in that photograph as the perpetrator.  Although defendant argued at trial, and argues now, that Johnson's ability to identify him was the result of viewing his  picture in television and newspaper accounts of his arrest, Johnson specifically denied that he had seen any such pictures.  It was properly the jury's function to weigh the credibility of Johnson's identification evidence, and the trial court instructed the jury extensively on the factors to consider in evaluating the reliability of eyewitness testimony.  The admission of such evidence, even if a timely objection had been made, was not error.

12

13

     We therefore find no ineffective assistance of counsel in the failure to object to Johnson's testimony.

14  *Hawkins*, 10 Cal.4th at 949-50.  Petitioner contends that the California Supreme Court

15  adjudicated only the deficient performance prong of *Strickland* in the above analysis, and thus

16  the prejudice prong should be reviewed *de novo*.  However, it is clear that the court concluded

17  that petitioner had suffered no prejudice from counsel's failure to object to Johnson's

18  identification testimony, as it stated:  "The admission of such evidence, even if a timely

19  objection had been made, was not error."  This Court thus reviews the entirety of petitioner's

20  claim under 28 U.S.C. § 2254(d)(1) and concludes that the California Supreme Court's reasoning

21  was not contrary to, nor an unreasonable application of, *Strickland*.  While there is always some

22  danger that a witness who has been shown a photograph of the defendant will make an in-court

23  identification based on his or her memory of the photograph rather than the criminal, *see*

24  *Simmons*, 390 U.S. at 383-84, the procedure employed in this case was not so suggestive as to

25  render Johnson's in-court identification unreliable.  Johnson viewed the gunman for

26  approximately ten seconds and gave the police a description, and petitioner makes no claim that

this description does not resemble his physical characteristics. *See Manson*, 432 U.S. at 115. While two years had elapsed since the crime, Johnson immediately identified petitioner from the stack of 22 or 23 photos and was certain of his in-court identification the following day. The totality of the circumstances here do not illustrate an unreliable identification procured through suggestive procedures. *Compare Simmons*, 390 U.S. at 382; *Manson*, 432 U.S. at 114-15; *Neil v. Biggers*, 409 U.S. 188, 200-01 (1972); *People v. Nation*, 26 Cal.3d 169, 179-81 (1980). As petitioner would not have been entitled to exclusion of Johnson's identification testimony, it was not deficient performance for counsel not to object, and petitioner suffered no prejudice from counsel's failure to object. *See  Juan H.*, 408 F.3d at 1273. Accordingly, summary adjudication of Claim I should be granted in favor of respondent.

viii.     *Claim K – Trial Court's Supplemental Examination of Ballistics Expert*

In Claim K of the Amended Petition, petitioner contends that the trial court deprived him of due process when it questioned one of the prosecution's ballistics experts. Petitioner seeks an evidentiary hearing on this claim. For the reasons provided *infra*, however, the Court concludes that no additional evidence is necessary to resolve the claim, and the Court will accordingly resolve the claim by summary adjudication on the record.

The facts underlying petitioner's claim were aptly summarized by the California Supreme Court:

> According to the testimony of two qualified ballistics experts, the bullet fragments found in Hedlund's body were fired from the same gun as the fragments recovered from the Sonny's Market crime scene. These experts explained that the copper jackets of the respective bullets were examined under a microscope to compare the striations or lines imprinted on the jackets. The striations are produced when the bullet is fired, and thus reflect the unique characteristics of each gun barrel. The experts compared the number and configuration of matching and nonmatching lines in the two jackets to determine that they were fired from the same gun. They conceded that ballistics identification is not an exact science. Rather, ballistics experts develop proficiency by microscopically observing a large number of bullets known to have been fired from the same gun, and from different guns, so that they acquire knowledge of when the similarities of the bullets' striations are sufficient to establish that the bullets were discharged from the same firearm.

In rebuttal, defendant did not call his own ballistics expert, but rather introduced two scholarly articles by Alfred Biasotti, written in 1955 and 1964, that called for reforming the practice of ballistics identification so as to make it make more precise.  According to these articles, criminalists should aspire to a greater quantification of ballistics identifications practice by developing a statistical data base that would inform them of identification thresholds, i.e., the exact number of matching consecutive or proximate striations that would be necessary for the expert to draw the conclusion that the bullets were fired from the same gun.  Such a data base would enable criminalists to formulate their opinions on firearm identification in terms of statistical probabilities.

Defendant contends that the trial court erred in the manner in which it intervened in the interrogation of the senior ballistics expert, Robert Garbutt, to question him about the significance of Biasotti's work.  Garbutt both reviewed the work of the other ballistics expert, Eric Parsons, and independently examined the bullet fragments, concluding that they were both fired from the same gun.  On cross-examination, defense counsel questioned Garbutt, as he had Parsons, about Biasotti's views.  That cross-examination attempted to establish the lack of scientific precision in the methods of ballistics identification.  Garbutt conceded that ballistics identification was to some extent more of a skill than a science, an intuition informed by extensive experience.  After the prosecution's redirect examination, and defendant's recross-examination, the trial court further interrogated Garbutt.  The court prefaced its remarks by making an analogy between ballistics and psychiatry, stating in essence that Sigmund Freud's lack of a Diagnostic Statistical Manual, a work currently used to secure uniformity in psychiatric diagnoses, did not invalidate his work as a psychiatrist.  The court then asked Garbutt if his ballistic identification in this case "was weakened any degree by having been reminded today of Mr. Biasotti's concerns about how a statistical model might lend an even additional dimension to your field?"  Garbutt responded by stating that his opinion "is not diminished and is as strong.  Biasotti's article is part of my training and learning, and I do consider his work in part in forming the opinion which I have formed."

After Garbutt elaborated on this statement, the trial court then stated: "Fifteen or twenty years ago [a] U.S. Supreme Court justice got some recognition about making a statement about obscenity.  I don't know how to define it, but I know it when I see it.  Is that analogous to what we are saying here: that you can't give us an objective definition of something, but you still have some confidence [in] what you have seen, that you have seen enough data to come to an opinion?"  Garbutt replied in the affirmative.

The following day, defendant objected to the trial court's interrogation and comment and asked for a motion to strike on the grounds that "the Court abused his discretion and became an advocate in asking those questions in trying, basically to do [the prosecutor's] job and to make Mr. Garbutt's testimony more credible."  The court denied the motion.

*Hawkins*, 10 Cal.4th at 946-47.

////

1    The U.S. Supreme Court has established that "the Due Process Clause clearly requires a

2 fair trial in a fair tribunal, before a judge without actual bias against the defendant or interest in

3 the outcome of his particular case." *Bracy v. Gramley*, 520 U.S. 899, 904-05 (1997) (internal

4 citation and quotation marks omitted); *In re Murchison*, 349 U.S. 133, 136 (1955); *Tumey v.*

5 *Ohio*, 273 U.S. 510, 532 (1927).   While a trial judge must avoid even the appearance of

6 advocacy or partiality, he or she is "more than an umpire," and may participate in the trial if

7 done in an impartial fashion. *Duckett v. Godinez*, 67 F.3d 734, 739-41 (9th Cir. 1995).   Where a

8 party challenges trial court comments, the question for the reviewing court is whether the

9 comments were so inherently prejudicial as to pose an unacceptable threat to a fair trial. *Maiden*

10 *v. Bunnell*, 35 F.3d 477, 482-83 (9th Cir. 1994).   Petitioner claims that the trial judge's

11 comments in this case "constituted improper advocacy, undermined the cross-examination, and

12 clearly expressed to the jury the court's view that ballistics evidence generally, and the ballistics

13 testimony in this case in particular, was reliable."  Pet'r's Cross-Mot. for Summ. Adj. at 51.   In

14 denying this claim, the California Supreme Court stated:

15      Defendant now contends that the trial court committed prejudicial error in its
        interrogation of Garbutt.

16
        Article VI, section 10 of the California Constitution states in pertinent part: "The
17      court may make such comment on the evidence and the testimony and credibility
        of any witness as in its opinion is necessary for the proper determination of the
18      cause."   Moreover, Evidence Code section 775 permits the court, "on its own
        motion or on the motion of any party, [to] call witnesses and interrogate them the
19      same as if they had been produced by a party to the action."   Inherent within
        Evidence Code section 775, then, is the judge's authority to interrogate witnesses
20      called by the parties.   The authority conferred on the trial court by Evidence Code
        section 775 to question witnesses sua sponte therefore extends beyond the rather
21      narrow judicial role set forth in Evidence Code section 765, subdivision (a),
        which declares that the court "shall exercise reasonable control over the mode of
22      interrogation of a witness so as to make such interrogation as rapid, as distinct,
        and as effective for the ascertainment of the truth, as may be, and to protect the
23      witness from undue harassment or embarrassment."

24      We have elaborated on the purposes and limitations of the trial court's
        interrogation of witnesses in *People v. Carlucci* (1979) 23 Cal. 3d 249 [152 Cal.
25      Rptr. 439, 590 P.2d 15].   Evidence Code section 775, which is a codification of
        case law, "'confers upon the trial judge the power, discretion and affirmative duty
26      . . . [to] participate in the examination of witnesses whenever he believes that he

1    may fairly aid in eliciting the truth, in preventing misunderstanding, in clarifying
     the testimony or covering omissions, in allowing a witness his right of
2    explanation, and in eliciting facts material to a just determination of the cause.'"
     (23 Cal. 3d at p. 256, quoting Gitelson, A Trial Judge's Credo (1966) 7 Santa
3    Clara L.Rev. 13-14.)

4    The constraints on the trial judge's questioning of witnesses in the presence of a
     jury are akin to the limitations on the court's role as commentator.  The trial
5    judge's interrogation "must be . . . temperate, nonargumentative, and scrupulously
     fair.  The trial court may not . . . withdraw material evidence from the jury's
6    consideration, distort the record, expressly or impliedly direct a verdict, or
     otherwise usurp the jury's ultimate factfinding power."  (*People v. Rodriguez*
7    (1986) 42 Cal. 3d 730, 766 [230 Cal. Rptr. 667, 726 P.2d 113].)

8    In the present case, the trial court's questions and comments were within the
     bounds of propriety.  Its role was one of clarification rather than advocacy, aimed
9    at elucidating Garbutt's testimony that the lack of a statistical model did not
     undermine his confidence in his judgment that the bullet fragments in question
10   were fired from the same gun.  If the court expressed any opinion, it was not as to
     the ultimate question of whether the firearms identification in this case was
11   reliable, but rather that the Biasotti articles did not in themselves undermine that
     reliability.  The expression of this opinion is nothing more than a "comment on
12   the evidence and the testimony and credibility of [a] witness" designed to assist
     the proper determination of the cause, as permitted by article VI, section 10 of the
13   California Constitution.  Therefore, whether the trial court's questioning of
     Garbutt is viewed as the interrogation of a witness, or a comment on the evidence,
14   or a combination of both, it was part of the trial court's legitimate role of
     clarifying witness testimony and assisting the jury's understanding of the
15   evidence, and was not error.

16   *Hawkins*, 10 Cal.4th at 947-48.  This ruling was not contrary to, nor an unreasonable application

17   of, the U.S. Supreme Court's pronouncements regarding the permissible judicial conduct under

18   the Due Process Clause.  In construing the scope of those pronouncements, the Ninth Circuit has

19   concluded that it is proper for a trial judge to ask questions that clarify evidence for the jury.

20   *Duckett*, 67 F.3d at 739-40.  This is so even where the questions allow a witness to emphasize

21   testimony helpful to the prosecution or elicit answers detrimental to the defense.  *Id.* at 740.  In

22   fact, even where a state trial judge pervasively questioned one witness, "expressed clear

23   frustration and hostility" toward a defense witness, and told the prosecutor to "once in a while

24   throw in an objection for the heck of it" during the defendant's testimony, the Ninth Circuit

25   concluded that no due process violation had been established when the judge's conduct was

26   considered in the context of the whole trial.  *Id.* at 741.  In this case, the California Supreme

1   Court reasonably concluded that the trial judge's questions merely clarified Garbutt's testimony

2   with respect to the Biasotti articles relied on by the defense.  While Garbutt's answers to the

3   court's questions were helpful to the prosecution and detrimental to the defense, the judge's

4   clarifying questions did not display the degree of partiality that would cause the trial to be

5   fundamentally unfair.  *See Maiden*, 35 F.3d at 482.  The trial court's participation in questioning

6   was limited to a few questions asked of one witness, which could have been responded to in a

7   manner favorable to the defense.  Petitioner points to no other conduct by the judge at trial

8   indicating that he credited the prosecution over the defense.  Accordingly, the judge's

9   questioning of Garbutt did not arise to a violation of due process, and summary adjudication of

10  Claim K should be granted in favor of respondent.

11          ix.     *Claim L – Failure to Instruct on Lesser Included Offenses of Hedlund
                    Murder Charge*

12

13          In Claim L of the Amended Petition, petitioner contends that the trial court deprived him

14  of due process by failing to instruct the jury on the lesser included offense of accessory after the

15  fact with regard to the Hedlund murder.  Petitioner further argues that trial counsel was

16  ineffective for failing to request that instruction.  The parties agree to summary adjudication of

17  Claim L.[8]

18  ////

19

20          [8] Petitioner concedes that the state court's determination that he had waived Claim L by
    failing to request a lesser included offense instruction at trial constitutes a procedural default of
21  the claim.  *See Hawkins*, 10 Cal.4th at 952 ("[D]efendant's failure to request the instruction at
    trial waives the issue on appeal."); *Wainwright v. Sykes*, 433 U.S. 72, 86-87 (1977) (stating that
22  where state procedure requires that an issue raised on appeal must have been raised at trial, an
    issue not raised at trial is generally defaulted on federal habeas absent cause for not raising the
23  issue and prejudice).  He contends, however, that his trial counsel was ineffective in failing to
    request the instruction and that such ineffective assistance of counsel constitutes cause for
24  excusing the default.  *Murray v. Carrier*, 477 U.S. 478, 488-89 (1986) (ineffective assistance of
    counsel is cause for a procedural default).  Because the Court will address the merits of
25  petitioner's claim in determining whether counsel was deficient for failing to request the
    instruction or whether that failure prejudiced petitioner, it need not further examine whether
26  procedural default occurred here.

1   It is clearly established federal law that, in a capital case, the Eighth Amendment and the

2   Due Process Clause of the Fourteenth Amendment require the trial court to instruct the jury on

3   lesser included offenses supported by the evidence. *Beck v. Alabama*, 447 U.S. 625, 627 (1980).

4   *Beck*, however, did not address the trial court's obligations with respect to lesser *related*

5   offenses. Instead, it addressed a factual situation in which "the evidence unquestionably

6   establish[d] that the defendant [was] guilty of a serious, violent offense[,] but left some doubt

7   with respect to an element that would justify conviction of a capital offense." *Id.* at 637. In that

8   scenario, a state statute which prohibited the jury from considering lesser included offenses and

9   required that it impose the death penalty upon a finding of guilt violated the Constitution by

10  enhancing the risk of an unwarranted conviction, where the jury believes that the defendant

11  committed a crime lesser than that charged and accordingly does not want to acquit the

12  defendant even though the elements of capital murder have not been proved. *Id.* at 637 & 642-

13  43. Since petitioner's conviction in this case, the United States Supreme Court has squarely held

14  that *Beck* does not extend to lesser related offenses and that trial courts have no constitutional

15  obligation to instruct on lesser related offenses. *Hopkins v. Reeves*, 524 U.S. 88, 90-91 (1998).

16  The California Supreme Court rejected petitioner's claim under *Beck*, concluding that the

17  trial court had no obligation to instruct the jury on accessory after the fact because no evidence

18  would have supported that instruction and because accessory after the fact is a lesser related

19  (rather than lesser included) offense to murder:

20      [N]o accessory-after-the-fact instruction was warranted here. Even when the law
        does impose on the trial court a sua sponte duty to instruct the jury, as in the case
21      of lesser included offenses, that duty is not triggered "when there is no evidence
        that the offense was less than that charged." (*People v. Wickersham* (1982) 32
22      Cal. 3d 307, 323-324 [185 Cal. Rptr. 436, 650 P.2d 311].) In this case, there was
        no evidence that defendant was involved in the Hedlund murder as an accessory
23      after the fact. Defendant argues that the primary evidence linking him to the
        Hedlund murder was his possession of the Hedlund murder weapon six days after
24      the murder was committed, and that his possession could be equally well
        explained if he had been an accessory after the fact as if he had been the
25      murderer. But other testimony had defendant leaving the Uptown Saloon around
        the same time as Hedlund, a few hours before Hedlund was murdered, indicating
26      that defendant's involvement in the Hedlund murder commenced before, not after,

the fact.  Moreover, there is simply no evidence pointing to any other person's involvement in the murder, and an accessory-after-the-fact instruction would have been based on sheer speculation.  The trial court's failure to give such an instruction was not error.

Defendant's claim of entitlement to a lesser related offense instruction is not strengthened by his invocation of *Beck v. Alabama* (1980) 447 U.S. 625 [65 L. Ed. 2d 392, 100 S.Ct. 2382].  In that case, the United States Supreme Court overturned a portion of Alabama's death penalty law that had prohibited lesser included offense instructions from being given in capital cases, holding that such provision violated the defendant's Fourteenth Amendment right to due process.  "'The goal of the Beck rule . . . is to eliminate the distortion of the factfinding process that is created when the jury is forced into an all-or-nothing choice between capital murder and innocence.'"  (*Schad v. Arizona* (1991) 501 U.S. 624, 646-647 [115 L. Ed. 2d 555, 575, 111 S.Ct. 2491].)  Subsequently, courts have held that Beck's rationale applies not only to the actual imposition of the death penalty, but also to a first degree murder verdict that renders a defendant eligible for death.  (*Vickers v. Ricketts* (9th Cir. 1986) 798 F.2d 369, 370-374.)  But the logic of *Beck* does not apply when, as here, the jury has been properly instructed as to second as well as first degree murder.[5]  The "'central concern of Beck simply is not implicated . . . [when the] jury was not faced with an all-or-nothing choice between . . . (capital murder) and innocence.'"  (*Schad v. Arizona, supra*, 501 U.S. at p. 647 [115 L. Ed. 2d at p. 575].)

FOOTNOTES

[5] Defendant argues . . . that the execution style of the Hedlund killing made it implausible that the murder was not premeditated, and that therefore second degree murder was not a credible alternative to first degree murder.  Therefore, a "real" alternative lesser related offense, such as accessory after the fact, should have been given.  That argument is fallacious on at least two grounds.  First, even if it were true that all the evidence pointed to first degree murder rather than second degree murder, the trial court would not be obliged to instruct on a lesser offense other than second degree murder if, as here, no evidence supported that instruction.  (*Spaziano v. Florida* (1984) 468 U.S. 447, 455 [82 L. Ed. 2d 340, 349, 104 S.Ct. 3154].)  Second, . . . given the lack of motive and planning evidence, the question of defendant's premeditation in the Hedlund murder was one on which reasonable jurors could differ, and a second degree murder instruction was amply justified.

END FOOTNOTES

More fundamentally, the *Beck* rule does not require an instruction on a lesser included offense when the evidence does not support it.  "[D]ue process requires that a lesser included offense instruction be given *only* when the evidence warrants such an instruction."  (*Hopper v. Evans* (1982) 456 U.S. 605, 611 [72 L. Ed. 2d 367, 373, 102 S.Ct. 2049], italics in original.)  By the same reasoning, *Beck* does not require instruction on a lesser related offense unsupported by the evidence.  In this case, as explained above, no evidence warranted an accessory-after-the-fact instruction, and so the failure to give such an instruction offends neither the United States Constitution nor California law.

*Hawkins*, 10 Cal.4th at 952-54.  That determination was not contrary to, nor an unreasonable

application of, *Beck*.  In California, an offense is included in the larger offense if the larger

offense cannot be committed without also committing the lesser offense.  *People v. Preston*, 9

Cal.3d 308, 319 (1973).  Because one can commit murder without also being an accessory after

the fact to murder, accessory after the fact is not a lesser included offense of murder.  *Id.*

Accordingly, *Beck* did not mandate that the trial court instruct on accessory after the fact.[9]

Petitioner's claim that trial counsel was ineffective for failing to request the instruction

was rejected in his state habeas petition without opinion and is thus subject to this court's

independent review.  Independent review here yields the same conclusion.  Petitioner was not

entitled to an instruction on accessory after the fact under *Beck* for precisely the reasons stated

by the state court.  Accordingly, petitioner cannot show that he was prejudiced by his counsel's

failure to request the instruction.  Indeed, there was no evidence at trial from which the jury

could reasonably infer that petitioner was just an accessory after the fact to the Hedlund murder.

Petitioner focuses solely on his possession of the gun after the murder as evidence supporting

accessory after the fact, but the clear evidence that petitioner was with Hedlund just *before* the

murder diluted any inference that could have been drawn that petitioner's sole involvement in

the crime was to conceal or dispose of the weapon afterward.  Given the lack of evidence from

which the jury could reasonably find that petitioner was an accessory after the fact to the

Hedlund murder but not the murderer, petitioner was not prejudiced by counsel's failure to

request an accessory after the fact instruction.  *See Anderson v. Calderon*, 232 F.3d 1053, 1083-

84 (9th Cir. 2000) (holding that any error from the failure to instruct on a lesser included offense

was harmless where minimal evidence supported that offense), *overruled in part on other*

---

[9]  While the entirety of his Claim L argument is concerned with accessory after the fact, petitioner mentions in passing that "[t]he trial court failed to instruct the jury on the law of aiding and abetting."  Pet'r's Cross-Mot. for Summ. Adj. at 54.  As aiding and abetting murder is not a lesser included offense of murder under California law, but is rather a theory under which an individual is charged for murder itself as a principal, *Beck* did not entitle petitioner to an instruction on aiding and abetting.  Cal. Pen. Code §§ 31, 971.

1    *grounds by Bittaker v. Woodford*, 331 F.3d 715, 728 (9th Cir. 2003).

2         x.    *Claim M – California Instructions on Reasonable Doubt and Circumstantial*

3             *Evidence*

4         In Claim M of the Amended Petition, petitioner claims that the standard California jury

5 instructions on reasonable doubt which were given in his case, CALJIC 2.90 and 2.01, misled

6 the jury to believe it could convict upon a quantum of proof less than beyond a reasonable

7 doubt.[10]  The parties agree to summary adjudication of Claim M.

8         The U.S. Supreme Court has clearly established that the Due Process Clause of the

9 Fourteenth Amendment requires proof of guilt beyond a reasonable doubt to secure a conviction

10 against a criminal defendant.  *In re Winship*, 397 U.S. 358, 364 (1970).  Jury instructions that

11 inform the jury otherwise are therefore subject to attack as unconstitutional.  *E.g., Cage v.*

12 *Louisiana*, 498 U.S. 39 (1990) (per curiam), *overruled in part on other grounds by Estelle v.*

13 *McGuire*, 502 U.S. at 72 n.4.  At the time petitioner's conviction became final in 1990, however,

14 the Supreme Court had not yet settled on a single standard for reviewing challenged jury

15 instructions.  *Boyde v. California*, 494 U.S. 370, 378-79 (1990) (comparing various standards

16 employed in different cases).  Some cases stated that jury instructions should be reviewed for

17 whether a reasonable juror *could have* understood them as allowing conviction on proof less than

18 beyond a reasonable doubt.  *E.g. Cage*, 498 U.S. at 41; *Francis v. Franklin*, 471 U.S. 307, 315-

19 16 (1985); *Sandstrom v. Montana*, 442 U.S. 510, 516-17 (1979).  Other cases additionally

20 referred to what a reasonable juror *would have* understood or whether there was a substantial

21 probability that the jury actually misinterpreted the charge.  *Boyde,* 494 U.S. at 378-79 (citing

22 *Mills v. Maryland,* 486 U.S. 367, 375-76, 377, 389 (1988) and *California v. Brown*, 479 U.S.

23  

24        [10]  While respondent argues that Claim M has been procedurally defaulted because petitioner did not object to the instructions at trial, this court cannot consider the claim defaulted

25 because the last state court to render a judgment on the claim did not clearly and expressly base the judgment on petitioner's failure to object but instead resolved the merits of his federal

26 constitutional claim.  *Hawkins*, 10 Cal.4th at 954-55; *Coleman v. Thompson*, 501 U.S. 722, 734-35 (1991); *Harris v. Reed*, 489 U.S. 255, 263 (1989).

538, 541-42 (1987)).  In 1990, the Court settled on a single formulation that it has consistently

applied since; i.e., whether there is a reasonable likelihood that the jury has actually applied the

instruction in a manner violating the Constitution.  *Victor v. Nebraska*, 511 U.S. 1, 6 (1994);

*Estelle v. McGuire*, 502 U.S. at 72 & n.4; *Boyde*, 494 U.S. at 380.

Petitioner raises two challenges to the instructions given here.  First, he claims that

CALJIC 2.90 and 2.01, in conjunction, "operated as a mandatory conclusive presumption of guilt

upon a finding that a guilty interpretation of the evidence 'appears to be reasonable.'"  Pet'r's

Cross-Mot. for Summ. Adj. at 60.  Second, he claims that CALJIC 2.01 erroneously suggested to

the jury that petitioner was required to put forth evidence of innocence.  CALJIC 2.90 was read

to the jury as follows:

> The defendant in a criminal action is presumed to be innocent until the contrary is
> proved, and in case of a reasonable doubt, whether his guilt is satisfactorily
> shown, he is entitled to a verdict of not guilty.  This presumption places upon the
> State the burden of proving him guilty beyond a reasonable doubt.

> Reasonable doubt is defined as follows: It's not a mere possible doubt; because
> everything relating to human affairs and depending on moral evidence, is open to
> some possible or imaginary doubt.

> Reasonable doubt is that state of the case which, after the entire comparison and
> consideration of all the evidence, leaves the minds of the jurors in that condition
> that they cannot say they feel an abiding conviction, to a moral certainty, of the
> truth of the charge.

RT 4871-72.

CALJIC 2.01 was read to the jury as follows:

> However, a finding of guilt as to any crime may not be based wholly or
> substantially on circumstantial evidence, unless the proved circumstances are not
> only:

> 1. Consistent with the theory that the defendant is guilty of the crime, and

> 2. Cannot be reconciled with any other rational conclusion.

> Further, each fact which is essential to complete a set of circumstances necessary
> to establish the defendant's guilt must be proven beyond a reasonable doubt. In
> other words, before an inference essential to establish guilt may be found to have
> been proven beyond a reasonable doubt, each fact or circumstance on which the
> inference necessarily rests must be proved beyond a reasonable doubt.

\*\*\*

Also, if the circumstantial evidence as to any particular count permits two reasonable interpretations, one of which points to a defendant's guilt and the other to his innocence, it is your duty to adopt the interpretation which points to a defendant's innocence and to reject that interpretation which points to his guilt.

If on the other hand, one interpretation of such evidence appears to you reasonable and the other to be unreasonable, it would be your duty to accept the reasonable interpretation and reject the unreasonable.

RT 4856-58.  According to petitioner, because "moral evidence" and "moral certainty," used in CALJIC 2.90, are not commonly understood terms, and because CALJIC 2.01 told the jury to accept a reasonable interpretation of circumstantial evidence where other interpretations are unreasonable, the jury was misled into believing that they had to presume petitioner's guilt if they determined that the prosecution's interpretation of the circumstantial evidence appeared more reasonable than the defense's interpretation.[11]

The California Supreme Court rejected petitioner's argument, stating:

We reject [petitioner's] challenge [to CALJIC 2.01], as we did in *People v. Jennings* (1991) 53 Cal. 3d 334, 386 [279 Cal. Rptr. 780, 807 P.2d 1009]: "The plain meaning of [this instruction] merely informs the jury to reject unreasonable interpretations of the evidence and to give the defendant the benefit of any reasonable doubt.  No reasonable juror would have interpreted these instructions to permit a criminal conviction where the evidence shows defendant was 'apparently' guilty, yet not guilty beyond a reasonable doubt."

We therefore reject defendant's claims that instructing the jury under CALJIC Nos. 2.01 and 2.90 was error, whether these instructions are considered separately or in conjunction.

*Hawkins*, 10 Cal.4th at 954-55.  That conclusion was not contrary to U.S. Supreme Court precedent, even under the less deferential standard for reviewing allegedly infirm jury instructions enunciated in some cases prior to *Boyde* and *Estelle v. McGuire*.  No reasonable juror could have interpreted the instructions to allow conviction on proof less than beyond a

---

[11] While petitioner claims that the terms "moral certainty" and "moral evidence"are not commonly understood terms, he concedes that the U.S. Supreme Court has rejected the contention that those terms, taken in the context of CALJIC 2.90 as a whole, could be misinterpreted by a jury as allowing conviction upon proof less than beyond a reasonable doubt. *Victor*, 511 U.S. at 10-17.

reasonable doubt merely because he or she was informed to accept reasonable interpretations of the evidence where the only other interpretation was unreasonable, especially after having been informed repeatedly that the prosecution bore the burden of proving guilt beyond a reasonable doubt.  Rather, under all the instructions given, a reasonable juror would understand that, even if all the circumstantial evidence had to be interpreted as the prosecution posited, such evidence, in combination with all the other evidence, had to amount to proof beyond a reasonable doubt in order to convict.

In his second challenge to CALJIC 2.01, petitioner claims that the instruction impermissibly placed a burden of proof on petitioner to rebut circumstantial evidence proffered by the prosecution.  This argument fails for the same reason – even if the jury had to accept the prosecution's theory on circumstantial evidence not rebutted by petitioner, the instructions still charged the jury that such evidence and the inferences therefrom had to amount to proof beyond a reasonable doubt before the jury could convict.  Thus, the instruction did not require petitioner to rebut the evidence and thereby deprive him of the presumption of innocence – if the evidence and inferences therefrom did not amount to proof beyond a reasonable doubt, the jury was instructed to acquit him.[12]

As the court concludes that no reasonable juror would have understood the instructions on reasonable doubt and circumstantial evidence to permit it to convict petitioner on proof less than beyond a reasonable doubt, summary adjudication of Claim M should be granted in favor of respondent.

xi.    *Claim N – Sufficiency of the Evidence for Hedlund Murder Conviction*

In Claim N of the Amended Petition, petitioner contends that "no rational trier of fact, after viewing the evidence in the light most favorable to the prosecution, could have found the

---

[12] Moreover, the court specifically instructed the jury that, "[i]n deciding whether or not to testify, the defendant may choose to rely on the state of the evidence and upon the failure, if any, of the People to prove beyond a reasonable doubt every essential element of the charge against him[.]" RT 4865-66.

1   essential elements of first degree murder on the Hedlund homicide beyond a reasonable doubt."

2   Pet'r's Cross-Mot. for Summ. Adj. at 61.  The parties agree to summary adjudication of Claim

3   N.

4        It is clearly established federal law that a conviction not supported by sufficient evidence

5   of each element of the charged crime – that is, "evidence necessary to convince a trier of fact

6   beyond a reasonable doubt of the existence of every element of the offense" – violates the

7   convicted person's right to due process under the Fourteenth Amendment.  *Jackson v. Virginia*,

8   443 U.S. 307, 315-16 (1979); *Sarausad v. Porter*, 479 F.3d 671, 677 (9th Cir. 2007), *rev'd on

9   other grounds by Waddington v. Sarausad*, __ U.S. __, 129 S. Ct. 823 (2009).  In considering a

10  sufficiency of the evidence claim, a reviewing court views the evidence in the light most

11  favorable to the prosecution.  *Jackson*, 443 U.S. at 318-19.  In addition, this Court evaluates

12  petitioner's claim under 28 U.S.C. § 2254(d)(1) rather than (d)(2):

13          Section 2254(d)(1) plainly applies to *Jackson* cases.  A state court must decide
            under *Jackson* whether the evidence, viewed in the light most favorable to the
14          prosecution, would allow any rational trier of fact to find the defendant guilty
            beyond a reasonable doubt.  If the state court affirms a conviction under *Jackson*,
15          a federal court is asked under § 2254(d)(1) to decide whether the state court
            adjudication "resulted in a decision that . . . involved an unreasonable application
16          of[] clearly established Federal law, as determined by the Supreme Court of the
            United States."  That is, we are asked to decide whether the state court's
17          application of *Jackson* was "objectively unreasonable."  *Juan H. [v. Allen]*, 408
            F.3d [1262] at 1275 n.13 [(9th Cir. 2005)].

18
            By contrast, § 2254(d)(2) is not readily applicable to *Jackson* cases.  Under §
19          2254(d)(2), the federal court must decide whether the state court adjudication
            "resulted in a decision that was based on an unreasonable determination of the
20          facts in light of the evidence presented in the State court proceeding."  (Emphasis
            added.)  Section 2254(d)(2) does not describe the task of a court in performing a
21          *Jackson* analysis.  A court under *Jackson* makes no "determination of the facts" in
            the ordinary sense of resolving factual disputes.  Rather, the court views the
22          evidence in the light most favorable to the prosecution without resolving any
            disputed factual questions.  Our task under AEDPA in reviewing a state court's
23          holding applying *Jackson* is not to decide whether that court unreasonably
            determined disputed facts.  It is, rather, to decide whether the state court
24          unreasonably applied the *Jackson* test of "whether, after viewing the evidence in
            the light most favorable to the prosecution, any rational trier of fact could have
25          found the essential elements of the crime beyond a reasonable doubt."

26  ////

We therefore evaluate a state court's resolution of a *Jackson* sufficiency-of-the-evidence claim in all cases under § 2254(d)(1) rather than § 2254(d)(2)[.]

*Sarausad*, 479 F.3d at 677-68.

In rejecting Claim N, the California Supreme Court reasoned:

There was sufficient evidence linking defendant to the Hedlund murder. First, as discussed above, unrebutted ballistics evidence, in conjunction with the eyewitness testimony of Jerry Stevens, placed the Hedlund murder weapon in defendant's hands approximately six days after Hedlund's murder. Second, Jill Gibbs testified that defendant and Hedlund left the Uptown Saloon, where Hedlund was last seen alive, within minutes of each other. Defendant and Hedlund had played pool that night, and had developed some sort of association. It was also a fact that Hedlund did not own a working automobile, and the jury could have inferred Hedlund received a ride from defendant. Hedlund was wrapped in a horse blanket covered with bird feathers and horsehair. Defendant had stayed shortly before that time on a horse ranch whose owner raised birds. All this evidence was sufficient to permit a rational trier of fact to conclude that defendant was guilty beyond a reasonable doubt of the Hedlund murder.

*Hawkins,* 10 Cal.4th at 955. That rationale was not contrary to, nor an unreasonable application of, *Jackson.* This Court need not discuss the evidence, aptly summarized by the California Supreme Court, further.

Petitioner also claims that, even if there was sufficient evidence that he killed Hedlund, there was insufficient evidence that he did so with premeditation and deliberation. In rejecting this argument, the California Supreme Court stated:

Defendant's second claim – that there is insufficient evidence defendant committed the Hedlund murder with premeditation and deliberation – is also without merit. The unrefuted testimony of a forensic expert showed that Hedlund was shot twice, once in the back of the head near the base of the skull and once in the back of the neck. According to the pathologist's examination of the burned and unburned gunpowder residues found on Hedlund's body, one of the shots was fired from a close range, between three and twelve inches away. The angle of entry and the downward trajectory of the bullets through Hedlund's body suggest that the position of the gun was somewhere above his head. As defendant was several inches shorter than Hedlund, it could be reasonably surmised that Hedlund may have been crouching or kneeling at the time the shots were fired. The manner of the killing clearly suggests an execution-style murder.

Moreover, there was little if any evidence of struggle, except for a single scratch on Hedlund's throat, that might lend support to the hypothesis that the murder occurred on impulse or in a rage. There were no signs that Hedlund had struggled with his assailant. The relatively superficial abrasions on the face and neck are

consistent with the victim's fall forward after having been shot in the back of the head.  A trier of fact could have concluded from such evidence that the Hedlund murder was committed with premeditation and deliberation.

Defendant contends that *People v. Anderson* (1968) 70 Cal. 2d 15 [73 Cal. Rptr. 550, 447 P.2d 942] supports his argument that evidence of premeditation and deliberation was insufficient in this case.  In *Anderson* we identified three types of evidence used to sustain a finding of premeditation. These were:  "(1) facts about how and what defendant did prior to the actual killing which show that the defendant was engaged in activity directed toward, and explicable as intended to result in, the killing – what may be characterized as 'planning' activity; (2) facts about the defendant's prior relationship and/or conduct with the victim from which the jury could reasonably infer a 'motive' to kill the victim, which inference of motive, together with facts of type (1) or (3), woid in turn support an inference that the killing was the result of 'a pre-existing reflection' and 'careful thought and weighing of considerations' rather than 'mere unconsidered or rash impulse hastily executed' [citation]; (3) facts about the nature of the killing from which the jury could infer that the manner of killing was so particular and exacting that the defendant must have intentionally killed according to a 'preconceived design' to take his victim's life in a particular way for a 'reason' which the jury can reasonably infer from facts of type (1) or (2)."  (*Id.* at pp. 26-27.)  The *Anderson* court concluded that "this court sustains [a first degree murder conviction] when there is evidence of all three types and otherwise requires at least extremely strong evidence of (1) or evidence of (2) in conjunction with either (1) or (3)."  (*Id.* at p. 27.)  Defendant claims that there was no evidence of planning and motive, and that, under Anderson, manner-of-killing evidence alone is insufficient to prove beyond a reasonable doubt premeditation and deliberation.

Defendant's reliance on *Anderson*, however, is of no avail.  As this court recently stated, "The *Anderson* analysis was intended only as a framework to aid in appellate review; it did not propose to define the elements of first degree murder or alter the substantive law of murder in any way."  (*People v. Perez* (1992) 2 Cal. 4th 1117, 1125 [9 Cal. Rptr. 2d 577, 831 P.2d 1159].)  The *Anderson* guidelines were formulated as a synthesis of prior case law, and are not a definitive statement of the prerequisites for proving premeditation and deliberation in every case.

Specifically, the *Anderson* court had no occasion to consider a case like the present one, in which evidence of the manner of killing strongly pointed to an execution-style murder.  *Anderson* recognized that manner-of-killing evidence is often ambiguous, and frequently cannot be relied on by itself to support an inference of premeditation beyond a reasonable doubt.  But *Anderson* did not confront the question whether manner-of-killing evidence which clearly indicates an execution-style murder was sufficient to sustain a first degree murder verdict. We have recognized elsewhere the strength of such evidence in support of a finding of premeditation and deliberation. (*People v. Bloyd* (1987) 43 Cal. 3d 333 [233 Cal. Rptr. 368, 729 P.2d 802].)  In *Bloyd* the forensic evidence "described actions that were cold and calculated," shots to the head taken at extremely close range while one of the victims was on her back, the other kneeling, with no bruises and lacerations to show a struggle.  (*Id.* at p. 348.)  Although the *Bloyd*

1

> court found evidence of motive as well, such evidence is not indispensable to
> proving premeditation when the manner-of-killing evidence is so compelling.

2

> (*See People v. Davis* (1995) 10 Cal. 4th 463, 510-511 [41 Cal. Rptr. 2d 826, 896
> P.2d 119].)

3

4

> In sum, although evidence of planning and motive was indeed minimal if not
> totally absent in the present case, we conclude that the manner-of-killing evidence

5

> was sufficiently strong to permit a trier of fact to conclude beyond a reasonable
> doubt that defendant committed the Hedlund murder with premeditation and

6

> deliberation. We therefore reject in toto defendant's insufficiency of evidence
> arguments.

7    *Hawkins*, 10 Cal.4th at 956-57.  Petitioner contends that the California Supreme Court

8    unreasonably applied *Jackson* by allowing petitioner's conviction to stand despite the lack of

9    evidence of planning or motive, which petitioner characterizes as elements of premeditated and

10   deliberate first degree murder.  Petitioner's argument is not supported by California substantive

11   law, however, which clearly provides that the *Anderson* factors are not elements of premeditated

12   and deliberated first degree murder, but are simply factors to aid appellate review, as the

13   California Supreme Court correctly stated in petitioner's case.  *People v. Perez*, 2 Cal.4th 1117,

14   1125 (1992) (stating that the *Anderson* factors are merely guides to appellate review and not

15   essential prerequisites to a finding of first degree murder and that *Anderson* did not define or

16   alter the elements of that crime); *People v. Daniels*, 52 Cal.3d 815, 869-70 (1991) (same);

17   *People v. Lucero*, 44 Cal.3d 1006, 1021 (1988) ("The *Anderson* factors . . . are not elements of

18   the crime of first degree murder which the jury must find proven beyond a reasonable doubt

19   before returning a guilty verdict.")  Because the California Supreme Court's conclusion that the

20   evidence indicating that Hedlund had been shot from close range in the back of the head and

21   neck while kneeling or crouching was sufficient to show premeditation and deliberation was not

22   contrary to, nor an unreasonable application of *Jackson*, summary adjudication of Claim N must

23   be granted in favor of respondent.

24       xii.   *Claim O – Juror's Reliance on Personal Knowledge of Ballistics*

25       In Claim O of the Amended Petition, petitioner contends that Ronald Creighton, the

26   foreman of the guilt-phase jury, committed misconduct by utilizing his personal experience with

56

1    ballistics comparison in deliberating with the other jurors.  The parties agree to summary

2    adjudication of Claim O.  Because this claim was denied without opinion by the California

3    Supreme Court in its rejection of petitioner's state habeas petition, this Court must independently

4    review the record to determine whether that denial was objectively unreasonable.  *Himes,* 336

5    F.3d at 853.

6         Petitioner constructs the facts underlying Claim O from three juror declarations dating

7    from the early 1990s.   Am. Pet'n, Exs. 10-12.  This evidence raises a preliminary admissibility

8    issue under Federal Rule of Evidence 606(b), which applies in federal habeas corpus

9    proceedings.  Fed. R. Evid. 1101(e).  Rule 606(b) provides:

10        Upon inquiry into the validity of a verdict or indictment, a juror *may not* testify

11             [1] as to any matter or statement occurring during the course of the jury's
               deliberations[,] or

12             [2] to the effect of anything upon [the deliberations] or any other juror's
               mind or emotions as influencing the juror to assent to or dissent from the
13             verdict or concerning the juror's mental processes in connection therewith.

14        But a juror *may* testify about

15             (1) whether extraneous prejudicial information was improperly brought to
               the jury's attention,

16             (2) whether any outside influence was improperly brought to bear upon
               any juror, or

17             (3) whether there was a mistake in entering the verdict onto the verdict
               form.
18
          A juror's affidavit or evidence of any statement by the juror may not be received
19        on a matter about which the juror would be precluded from testifying.

20    Fed. R. Evid. 606(b) (emphasis added).  Respondent argues that the juror declarations proffered

21    by petitioner are inadmissible as evidence of something occurring during deliberations and the

22    effect of that event on jurors' mental processes.  While not directly addressing the admissibility

23    issue, petitioner characterizes the declarations as concerning extraneous prejudicial information

24    (making them admissible).

25        While a juror's past personal experiences may be an appropriate part of jury deliberation,

26    such experience constitutes extraneous evidence which may be used to impeach the verdict

where: (1) a juror has personal knowledge of the parties or issues in the litigation, or (2) a juror

uses past experience regarding a fact on which no evidence has been submitted.  *United States v.*

*Navarro-Garcia*, 926 F.2d 818, 821-22 (9th Cir. 1991) (finding that a juror's experiment

designed to replicate some facts of the crime to assess truth of evidence presented constituted

extraneous evidence); *see also Hard v. Burlington N. R.R.*, 812 F.2d 482, 485-86 (9th Cir. 1987)

(finding that juror's personal knowledge of the defendant's settlement practices constituted

extraneous evidence).  To determine whether juror Creighton introduced extraneous evidence

into the deliberations, the court must review the declarations to review the facts alleged therein.

First, in a declaration dated December 4, 1992, juror Judy Egan states that Creighton

represented himself as "having knowledge about ballistics" and insisted on discussing his

ballistics experience and opining that the bullets from the two crime scenes matched.  Am. Pet'n,

Ex. 10, at 2, ¶¶ 3-5.  According to Egan, the match of the bullet evidence "was one of the main

points of contention during deliberations on the Hedlund Murder."  *Id.*, ¶ 6.  Juror Melvin Stone,

in a declaration dated December 14, 1992, also states that Creighton "represented himself to the

jury as having experience in law enforcement" and opined that the bullet fragments came from

the same gun.  Am. Pet'n, Ex. 11, ¶¶ 3-4.  Stone similarly declares that whether the bullets

matched "was one of the main points of contention during deliberations on the Hedlund murder."

*Id.*, ¶ 5.  Stone concludes that, "[j]ust based on the evidence about the Hedlund murder, I am still

*not* convinced beyond a reasonable doubt that Hawkins committed that offense."  *Id.*, ¶ 6.

Creighton, for his part, declares in a September 13, 1994 declaration that he never claimed to be

an "expert" in bullet comparison, but that he did inform the other jurors that he had some

experience and training in that field.  Am. Pet'n, Ex. 12, ¶ 4.  Creighton states that he examined

the blown-up photos of the bullet fragments that had been received in evidence, concluded that

the bullets matched, and shared that opinion with the other jurors.  *Id.*, ¶ 5.  According to

Creighton, other jurors also examined the photos and shared their opinions about whether the

bullets matched.  *Id.*  Moreover, each of the jurors heard and had the opportunity to consider and

weigh the testimony and opinions of the ballistics expert.  Each was free to properly rely on their

respective life experiences in evaluating that testimony.  The issues covered by that testimony

may or may not have been a decisive issue for each of the jurors.  According to Creighton, the

ballistics match was not the most important issue discussed in deliberating on the Hedlund

charge, and he notes that Egan voted "guilty" in an initial poll on that count along with 10 other

jurors, before the jury began discussing the evidence, the lone dissenting voice being that of

"[t]he elderly black juror." *Id.* ¶ 7.  Egan might feel differently, but the issue is whether it has

been shown that extraneous prejudicial information was improperly brought before the jury.

Based on the facts presented in the declarations, the court concludes that Creighton did

not introduce extraneous evidence into deliberations.  Creighton did not have personal

knowledge of Hawkins's case or the unique issues presented by it; rather, he had experience and

training in ballistics comparison generally and used that experience to evaluate the expert

testimony and evidence that had been submitted (i.e., the blown-up photos of the bullets).  The

juror declarations are thus inadmissible under Rule 606(b).

Even if the court were to consider the declarations, they do not establish juror misconduct

entitling petitioner to relief.  It is clearly established federal law that the Fourteenth

Amendment's guarantee of due process includes a criminal defendant's right to a determination

of guilt based on the evidence developed at trial.  *Turner v. Louisiana*, 379 U.S. 466, 471-72

(1965) (finding constitutional error where jurors had associated with key prosecution witnesses

during trial).  Nevertheless, jurors are permitted and expected to rely on their life experiences in

deliberations.  *Head v. Hargrave*, 105 U.S. 45, 49 (1881); *Hard v. Burlington*, 870 F.2d 1454,

1460 (9th Cir. 1989).  As discussed above, Creighton's conduct during deliberations did not

amount to misconduct.  Rather, he permissibly relied on his general experience with ballistics

comparison to evaluate the evidence presented.

Moreover, even if Creighton's conduct did cross a constitutional line, and the record fails

to show that it did, any error was harmless.  Petitioner characterizes the declarations in question

as showing that "[s]ome jurors originally voted not guilty on the Hedlund murder case because they believed that the prosecution had not shown that the bullet fragments recovered from the two murder scenes had been fired from the same gun.  Others had a reasonable doubt about petitioner's culpability for this offense, even if the ballistics evidence was believed."  Pet'r's Cross-Mot. for Summ. Adj. at 66.  However, none of the jurors for whom petitioner has provided declarations stated that they originally voted "not guilty" on the Hedlund charge due to misgivings about the ballistics evidence.  More importantly, neither Egan nor Stone state that they credited the ballistics experts' testimonies or voted to convict petitioner on the Hedlund charge because Creighton also opined in deliberations that the bullets matched.  Accordingly, petitioner has not shown that Creighton's conduct had any influence on the verdict, much less a "substantial and injurious influence," and that conduct was therefore harmless.  *Brecht*, 507 U.S. at 637-38.

For the foregoing reasons, summary adjudication of Claim O should be granted in favor of respondent.

xiii.  *Claim P – Counsel's Performance Regarding Evidence of Self Defense on Hicks Murder*

In Claim P of the Amended Petition, petitioner contends that his trial counsel rendered ineffective assistance by "failing to consult a criminalist in support of a theory of self-defense to the Hicks murder" and establishing that the shooting occurred when Hicks came at the shooter. Pet'r's Cross-Mot. for Summ. Adj. at 68.  According to petitioner, "[c]ompetent counsel would have used this evidence alone without conceding that it was petitioner who was the shooter, or, in combination with mental health evidence that petitioner suffered from symptoms of post-traumatic stress disorder, to establish that there was no intent to kill."  *Id.*  Petitioner further argues that competent counsel would have used such evidence in the penalty phase to mitigate the circumstances of the crime.  Petitioner seeks an evidentiary hearing on Claim P, while respondent submits that no hearing is necessary.

1   For the reasons stated below regarding petitioner's Motion for Evidentiary Hearing, the

2   facts alleged by petitioner in support of Claim P, even if proven true, would not entitle him to

3   relief.  Accordingly, summary adjudication of Claim P must be granted in favor of respondent.

4      xiv.   *Claim Q – Jury Instruction on Intent to Kill for Multiple Murder Special*
              *Circumstance*

5

6   In Claim Q of the Amended Petition, petitioner claims that the trial court erroneously

7   failed to instruct the jury that it must find intent to kill to find true the multiple murder special

8   circumstance and that trial counsel was ineffective for failing to request such an instruction.  The

9   parties agree to summary adjudication of Claim Q.

10   As discussed in regard to Claim M, it is clearly established federal law that the

11   Constitution requires proof beyond a reasonable doubt of each element of the offense charged

12   and that jury instructions may be challenged as violating due process if they fail to so instruct.

13   In petitioner's case, the law applicable at the time of his trial required that the jury find that the

14   defendant acted with intent to kill to find the multiple murder special circumstance true.  *People*

15   *v. Anderson*, 43 Cal.3d 1104, 1147 (1987); *People v. Turner*, 37 Cal.3d 302, 328-29 (1984).  The

16   California Supreme Court rejected Claim M because "the jury was instructed on, and found,

17   intent to kill in *both* the Hedlund and Hicks murders."  *Hawkins*, 10 Cal.4th at 959 n.6.  The

18   court did not provide a record citation for that assertion, although respondent cites to CT 281, the

19   instruction given on the felony murder special circumstance.  The multiple murder special

20   circumstance instruction, however, unlike the felony murder instruction, did not instruct the jury

21   that it must find intent to kill to find the circumstance true.  CT 282.  Thus, in connection with

22   the special circumstances, the jury was instructed only that it had to find that petitioner intended

23   to kill Hicks, as that was the only murder qualifying for the felony murder special circumstance.

24   The California Supreme Court was not entirely incorrect, however – the trial court did instruct

25   the jury on intent to kill with regard to the Hedlund murder, but it did so in its instruction on

26   first-degree murder and not in the instruction on the multiple murder special circumstance.  CT

270 (instructing that first-degree murder is willful, defining "willful" as "intentional," and stating that a killing "preceded and accompanied by a clear, deliberate intent on the part of defendant to kill" is first-degree murder).

The trial court also instructed the jury that a first-degree murder conviction could be based on a killing committed during the course of a robbery.  CT 271.  According to petitioner, we cannot infer from the jury's decision to convict petitioner of the first-degree murder of Hedlund that it found that he committed the murder with intent to kill, because the jury could have found first-degree murder after concluding that petitioner killed Hedlund during the course of a robbery.  There was absolutely no evidence, however, that Hedlund was killed in the course of a robbery, and thus no basis whatsoever for the jury to convict petitioner of first-degree felony murder with regard to Hedlund.  As the only other first-degree murder option for the jury depended on a finding that petitioner acted with intent to kill, it is clear that the jury concluded that petitioner intended to kill Hedlund.  The trial court's failure to instruct the jury that it had to find that petitioner intended to kill Hedlund to find the multiple murder special circumstance true was therefore harmless, as the jury would have found that circumstance true even if it had been correctly instructed.  *California v. Roy*, 519 U.S. 2, 4-6 (1996) (applying *Brecht* harmless error analysis to trial court's failure to instruct on intent element of crime).  For the same reason, petitioner cannot show that his attorneys' failure to object to the defective instruction caused him prejudice.  Accordingly, summary adjudication of Claim Q should be granted in favor of respondent.

   xv.   *Claims T and FF – Constitutionality of California's Death Penalty Law*

In Claims T and FF, petitioner challenges the constitutionality of California's Death Penalty Law on a number of grounds.  The parties agree to summary adjudication of these claims.  In particular, petitioner claims:

   (1)   The law violates his rights to due process, a speedy trial, confrontation of adverse witnesses, equal protection, double jeopardy, and to a reliable and non-arbitrary

1   penalty determination by allowing evidence of unadjudicated criminal activity to

2   be considered as a factor in aggravation;

3   (2)   The law violates his rights to jury trial, to a reliable and non-arbitrary penalty

4   determination, and to equal protection by failing to assign burdens of proof and

5   persuasion during the penalty phase, and, specifically, by failing to require that

6   the jury unanimously conclude that the prosecution has proven certain things

7   beyond a reasonable doubt;

8   (3)   The law violates his rights to a reliable and non-arbitrary penalty determination

9   and to due process by failing to require that the jury be informed which factors

10   should be considered in aggravation and which in mitigation;

11   (4)   The law violates his rights to meaningful appellate review, due process, and equal

12   protection by failing to require that the jury make written findings;

13   (5)   The law violates his right to non-arbitrary imposition of the death penalty by

14   allowing prosecutors unfettered discretion to determine those murder suspects to

15   seek the death penalty against;

16   (6)   The law violates his right to non-arbitrary imposition of the death penalty by

17   failing to narrow the class of murderers eligible for death.

18   Some of these arguments were rejected by the California Supreme Court on petitioner's direct

19   appeal, while others were raised and rejected without opinion in petitioner's state habeas

20   proceeding.  The Court will address each argument in the order presented by petitioner and will

21   indicate the state's disposition of each in turn.

22   a.   Unadjudicated Criminal Activity

23   Petitioner argues that the introduction of evidence of unadjudicated criminal activity

24   during the penalty phase of his trial violated numerous federal constitutional guarantees as does

25   California Penal Code § 190.3(b) (hereinafter "factor (b)"), which allows the jury to consider

26   such evidence as an aggravating factor.  This argument was addressed only in part by the

California Supreme Court in its opinion on petitioner's direct appeal; there, the court addressed only whether factor (b) is unconstitutionally vague and overbroad. *Hawkins*, 10 Cal.4th at 954. As that court did not explain its reasons for denying the remaining contentions raised by petitioner regarding factor (b) in ruling on petitioner's state habeas petitions, this court must independently review the record to determine whether the denial of the remaining contentions was objectively unreasonable.

The prosecution introduced the following incidents of prior unadjudicated violent criminal activity under that section:

    (1)    resisting arrest and battery on police officers in 1974;

    (2)    assault with a deadly weapon on Frank Ruopoli in 1980;

    (3)    resisting arrest in 1981;

    (4)    assault with a deadly weapon on petitioner's brother, Gerald Hawkins, Jr., in 1987; and

    (5)    battery on Sacramento County Jail deputies in 1989.

RT 6366-6584; CT 410. According to petitioner, the 1974 resisting arrest and battery was dismissed pursuant to a plea bargain, the 1980 assault with a deadly weapon case was not prosecuted due to unreliability of evidence, he was not charged with a crime for the 1981 resisting arrest, and he was arrested but not prosecuted for the 1987 assault on his brother. The trial court instructed the jury, quoting factor (b), that it should consider "[t]he presence or absence of criminal activity by the defendant which involved the use or attempted use of force or violence or the express or implied threat to use force or violence." CT 408. It further instructed that, to use incidents of unadjudicated criminal activity as an aggravating factor, it must find them proved beyond a reasonable doubt. CT 410. It did not instruct the jury on the elements of battery, assault, or resisting arrest, however.

Petitioner raises a panoply of issues with regard to the unadjudicated criminal activity evidence. According to petitioner, the federal Constitution was violated in a number of ways

because: (1) the jury was not required to find unanimously that petitioner committed any one

unadjudicated violent criminal act (e.g., five jurors could believe that petitioner committed the

1974 resisting arrest, 3 could believe that he committed the 1980 assault, and 4 could believe that

he committed the 1981 resisting arrest, leading all 12 to conclude that factor (b) had been

established although not all agreeing on which act or acts established it); (2) the trial court was

not required to, and did not, instruct the jury on the elements of each of the unadjudicated

crimes; (3) the trial court did not instruct the jury not to use petitioner's murder convictions or

the evidence of other unadjudicated crimes to conclude that he had a criminal character and was

thus more likely to have committed a particular unadjudicated crime; (4) the trial court admitted

evidence of violent criminal activity by petitioner where charges related to that activity were

dismissed; and (5) California law treats capital sentencing proceedings differently than other

criminal proceedings in its rules about the admissibility of evidence of unadjudicated criminal

activity.

    In substance, petitioner's arguments fall into two categories.  One, he argues that the

federal Constitution directly requires additional procedural protections at capital sentencing with

regard to factor (b), and two, he contends that the federal Constitution indirectly requires

additional procedural protections because admission of evidence under factor (b) deprived him

of state-created liberty interests and equal protection.

    With respect to the first category of arguments advanced by petitioner, respondent

counters that no clearly-established federal law requires additional procedural protections and,

relatedly, that holding otherwise would create a new rule of constitutional criminal procedure

barred by *Teague v. Lane*, 489 U.S. 288 (1989).  The court agrees.  There simply is no U.S.

Supreme Court precedent requiring states to provide the procedural safeguards advocated by

petitioner in using prior misconduct at a capital sentencing proceeding.  What has been clearly

established by the Supreme Court is that, to be constitutionally valid, a death penalty law must

"be structured so as to prevent the penalty from being administered in an arbitrary and

1    unpredictable fashion" and must allow the jury to consider "any relevant mitigating evidence

2    regarding [the defendant's] character or record and any circumstances of the offense."

3    *California v. Brown*, 479 U.S. 538, 541 (1987) (internal quotation marks omitted).  The

4    procedures petitioner advocates are not dictated by these general rules.  Thus, the California

5    Supreme Court's denial of relief on petitioner's claims regarding factor (b)'s constitutionality

6    was not contrary to, nor an unreasonable application of, clearly established federal law, and

7    federal habeas relief is therefore unavailable to petitioner under 28 U.S.C. § 2254(d).

8           For similar reasons, the Court may not rule that the federal Constitution requires the

9    procedural protections urged by petitioner because, in doing so, it would create new rules which

10   are barred by *Teague*.  Under that case, where a rule is not compelled by existing precedent,

11   federal habeas relief may not be granted on the basis of the rule unless: (1) the rule forbids

12   "punishment of certain primary conduct" or prohibits "a certain category of punishment for a

13   class of defendants because of their status or offense" or (2) the rule is a "watershed rule of

14   criminal procedure implicating the fundamental fairness and accuracy of the criminal

15   proceeding."  *Beard v. Banks*, 542 U.S. 406, 416-17 (2004) (quoting *Penry v. Lynaugh*, 492 U.S.

16   302, 330 (1989)).  Petitioner does not contend that the first *Teague* exception applies here, but

17   claims that the rules he advocates fall within the second.  However, the U.S. Supreme Court has

18   "repeatedly emphasized the limited scope of the second *Teague* exception."  *Id.* at 417.  That

19   exception applies only to a "small core of rules" which have the "sweeping and fundamental"

20   nature of the rule announced in *Gideon v. Wainwright*, 372 U.S. 335 (1963), which held that

21   state criminal defendants are entitled to counsel under the federal Constitution.  The fact that

22   petitioner's new rules would incrementally enhance the reliability of capital sentencing

23   proceedings does not bring them within the scope of *Teague*'s second exception.  *Beard*, 542

24   U.S. at 419-20 (holding that the rule announced in *Mills*, 486 U.S. 367, which invalidated capital

25   sentencing schemes requiring juries to disregard mitigating factors not found unanimously, was

26   not a "watershed rule" under *Teague*); *O'Dell v. Netherland*, 521 U.S. 151 (1997) (holding that

1   the rule announced in *Simmons v. South Carolina*, 512 U.S. 154 (1994), that a capital defendant

2   must be allowed to inform the sentencer that he would be ineligible for parole if the prosecution

3   argues future dangerousness, was not a "watershed rule" under *Teague*); *Sawyer v. Smith*, 497

4   U.S. 227 (1990) (holding that the rule announced in *Caldwell v. Mississippi*, 472 U.S. 320

5   (1985), that the Eighth Amendment bars imposition of the death penalty by a jury that has been

6   led to believe that the responsibility for the ultimate decision lay elsewhere, was not a

7   "watershed rule" under *Teague*).   Accordingly, the rule of *Teague* prohibits this Court from

8   holding that the federal Constitution was violated because the state court did not provide the

9   procedural protections urged by petitioner in connection with the evidence of unadjudicated

10   criminal activity.

11         To address the second category of petitioner's factor (b) arguments – that the procedures

12   followed under that factor deprived him of state-created liberty interests and equal protection –

13   the Court must reconcile two threads of federal law.  First, it has been well-established that

14   "'federal habeas corpus relief does not lie for errors of state law.'" *Estelle v. McGuire*, 502 U.S.

15   at 67 (quoting *Lewis v. Jeffers*, 497 U.S. 764, 780 (1990) and citing *Pulley v. Harris*, 465 U.S.

16   37, 41 (1984)).   However, a clever petitioner may attempt to transform any state law issue into a

17   federal due process or equal protection claim by simply claiming that he was deprived of a state-

18   created liberty interest or of equal protection vis-a-vis defendants not subjected to a contested

19   state law procedure.  Such attempts have generally been rejected by federal habeas courts. *E.g.,*

20   *Beck v. Washington*, 369 U.S. 541, 554-55 (1962) (rejecting petitioner's claim that alleged

21   misapplication of a state law deprived him of equal protection because "the Fourteenth

22   Amendment does not assure uniformity of judicial decisions. . . [or] immunity from judicial

23   error" and noting that "otherwise, every alleged misapplication of state law would constitute a

24   federal constitutional question."); *Little v. Crawford*, 449 F.3d 1075, 1081-86 & n.6 (9th Cir.

25   2006) (rejecting petitioner's claim that he was deprived of equal protection and due process

26   simply because the state court misapplied state law).  Petitioner cites to two cases, however,

67

which considered such equal protection and due process claims premised on state law errors.

First, petitioner cites *Myers v. Ylst*, 897 F.2d 417 (9th Cir. 1990).  In that case, the Ninth Circuit found an equal protection violation where the state court had established a rule and applied it retroactively to one case, while refusing to apply the same rule to the petitioner's identical case.  Second, petitioner cites *Hicks v. Oklahoma,* 447 U.S. 343 (1980).  In that case, the U.S. Supreme Court found a due process violation where the state court had declined to require that the petitioner, who had been sentenced to a mandatory 40-year prison term under a habitual offender statute, be afforded resentencing after the habitual offender statute had been held to be unconstitutional.  The Court concluded that the petitioner had a liberty interest in being sentenced by a jury under the statute that applied following the invalidation of the habitual offender statute, which gave the jury discretion to impose a sentence of ten years or more.  *Id.* at 345-46.  *Myers* and *Hicks* are distinguished from the normal rule prohibiting review of state law errors by federal habeas corpus courts by the exceptional circumstances presented by those cases – in *Myers* the state court had arbitrarily applied different rules to identically-situated defendants and in *Hicks* the state court had left the petitioner with a 40-year prison sentence imposed under an invalid statute when the jury, it its discretion, could have imposed a substantially shorter term under the valid statute.  *See Little*, 449 F.3d at 1083 (stating that habeas review of state law errors may be appropriate in exceptional circumstances, such as where the error causes a complete miscarriage of justice).

Petitioner's state-law-based due process and equal protection claims do not present such exceptional circumstances.  He argues that he had a state-created liberty interest that evidence of unadjudicated criminal acts would not be introduced or would be subject to a limiting instruction under California Evidence Code § 1101(a) and his plea agreements in prior cases, but this argument ignores the special nature of capital sentencing, in which, contrary to the guilt phase, such evidence is highly relevant.  Moreover, a countervailing express statutory provision – factor (b) itself – provides that certain of such evidence may be considered as an aggravating factor in

1    capital sentencing proceedings.  *See Gregg v. Georgia*, 428 U.S. 153, 190-92 (1976) (plurality)

2    (recognizing that a defendant's prior criminal record is relevant at sentencing but irrelevant and

3    prejudicial at the guilt phase); *id.* at 203-04 (noting that a wide scope of evidence is allowed at

4    capital sentencing, because it is "desirable for the jury to have as much information before it as

5    possible when it makes the sentencing decision.")  Petitioner's contention that it violates equal

6    protection for California to allow evidence of unadjudicated crimes at capital sentencing but not

7    in non-capital sentencing proceedings similarly discounts the special nature of capital sentencing

8    and the state's rational interest in a jury determination based on relevant information.  Lastly, the

9    court concludes that no exceptional circumstances are presented by petitioner's claim that he was

10   deprived equal protection and of his state-created liberty interest in a unanimous jury on all

11   disputed factual issues under the California Constitution by the trial court's failure to require

12   unanimous findings as to each of the unadjudicated crimes introduced under factor (b) and their

13   elements.  Petitioner cites to no cases interpreting the state Constitution as requiring such

14   particularized unanimity in capital sentencing proceedings, and the court is therefore disinclined

15   to hold not only that such unanimity is required by the state Constitution but that its deprivation

16   is an exceptional circumstance warranting federal habeas relief.

17          As the Court is barred by *Teague* from holding that the federal Constitution requires

18   additional procedures than those provided by California law respecting the introduction and

19   consideration of evidence of unadjudicated criminal activity in a capital sentencing proceeding,

20   and as petitioner's case does not present exceptional circumstances giving rise to a federal due

21   process or equal protection claim based on state law issues, petitioner is not entitled to federal

22   habeas relief on his claims regarding factor (b).

23                      b.  Burdens of Proof and Persuasion

24          Petitioner next argues that the California Death Penalty Law is unconstitutional in a

25   number of ways because it does not expressly assign a burden of proof or persuasion to the state

26   and does not inform the jury of such a burden (or the absence of such a burden).  The California

1    Supreme Court rejected this argument without providing any reasoning in response to

2    petitioner's habeas petitions, and the court therefore reviews the record independently to

3    determine whether that rejection was objectively unreasonable.

4            First, petitioner argues that the failure to assign a burden of proof violates the Sixth

5    Amendment as interpreted in *Ring v. Arizona*, 536 U.S. 584 (2002) and *Apprendi v. New Jersey*,

6    530 U.S. 466 (2000).  He asserts that once a defendant has been found eligible for the death

7    penalty because a jury has determined unanimously and beyond a reasonable doubt that a special

8    circumstance exists under California Penal Code § 190.2, *Ring* and *Apprendi* require that, in

9    deciding whether the defendant should actually receive that penalty, the jury must find

10   unanimously and beyond a reasonable doubt that the aggravating circumstances outweigh the

11   mitigating circumstances and that death is the appropriate penalty under all the circumstances.

12   *Ring*, however, instructs only that, under *Apprendi*, where the jury's verdict alone does not make

13   the defendant eligible for the maximum punishment of death, additional findings necessary to

14   make the defendant eligible for that punishment must be found by a jury beyond a reasonable

15   doubt.  *Ring*, 536 U.S. at 597-609.

16           Even if the court were to agree with petitioner that some language in *Ring* could be

17   interpreted as requiring a jury determination beyond a reasonable doubt of all findings made in

18   selecting whether death is the appropriate penalty, *Ring* was not the law at the time that

19   petitioner's conviction became final, and is thus a "new rule" under *Teague* for purposes of this

20   case.  *Beard*, 542 U.S. at 411.  The Supreme Court has held that the *Ring* rule is not a "watershed

21   rule" and that *Teague* thus bars its retroactive application to cases which were final before it was

22   announced.  *Schriro v. Summerlin*, 542 U.S. 348 (2004).  The holding is binding here.

23           Petitioner's remaining contentions regarding the burdens of proof and persuasion and

24   jury unanimity at sentencing, like his arguments with respect to factor (b), *supra*, fail for similar

25   ////

26   ////

                                                    70

reasons.  No clearly established federal law requires the procedures he advocates.[13]  To rule that

these procedures are mandated by the federal Constitution would be to adopt a new rule under

*Teague*, but the procedures do not represent the kind of sweeping and fundamental change as to

qualify as "watershed rules" that may be retroactively applied to petitioner's case.  *See Williams*

*v. Calderon*, 52 F.3d 1465, 1485 (9th Cir. 1995) ("[T]he failure of the statute to require a specific

finding that death is beyond a reasonable doubt the appropriate penalty does not render it

unconstitutional.").  Petitioner's argument that equal protection was violated by non-unanimous

jury findings at his capital sentencing because non-capital cases are treated differently does not

establish a miscarriage of justice in his case or other exceptional circumstances that would cause

the court to conclude that the differential treatment provided by state law arises to a federal

constitutional issue.  Accordingly, petitioner is not entitled to federal habeas relief on his claim

that the California Death Penalty Law is unconstitutional for failing to assign burdens of proof

and persuasion and for failing to require jury unanimity on all aggravating factors.

### c. Failure to Label Sentencing Factors

Petitioner next argues that the California Death Penalty Law is unconstitutional because

it fails to label which factors listed in California Penal Code § 190.3 are aggravating factors and

which are mitigating factors.[14]  He further argues that the trial court should have deleted from its

---

[13]  Petitioner contends that the Constitution requires:  (1) that the state bear some burden of proof at sentencing; (2) that that burden of proof be "beyond a reasonable doubt"; (3) that if no burdens of proof are allocated, the jury must be so informed; and (4) the jury must unanimously find aggravating factors.

[14]  Section 190.3 lists the following factors to guide the jury in determining whether to impose the death penalty:

(a)     The circumstances of the crime of which the defendant was convicted in the present proceeding and the existence of any special circumstances found to be true pursuant to Section 190.1.

(b)     The presence or absence of criminal activity by the defendant which involved the use or attempted use of force or violence or the express or implied threat to use force or violence.

instruction all of the statutory mitigating factors which were inapplicable to his case, to ensure that the jury did not use the absence of those mitigating factors as aggravation.

The California Supreme Court rejected this argument on petitioner's direct appeal, holding that it was foreclosed by *Tuilaepa v. California*, 512 U.S. 967 (1994).  *Hawkins*, 10 Cal.4th at 964.  That determination was not contrary to, nor an unreasonable application of, clearly established federal law.  The U.S. Supreme Court has not held that the state must actually attach the labels of aggravating and mitigating to capital sentencing factors, although it has stated that, if labels are applied, due process prohibits the attachment of the label "aggravating" to a factor that is actually mitigating.  *Zant v. Stephens*, 462 U.S. 862, 885 (1983).  Nor has the U.S. Supreme Court held that the theoretical possibility that a jury may treat as an aggravating

-------

(c)    The presence or absence of any prior felony conviction.

(d)    Whether or not the offense was committed while the defendant was under the influence of extreme mental or emotional disturbance.

(e)    Whether or not the victim was a participant in the defendant's homicidal conduct or consented to the homicidal act.

(f)    Whether or not the offense was committed under circumstances which the defendant was reasonably believed to be a moral justification or extenuation for his conduct.

(g)    Whether or not defendant acted under extreme duress or under the substantial domination of another person.

(h)    Whether or not at the time of the offense the capacity of the defendant to appreciate the criminality of his conduct or to conform his conduct to the requirements of law was impaired as a result of mental disease or defect, or the affects of intoxication.

(I)    The age of the defendant at the time of the crime.

(j)    Whether or not the defendant was an accomplice to the offense and his participation in the commission of the offense was relatively minor.

(k)    Any other circumstance which extenuates the gravity of the crime even though it is not a legal excuse for the crime.

factor the absence of evidence to establish a listed mitigating factor violates the federal

Constitution, absent some indicator that the jury was directed to do so.  Instead, the Supreme

Court has stated that "[a] capital sentencer need not be instructed how to weigh any particular

fact in the capital sentencing decision" and "may be given unbridled discretion in determining

whether the death penalty should be imposed after it has found that the defendant is a member of

the class made eligible for that penalty." *Tuilaepa*, 512 U.S. at 979-80 (internal quotation marks

omitted).  The Ninth Circuit has accordingly stated that "[t]he death penalty statute's failure to

label aggravating and mitigating factors is constitutional." *Williams v. Calderon*, 52 F.3d at

1484.  As the state court's rejection of petitioner's argument was not contrary to U.S. Supreme

Court precedent, and because adoption of petitioner's argument would create a new rule barred

by *Teague*, petitioner is not entitled to relief on this claim.

d.  Written Findings

Petitioner next argues that the California Death Penalty Law is unconstitutional because

it does not require the jury to make written findings, which thwarts meaningful appellate review.

This claim was rejected without reasoning by the California Supreme Court in petitioner's state

habeas proceedings, but that determination was not objectively unreasonable.  No clearly

established federal law requires written findings.  *Williams v. Calderon,* 52 F.3d at 1484-85

(holding that no written findings are required to ensure meaningful appellate review).

Accordingly, this claim fails.

e.  Prosecutorial Discretion

Petitioner next contends that the California Death Penalty Law is unconstitutional

because it gives prosecutors unfettered discretion in determining which defendants against whom

they will seek the death penalty.  This claim was rejected without reasoning by the California

Supreme Court in petitioner's state habeas proceedings, but, again, that determination was not

objectively unreasonable, as no clearly established federal law requires that such prosecutorial

discretion be curtailed or otherwise regulated.  Rather, the U.S. Supreme Court has indicated that

such discretion, without evidence that it was exercised in a discriminatory manner, does not

cause constitutional concern.  *McCleskey v. Kemp*, 481 U.S. 279, 311-12 (1987); *Gregg*, 428

U.S. at 199.

> f.  Narrowing

Lastly, petitioner argues that the California Death Penalty Law is unconstitutional

because it fails to narrow the class of murderers eligible for death, as required by the Eighth

Amendment.  This claim was rejected without reasoning by the California Supreme Court in

petitioner's state habeas proceedings.  That determination was not objectively unreasonable, as

the law limits those eligible for the death penalty to distinct subclasses of the overall class of

murderers.  Cal. Pen. Code § 190.2.  Petitioner's argument to the contrary notwithstanding, the

aggregation of these subclasses is not equal to the overall class of murderers.  *Karis v. Calderon*,

283 F.3d 1117, 1141 n.11 (9th Cir. 2002) ("California has identified a subclass of defendants

deserving of death and by doing so, it has narrowed in a meaningful way the category of

defendants upon whom capital punishment may be imposed.) (internal citation and quotation

marks omitted).

> xvi.   *Claim U – Prosecutor's Penalty Phase Closing Argument*

In Claim U of the Amended Petition, petitioner contends that the prosecutor committed

misconduct in his closing argument during the penalty phase of the trial.  The parties agree to

summary adjudication of Claim U.

The U.S. Supreme Court has clearly established that improper argument by a prosecutor

that does not prejudice a specific right of the defendant may nevertheless be grounds for habeas

relief if it "'so infected the trial with unfairness as to make the resulting conviction a violation of

due process.'"  *Darden v. Wainwright*, 477 U.S. 168, 180 (1986) (quoting *Donnelly v.

DeChristoforo*, 416 U.S. 637, 643 (1974)); *see also Greer v. Miller*, 483 U.S. 756, 765 (1987).

Here, petitioner argues that his penalty trial was rendered fundamentally unfair because the

prosecutor improperly:  (1) argued that the death penalty was the only way to guarantee against

future violence and murders by petitioner and (2) used epithets to describe petitioner, thus

dehumanizing him.  He also alleges that counsel's failure to object to these aspects of the

prosecutor's argument constituted ineffective assistance.  The California Supreme Court ruled on

petitioner's claims as follows:

> Defendant claims in essence three types of prosecutorial misconduct, each of which will be considered in turn:

> 1. Future Dangerousness

> Defendant points to the prosecution's exposition on the issue of his future dangerousness and his potential menace to prison personnel.  After reviewing the eight felony convictions – most of them involving violence – to which defendant had stipulated, as well as his present crimes and other acts of violence for which he had not been charged, the prosecutor then went on to argue that defendant might continue his violent behavior if he were given a life sentence.  For example, the prosecutor stated: "For Herman Hicks, for Jerry Stevens, for John Hedlund, for the countless other people who have experienced firsthand the violence of Jeffrey Hawkins, [listing several victims from his previous felonies], and really for unborn generations in the future, I say enough is enough of this man."  Elsewhere, the prosecutor stated defendant was "a malevolent presence, waiting to strike at any moment, coiled like a snake, never knowing when that violence is going to erupt and kill someone."

> "'[W]e have held that argument directed to a defendant's future dangerousness, when based on evidence of the defendant's past conduct rather than expert opinion, is proper and does not invite speculation as to the defendant's possible release. . . .'  Moreover, 'we have consistently held that it is not misconduct for a prosecutor to argue at the penalty phase that if a defendant were sentenced to prison he might kill another prisoner. . . .'"  (*People v. Fierro* (1991) 1 Cal. 4th 173, 249 [3 Cal. Rptr. 2d 426, 821 P.2d 1302].)  In this case, the prosecutor's argument on future dangerousness was based on defendant's extensive record of violence rather than expert opinion and was fairly supported by the evidence.

> Nor is defendant's claim of ineffective assistance of counsel for failure to object to the prosecutor's remarks on future dangerousness well founded.  Because there is little chance such an objection would have succeeded in light of this court's holdings on the permissibility of future dangerousness arguments at the time of trial (*see People v. Davenport* (1985) 41 Cal. 3d 247, 288 [221 Cal. Rptr. 794, 710 P.2d 861]), defendant cannot show deficient performance in his trial counsel's failure to object.

> 2. Epithets

> In the course of summarizing defendant's career of criminal violence, the prosecutor referred to defendant as "coiled like a snake."  The act of sentencing defendant to life in prison was compared to "putting a rabid dog in the pound."  Defendant contends that this dehumanizing language improperly inflamed the jury's passions and further invited them to speculate on defendant's future conduct.  We do not condone the use of such terms in argument.  But as we have held, the use of such opprobrious epithets is not necessarily misconduct.  (*People v. Sandoval* (1992) 4 Cal. 4th 155, 180 [14 Cal. Rptr. 2d 342, 841 P.2d 862].)  Further, when the prosecutor's penalty phase argument is viewed as a whole, these epithets played an extremely minor role, in comparison to the lengthy discussion of defendant's prior criminal and violent acts.  In this instance we find

1    no misconduct from these remarks.

2    3. Comments on Defendant's Conduct in Prison

3    During defendant's closing argument, trial counsel commented in essence that the
     prosecutor had not introduced any evidence, at the penalty phase, of defendant's
     misbehavior while incarcerated, other than a single incident that had occurred in
4    the county jail while defendant was awaiting trial.  Counsel argued that the
     obvious implication of this lack of evidence was that defendant had not had
5    significant problems while incarcerated, and that therefore there was little risk in
     sentencing defendant to prison for life without possibility of parole.  In rebuttal,
6    the prosecutor responded to those comments by stating: "Defense counsel
     suggested that Jeffrey Hawkins does well in prison, that we ought to put him
7    there, because that's a good place for him.  And you know that, because the
     prosecution didn't present any evidence of his wrongdoing in prison.  [P] Well,
     that isn't necessarily the inference that follows.  Now, [defense counsel] had his
8    opportunity to present evidence in mitigation.  Part of that evidence that Jeffrey
     Hawkins would do so well in prison would be, wouldn't you think, the fact that he
9    was a model prisoner, if that were the fact?"

10   Defendant contends that these rebuttal remarks strongly suggested that the
     prosecutor possessed information outside the evidentiary record that he had
11   misbehaved while in prison, and that this improper suggestion constituted
     misconduct.  However, the prosecutor's remarks immediately after the ones
12   quoted above belie this contention.  "THE BOTTOM LINE OF ALL THIS: Don't
     be misled to think one way or the other, because there was no evidence presented
     about how he behaved in prison.  It's just not part of the evidence.  You shouldn't
13   draw any inferences one way or the other."  Thus, the prosecutor's rebuttal
     remarks, taken in context, do not imply that he had a covert knowledge of
14   defendant's violent prison behavior, but rather were designed to counter the
     negative inference by defense counsel that the lack of evidence of defendant's
     prison misconduct was positive evidence of good conduct.  As such, these
15   remarks did not constitute prosecutorial misconduct.

16   *Hawkins*, 10 Cal.4th at 960-62.  This reasoning was not contrary to, nor an unreasonable

17   application of, clearly established federal law.  Moreover, the prosecutor's pointing out that the

18   defense failed to present evidence in support of a factual argument did not impermissibly suggest

19   that the prosecutor possessed evidence outside the record on the factual issue in question.

20   Instead, it simply suggested to the jury what was stated by the prosecutor, i.e. that "there was no

21   evidence presented about how he behaved in prison.  It's just not part of the evidence.  You

22   shouldn't draw any inferences one way or the other."  *Id.*

23   While petitioner cites to *Darden* for the proposition that it is improper for a prosecutor to

24   comment in closing argument that death would be the only way to guarantee against a future

25   similar act by the defendant, that case addressed such comments made during the closing of the

26   *guilt phase* of the defendant's trial.  447 U.S. at 180.  In other cases, the Supreme Court has

76

1    expressly approved of consideration of future dangerousness at the *penalty phase* of a capital

2    trial without indicating that such consideration is improper.  *Simmons*, 512 U.S. at 162 ("This

3    Court has approved the jury's consideration of future dangerousness during the penalty phase of

4    a capital trial."); *Caldwell*, 472 U.S. at 335 (stating that, in a capital case, the jury has a valid

5    interest in receiving accurate information on the possibility of parole because the state has a

6    legitimate concern for the future dangerousness of the defendant should he be returned to

7    society); *California v. Ramos*, 463 U.S. 992, 1005-06 (1983) (holding that the jury is not

8    improperly diverted from its central task when asked to consider the defendant's potential for

9    future violence in considering whether to impose the death penalty, as long it considers that

10   particular defendant's future violence potential); *Jurek v. Texas*, 428 U.S. 262, 274-77 (1976)

11   (holding that Texas sentencing factor of future dangerousness was not overly vague); *see also*

12   *Commonwealth v. Mendiola*, 976 F.2d 475, 486 (9th Cir. 1992) (noting that consideration of

13   future dangerousness is improper at the guilt phase but proper at the penalty phase), *overruled on*

14   *other grounds by George v. Camacho*, 119 F.3d 1393, 1395 (9th Cir. 1997); *Campbell v.*

15   *Kincheloe*, 829 F.2d 1453, 1457-58 ("The Supreme Court has consistently held that the future

16   dangerousness of a defendant is a proper consideration in a capital sentencing proceeding.") &

17   1459 n.4 (finding that prosecutor's comments – suggesting that defendant would hold a grudge

18   and exact revenge on others in prison as he had done to his victim – did not render his penalty

19   trial fundamentally unfair).  As the California Supreme Court correctly noted, petitioner had

20   stipulated to a number of violent felonies and the prosecution had put on evidence of a number of

21   uncharged violent acts in addition to the crimes for which petitioner was being sentenced.  The

22   prosecutor's argument was based on this history of violence, specific to petitioner.  *See Ramos*,

23   463 U.S. at 1005-06.  In addition, the prosecutor did not misstate or manipulate the evidence,

24   there was substantial evidence of the statutory aggravating factors of prior violent conduct and

25   prior felonies, and the court instructed the jury to decide the penalty based on the evidence, not

26   the argument of counsel.  RT 6776, 6777; *see Darden*, 477 U.S. at 180 (concluding that, while

1  prosecutor's comment in his guilt-phase closing argument on the defendant's potential for future

2  violence was improper, it did not cause the trial to be fundamentally unfair).  Accordingly, the

3  court cannot find that petitioner was deprived of due process simply because the prosecutor's

4  argument raised the issue of petitioner's potential for future violence.

5          Nor can the Court grant relief to petitioner on his claim that the argument caused the jury

6  to use potential for future violence as a non-statutory aggravating factor.  The express statutory

7  aggravating factors of prior felonies and prior violent criminal conduct (California Penal Code

8  § 190.3(a) and (b)) are relevant in capital sentencing precisely because of what those past acts

9  may indicate about a capital defendant's future conduct.  Moreover, as respondent notes, the jury

10  was not instructed that future violence was a discrete aggravating factor, and the prosecutor did

11  not characterize it as an aggravating factor.

12          The court also rejects petitioner's contention that the prosecutor's argument with regard

13  to future dangerousness was not supported by the evidence.  While the prosecutor put forward

14  evidence of only one incident of violence by petitioner while incarcerated, he also presented

15  significant evidence of other incidents of violence by petitioner, including much violence

16  directed at law enforcement.  That evidence supported the reasonable inference that petitioner,

17  who had reacted to many situations involving authority in the past with violence, would continue

18  to react violently to authority in the future.

19          Lastly, while the epithets used by the prosecutor to describe petitioner in his closing

20  argument ("coiled like a snake," "jack-in-the-box," "rabid dog," "volcano") may be considered

21  improper, "it is not enough that the prosecutor's remarks were undesirable or even universally

22  condemned."  *Darden*, 477 U.S. at 180-81 (internal quotation marks omitted).  These brief

23  references, in the context of a 25 page long argument, and in light of the substantial evidence of

24  aggravating factors and the court's instruction to the jury not to base its decision on the

25  arguments of counsel but rather on the evidence, did not deprive petitioner of a fundamentally

26  ////

1  fair penalty-phase trial.[15]

2     Because the prosecutor's argument did not amount to misconduct under state law or the

3  federal Constitution, petitioner cannot show that counsel's failure to object to it constituted

4  deficient performance, or that he suffered prejudice therefrom.  Thus, the California Supreme

5  Court reasonably concluded that he had not shown ineffective assistance of counsel.

6     As the prosecutor's argument did not deprive petitioner of a fair trial and counsel did not

7  render ineffective assistance by failing to object thereto, summary adjudication of Claim U must

8  be granted in favor of respondent.

9     xvii.   _Claim V – Prosecutor's Comment on Petitioner's Silence_

10     In Claim V of the Amended Petition, petitioner contends that the prosecutor violated

11  petitioner's Fifth Amendment rights by commenting on his silence during the penalty phase, that

12  the trial court erroneously failed to give a curative instruction, and that his trial counsel was

13  ineffective for failing to request such an instruction.  The parties agree to summary adjudication

14  of Claim V.  The portions of Claim V alleging prosecutorial misconduct in commenting on

15  petitioner's silence and ineffective assistance of counsel were raised in petitioner's state habeas

16  petition and denied without comment by the California Supreme Court.  This court must

17  therefore review the record independently to determine whether the denial of those portions of

18  Claim V was objectively unreasonable.  Petitioner's claim that the trial court erroneously failed

19  to give an instruction admonishing the jury not to draw an adverse inference from his failure to

---

20

21     [15] Petitioner also argues that the prosecutor's comments deprived him of his right under
   the Eighth Amendment to be free from cruel and unusual punishment, citing _Penry v. Lynaugh_,

22  492 U.S. 302, 328 (1989).  In that case, the U.S. Supreme Court held that a jury must be
   provided with "a vehicle for expressing its reasoned moral response" to mitigating evidence – to

23  wit, instructions that it may decline to impose the death penalty based on its consideration of
   mitigating evidence – to avoid the risk that death will be imposed in spite of factors calling for a

24  less severe penalty.  _Id._  Petitioner has not provided the court with any authority holding that a
   prosecutor's comments during closing argument can operate to prevent a jury from expressing its

25  reasoned response to mitigating evidence.  Even if _Penry_ were extended into that context, the
   court concludes, for the same reasons provided above, that the prosecutor's comments here were

26  not so inflammatory and prejudicial, in light of the entirety of his argument and evidence as a
   whole, as would prevent the jury from giving the mitigating evidence its due consideration.

testify was rejected by the California Supreme Court on petitioner's direct appeal, and this court

therefore must determine whether that reasoning was contrary to, or an unreasonable application

of, clearly established federal law.

It is clearly established federal law that the Constitution prohibits a prosecutor from

inviting the jury to make an inference adverse to the defendant because he exercised his

constitutional right not to testify, because such commentary acts as "a penalty by the courts for

exercising a constitutional privilege.  It cuts down on the privilege by making its assertion

costly."  *Griffin v. California*, 380 U.S. 609, 614 (1965).  This principle applies with equal force

in sentencing proceedings as it does in guilt proceedings.  *Mitchell v. United States*, 526 U.S.

314, 329 (1999); *see Estelle v. Smith*, 451 U.S. 454, 462-63 (1981).  Some comments may

implicate the defendant's silence while not expressly noting the decision not to testify or inviting

the jury to make an adverse inference from that decision, however.  Comments which violate the

Constitution are those which either: (1) are manifestly intended to call attention to the

defendant's failure to testify, or (2) are of such a character that the jury would naturally and

necessarily understand them to be comments on the failure to testify.  *Lincoln v. Sunn*, 807 F.2d

805, 809 (9th Cir. 1987); *see also Hovey v. Ayers,* 458 F.3d 892, 911-13 (9th Cir. 2006);

*Beardslee v. Woodford*, 358 F.3d 560, 586 (9th Cir. 2004).  *Griffin* errors are subject to harmless

error review.  *Chapman,* 386 U.S. at 25-26.

In this case, the prosecutor stated in his penalty-phase closing argument, after recounting

petitioner's past criminal activity and the crimes for which he was currently on trial:  "Now, he

just sits there, *doesn't say anything*, just quietly, meek, well-mannered, well-groomed, got a suit

and tie on.  But would any one of you hand him a gun?  He is a dangerous man."  RT 6813

(emphasis added).  After careful review of the prosecutor's argument, the court finds that this

comment was not manifestly intended to call attention to petitioner's failure to testify.  From the

context in which the comment was made, it is clear that the prosecutor was trying to

communicate to the jury simply that it should not infer that petitioner was not dangerous based

on his mild appearance in the courtroom and was not inviting the jury to make an adverse

inference (e.g., petitioner was dangerous or lacked remorse) because he did not take the stand to

tell the jury otherwise.  Nor was the comment such that the jury would naturally and necessarily

understand it as a reference to petitioner's decision not to testify.  Rather, the comment, in

context, was such that the jury would understand it as it was intended – as a comment on

petitioner's mild courtroom appearance.  Moreover, even if the court were to find that the

comment was constitutionally impermissible, the error was harmless.  The comment was a single

and very brief reference within the scope of a 25-page argument summarizing the significant

weight of evidence of aggravating factors introduced against petitioner at the penalty phase.  In

addition, the trial court instructed the jury twice to base its determination on the evidence and not

any other source, RT 6776, and that statements made by the attorneys did not constitute

evidence, RT 6777.  Because of these instructions and because the comment was so brief and

isolated, there is not a reasonable probability that it affected the jury's penalty verdict.  *See*

*Hovey*, 458 F.3d at 912-13 (holding that a *Griffin* error was harmless where it was isolated,

minimal in comparison to the evidence against the defendant, and the trial court instructed the

jury to decide the case on the evidence and not the arguments of counsel).  For the same reasons,

the trial court's failure to *sua sponte* provide a curative instruction, if error, was harmless,[16] and

petitioner was not prejudiced by trial counsel's failure to seek such an instruction.  Accordingly,

summary adjudication of Claim V should be granted in favor of respondent.

> xviii.  *Claim W – Claims Regarding Residual Doubt*

In Claim W of the Amended Petition, petitioner argues that the trial court's decision that

the second penalty-phase jury should not be informed of the first penalty-phase jury's deadlock

and his trial counsel's agreement not to argue that death should not be imposed due to lingering

---

[16] On this issue, the California Supreme Court ruled that petitioner was not entitled to relief because the trial court had no duty to *sua sponte* instruct the jury not to make an adverse inference from petitioner's decision not to testify.  *Hawkins*, 10 Cal.4th at 964-65.

1   doubt about petitioner's guilt for the crimes charged (the Hedlund murder in particular) violated

2   numerous constitutional provisions.  Petitioner seeks an evidentiary hearing on the ineffective

3   assistance subclaims contained in Claim W to resolve a factual dispute about whether trial

4   counsel's decision was a defensible strategic choice and also contends that a hearing is necessary

5   because Claim W is intertwined with Claim R (whether counsel failed to competently investigate

6   and present evidence at the penalty phase).  According to petitioner, counsel's strategy to focus

7   on petitioner's background rather than on lingering doubt was not reasonable because the

8   background investigation and presentation was itself deficient.

9          Petitioner's claims of trial court error hinge on his assertion that he has a right under

10   clearly established federal law to have the penalty-phase jury consider evidence to establish

11   "residual doubt" (also referred to as "lingering doubt").  According to petitioner, his

12   constitutional rights were violated when the jury did not consider two items that would have

13   caused it to harbor enough doubt about his guilt on the Hedlund murder that it would have

14   elected to impose life imprisonment rather than death.

15          First, petitioner urges that the jury should have considered evidence that the first jury

16   deadlocked on penalty, and that court should not have granted the prosecution's in limine motion

17   to exclude that evidence.  Petitioner claims that this ruling deprived him of his right under the

18   Eighth Amendment to have the jury consider and give effect to his mitigating evidence, because

19   lingering doubt is a proper mitigating factor under California law.  *See Tennard v. Dretke*, 542

20   U.S. 274, 285 (2004) (stating that a jury must be able to consider and give effect to a capital

21   defendant's relevant mitigating evidence).  This claim was rejected by the California Supreme

22   Court on petitioner's direct appeal, which stated:

23          Defendant also contends that the trial court's refusal to permit defense counsel to
            refer to the results of the first penalty phase deadlock was constitutional error
24          under the Eighth Amendment.  He argues that his right to have all mitigating
            evidence heard by the penalty phase jury (*see Lockett v. Ohio, supra*, 438 U.S. at
25          p. 604 [97 L. Ed. 2d at pp. 989-990]) includes the right to have the second jury
            consider that the first jury was unable to agree on a penalty.  He further argues
26          that the second jury might have concluded from the first jury's deadlock that the

1    first jury entertained lingering doubt regarding the Hedlund murder.  Defendant's
     contentions are without merit.
2
     As we have elsewhere declared, the fact of a first jury's deadlock, or its numerical
3    vote, is irrelevant to the issues before the jury on a penalty retrial.  (*People v.
     Thompson* (1990) 50 Cal. 3d 134, 178 [266 Cal. Rptr. 309, 785 P.2d 857].)
4    Although, as discussed above, guilt phase evidence may be relevant to the matter
     of residual doubt, which in turn may be considered by the jury in mitigation, the
5    fact of the jury's deadlock is not pertinent to this or any other mitigating
     circumstance.  All that can reasonably be inferred from the first jury's failure to
6    agree on a penalty is that the jurors differed as to defendant's moral culpability
     for any number of reasons.  The evidence of deadlock does not go to defendant's
7    "'character,' 'record,' or a 'circumstance of the offense,'" relevant to the
     individualized determination of the penalty in capital cases.  (*Franklin v.*
8    *Lynaugh, supra*, 487 U.S. at p. 174 [101 L. Ed. 2d at pp. 165-166], quoting
     *Eddings v. Oklahoma* (1982) 455 U.S. 104, 110 [71 L. Ed. 2d 1, 8, 102 S.Ct.
9    869].)  The fact of the first deadlocked jury was therefore immaterial to the
     second penalty phase jury's task, and the trial court did not err in excluding
10   reference to it.

11   *Hawkins,* 10 Cal.4th at 967-68.  That reasoning was a proper application of U.S. Supreme Court

12   precedent.  That Court has left open whether a capital defendant has a right under the Eighth

13   Amendment to have the penalty-phase jury consider evidence to establish lingering doubt, but

14   has strongly indicated that no such right exists.  *Franklin v. Lynaugh*, 487 U.S. 164, 173-74 &

15   n.6 (1988) (four-justice plurality approving of penalty-only retrials and stating that prior Court

16   cases did not recognize a right to consideration of residual doubt included in the right of a capital

17   defendant to have the jury consider mitigating evidence); *id.* at 187 (two-justice concurrence

18   expressing the view that the Eighth Amendment does not require consideration of residual

19   doubt); *see also Oregon v. Guzek*, 546 U.S. 517, 525 (2006) (noting that the Court's statements

20   in *Franklin* made clear that the state court in *Guzek* erred when it interpreted the Court's

21   precedent "as providing a capital defendant with a constitutional right to introduce residual doubt

22   evidence at sentencing.").  As there is no clearly established federal law that a capital

23   defendant's right to have the penalty-phase jury consider mitigating evidence includes the right

24   to have it consider evidence of residual doubt, petitioner may not obtain habeas relief on his

25   claim that the trial court's in limine ruling on the prior jury's deadlock deprived him of this right.

26   ////

1      Second, petitioner argues that the trial court deprived him of his right to present

2  mitigating evidence under the Eighth Amendment, his due process right to present evidence of

3  lingering doubt, and his due process right to rebut the prosecution's evidence when it allowed

4  the prosecution to present selective pieces of evidence on the Hedlund conviction rather than

5  requiring it to present the entire circumstances of that crime.  The California Supreme Court

6  rejected these arguments, because

>      defendant was not prevented from putting on guilt phase evidence at the penalty
>      phase so as to raise the possibility of lingering doubt, or from advocating this
>      theory at closing argument.  Defendant did in fact argue to the jury that the
>      forensic evidence had failed to establish beyond a reasonable doubt that the
>      Hedlund murder had been committed with premeditation and deliberation; he
>      chose not to present evidence or to make an argument, however, that would raise
>      the issue of reasonable doubt regarding his identity as Hedlund's murderer.  We
>      have never held that the right to introduce evidence of residual doubt translates
>      into the right to have the same jury at the guilt and penalty phases.  Indeed, the
>      *Terry* court, which first recognized the former right, assumed that a capital
>      defendant's trial by different guilt and penalty phase juries was lawful, so long as
>      defendant was able to introduce to the penalty phase jury guilt phase evidence
>      intended to show lingering doubt.  (*Terry, supra,* 61 Cal. 2d at pp. 146-147.)
>      Defendant did not attempt to introduce such evidence at the second penalty phase
>      trial and cannot complain of any state law violation in this regard.
>
>      Moreover, contrary to defendant's contention, a capital defendant has no federal
>      constitutional right to have the jury consider lingering doubt at the penalty phase
>      of the trial.  (*Franklin v. Lynaugh* (1988) 487 U.S. 164, 173-174, fn. 6 [101 L. Ed.
>      2d 155, 165-166, 108 S.Ct. 2320].)

18  *Hawkins*, 10 Cal.4th at 967.  Again, this reasoning comports with federal law.  Because no

19  clearly established federal law establishes a right to present evidence of lingering doubt in the

20  penalty phase of a capital trial under the Eighth Amendment, as discussed above, petitioner's

21  Eighth Amendment claim fails.  Petitioner argues that, even if he lacks a direct Eighth

22  Amendment right to present evidence of lingering doubt, the state of California has created a

23  liberty interest in presentation of such evidence protected by the Due Process Clause.  *See*

24  *Hawkins*, 10 Cal.4th at 966-97 ("[R]esidual doubt about a defendant's guilt is something that

25  juries may consider at the penalty phase under California law, and a trial court errs if it excludes

26  evidence material to this issue.").  This claim also fails, however, because a trial court's violation

of state law is not cognizable on federal habeas regardless of whether it may be couched in due process terms. *Little*, 449 F.3d at 1083 & n.6. Petitioner's case does not present the kind of extraordinary state law violation, as was present in *Hicks v. Oklahoma*, as would arise to a violation of due process under the federal Constitution. *See* Analysis of Claims T & FF, *supra*. Petitioner concedes that his trial counsel agreed not to attempt to establish lingering doubt – no action by the trial court prevented petitioner from rebutting the prosecution's evidence. Accordingly, he was not precluded from rebutting the prosecution's evidence in contravention of due process or the Eighth Amendment. *See Gardner v. Florida*, 430 U.S. 349, 362 & 364-65 (1977).

Petitioner also claims that his rights under the Equal Protection Clause were violated because his penalty was determined by a jury different from the one that determined his guilt. According to petitioner, this put him at a disadvantage because the second penalty-phase jury was not required to consider all of the guilt-phase evidence. Petitioner has failed to present any clearly established federal law requiring that the same jury determine penalty, however. Indeed, the U.S. Supreme Court has indicated its approval of separate penalty-phase retrials. *Franklin*, 487 U.S. at 173 n.6 (four-justice plurality noting that "this Court has, on several previous occasions, suggested such a method of proceeding [penalty-only retrial] on remand," citing *Hitchcock v. Dugger*, 481 U.S. 393, 399 (1987)). On this issue, the California Supreme Court stated:

> Defendant makes the related claim that his right to equal protection of the laws under the Fourteenth Amendment of the United States Constitution was violated by being tried by a penalty phase jury that did not hear all the guilt phase evidence; he was put in a worse position than a similarly situated, death-eligible defendant whose guilt and penalty were decided by the same jury, because he could not benefit from lingering doubt to the same degree as the latter defendant. This claim is without merit. As discussed above, a bifurcated trial does not restrict a defendant's ability to introduce guilt phase evidence designed to foster residual doubt. Nor, of course, is it at all clear that a defendant whose penalty has been determined by a second jury is put at a disadvantage; he may also benefit from having a jury which has not focused at length on the details of his crimes. Defendant's equal protection claim is therefore without merit.

1    *Hawkins*, 10 Cal.4th at 967.  As there is no clearly-established federal law to the contrary,

2    petitioner cannot obtain habeas relief on his equal protection claim.

3        Petitioner relatedly contends that his trial counsel rendered ineffective assistance by:

4    (1) failing to present evidence from the guilt phase demonstrating the mitigating aspects of the

5    circumstances of the Hedlund murder; (2) failing to argue lingering doubt and to request a

6    instruction that lingering doubt was a mitigating circumstance; and (3) failing to object to a

7    comment made by the trial court during voir dire which he contends undermined the existence of

8    lingering doubt.  Although couched as many separate instances of deficient performance,

9    petitioner's claim boils down to an assertion that trial counsel erred by not pursuing a lingering

10   doubt argument during the penalty phase, as the "mitigating aspects" of the circumstances of the

11   Hedlund murder proffered by petitioner are those evidentiary disputes resolved against him

12   during the guilt phase which he contends cast doubt on his identity as Hedlund's murderer.

13       As provided in Claim C, *supra*, *Strickland v. Washington* lays out the clearly-established

14   standard for showing that ineffective assistance of counsel deprived a defendant of his right to

15   counsel under the Sixth Amendment.  The California Supreme Court found that trial counsel's

16   actions did not amount to deficient performance under *Strickland*:

17       Finally, defendant charges his trial counsel with ineffective assistance for failing
         to request a lingering doubt instruction at the penalty phase.  We find no deficient
18       performance by counsel in this instance, and therefore reject defendant's
         contention.  Defendant argues that, given the relative uncertainty of the evidence
19       in the Hedlund case, there was no good reason not to request a lingering doubt
         instruction.  This argument misses the point.  Defendant's trial counsel appears to
20       have decided, for reasons that we cannot say were unsound, not to re-present the
         guilt phase evidence of the Hedlund murder, thereby de-emphasizing the murder
21       itself.  Instead trial counsel focused on elements in defendant's background that
         might persuade a jury toward leniency.  Because of this strategic decision, the
22       jury had no evidentiary basis, as discussed in part III. G., post, for considering
         any residual doubt as to defendant's identity as Hedlund's murderer.  Therefore
23       trial counsel's failure to request a lingering doubt instruction was consistent with
         their penalty phase defense strategy.  When considering trial counsel's
24       performance in an ineffective assistance claim, we "'indulge a strong presumption
         that counsel's conduct falls within the wide range of reasonable professional
25       assistance.'"  (*People v. Lewis* (1990) 50 Cal. 3d 262, 288 [266 Cal. Rptr. 834,
         786 P.2d 892], quoting *Strickland v. Washington, supra*, 466 U.S. at p. 689 [80 L.
26       Ed. 2d at pp. 694-695].)  We cannot say that trial counsel's decision not to

1    re-present the evidence  in the Hedlund murder, and therefore not to create a
     context in which a residual doubt instruction would be meaningful, was
2    unreasonable.

3    *Hawkins*, 10 Cal.4th at 968-69.  Petitioner argues that this reasoning was objectively

4    unreasonable because: (1) it failed to account for the trial court's allegedly misleading synopsis

5    of the evidence during voir dire and remarks during deliberations, which petitioner argues led the

6    jury to believe the evidence against him regarding his guilt for the Hedlund murder had been

7    indisputable[17]; (2) it ignored that the evidence against petitioner with regard to the Hedlund

8    murder was questionable enough to support a lingering doubt argument; and (3) it ignored trial

9    counsel's incompetence in investigating and presenting petitioner's background.  However, even

10   if this court were to construe the trial court's comments as communicating to the jury that the

11   case against petitioner for the Hedlund murder had been indisputable, that fact would not show

12   that counsel's decision not to pursue a lingering doubt strategy was indefensible.  Nor does the

13   fact that petitioner views the evidence on the Hedlund count as weak enough to support a

14   lingering doubt argument show that it was not a defensible choice for counsel to eschew that

15   argument in favor of a different strategy.  The court therefore is inclined to defer to the

16   California Supreme Court's determination that counsel's performance was not deficient.

17   However, as petitioner notes, to determine whether or not it was deficient performance for

18   counsel to choose to emphasize his background instead of arguing lingering doubt about his guilt

19   depends on whether counsel's decision was informed by an adequate investigation of petitioner's

20   background, a separate claim (Claim R).  As the court has determined, *infra*, that an evidentiary

21   _____

22   [17] During voir dire, the trial court summarized the evidence of the Hedlund murder.
     During that summary, the court stated that "Hedlund had been in the company of the defendant,
23   Mr. Hawkins, the previous evening at a place in Galt called the Uptown bar" and that
     "[e]xamination of the bullets removed from Mr. Hedlund's body proved to have been fired by
24   the same gun that was used in a robbery and murder at Sonny's Market . . . six days later."  RT
     5641.

25        During deliberations, the trial court told the jury, with regard to the Hedlund murder, that
26   it had heard evidence of "the ballistics matchup of the weapons."  RT 6900; *see* Claim Y
     (petitioner's independent challenge to this comment).

1  hearing is necessary to determine whether counsel rendered ineffective assistance by failing to

2  competently investigate and present evidence of petitioner's background, the Court must defer

3  resolution of the ineffective assistance subclaims of Claim W until the evidentiary hearing has

4  concluded.  However, summary adjudication of the trial court error subclaims of Claim W must

5  be granted in favor of respondent for the reasons stated above.

6       xix.    *Claim X – Trial Court's Response to Jury's Penalty-Phase Question*
                *Concerning Evidence of Crimes*
7

8       In Claim X of the Amended Petition, petitioner argues that: (1) the trial court deprived

9  him of his right to have the jury consider evidence of lingering doubt by a response it gave to a

10 jury question during penalty-phase deliberations and (2) trial counsel rendered ineffective

11 assistance for failing to object to the response.  Petitioner seeks an evidentiary hearing on Claim

12 X, arguing that it is interrelated with Claim W.  However, unlike the ineffective assistance

13 claims contained within Claim W, no additional evidence is necessary to determine Claim X.  As

14 Claim X can be decided on the record, an evidentiary hearing is not called for.  *See* Section II.A.,

15 *infra*.

16      Claim X was denied by the California Supreme Court without opinion in its denial of

17 petitioner's state habeas petition.  Thus, this court must independently review the record to

18 determine whether the state court's denial of Claim X was objectively unreasonable.

19      The following facts underlie Claim X.  On the second day of deliberations in the penalty-

20 phase retrial, the jury submitted these questions to the trial court:

21      1)    Define special circumstances;

22      2)    Pertaining to special circumstance #2 [multiple murders] – Did this
             become a special circumstance only after Mr. Hicks was killed or did Mr.
23           Hedlund's death have separate special circumstances; and

24      3)    How does the law read concerning the death penalty?

25 RT 6897-98.  After the trial court provided answers, one juror stated:

26 ////

1

2   Your honor, I think the problem is that we've seen that both the prosecutor and
    defense go to great lengths to give us those circumstances on Case No. two, Mr.
    Hicks, and we all, you know – Maybe we could – We can see that real clearly.
3   But on Mr. Hedlud's death, we have no – in our jury room, anything that would
    put the –

4   RT 6902.  The trial court interjected:

5   I see what you're saying.  You're looking at the quantum of evidence before you,
    and I simply tell you:  Do with that what you will.  You have only the evidence
6   before you to consider.

7   And I will agree; you don't have as much detail about the Hedlund death – You
    didn't have an eyewitness around to talk about it.
8
    You do have the conviction, the verdict having been rendered by a prior jury, and
9   that's all you have, except for the limited evidence that was put on in this trial,
    some forensic pathologist evidence about the condition of the body, and so forth.
10  That's really all you have, and you decide the case on the evidence you have
    before you. . . .  I'm getting a little sense here that someone is saying, why didn't
11  they give us more evidence on this?  And I'm instructing you that you work with
    the evidence that was given to you.  No more, no less.  You don't speculate as to
12  why more or different evidence wasn't given to you in a particular case.  You're
    the neutral fact finders to judge, if you can, on the basis of what's before you and
13  not to speculate why something else or different isn't before you.

14  RT 6903.  Petitioner argues that this response "led the jury to believe that they should not

15  consider the lack of evidence on the Hedlund charge as mitigating and should not consider

16  lingering doubt in determining which sentence should be imposed."  Pet'r's Cross-Mot. for

17  Summ. Adj. at 133.  For the reasons discussed in response to Claim W, *supra*, petitioner is not

18  entitled to federal habeas relief, as no clearly established federal law provides a capital defendant

19  with a federal constitutional right to have his penalty-phase jury consider lingering doubt.

20  Petitioner's attempt to cast this claim as a deprivation of a state-created liberty interest also fails

21  for the reasons discussed in response to Claim W.

22      Petitioner also argues that his trial counsel was ineffective for not objecting to the

23  response.  Petitioner does not explain why competent counsel would have objected, however, or

24  how he was prejudiced by counsel's failure to object.  Having independently reviewed the

25  record, this court does not agree with petitioner that the trial court's statements would likely

26  have been understood by the jury as telling it not to consider the lack of evidence on the Hedlund

charge or any lingering doubt.  On the contrary, the trial court was careful not to tell the jury to

interpret the lack of evidence as favoring one side or the other.  The court told the jury not to

speculate about why different or more evidence was presented on the Hicks murder, but it did

not tell the jury that it should not consider the lack of evidence presented on the Hedlund murder

or any lingering doubt the jury may have been entertaining therefrom.  As there is not a

reasonable probability that the jury understood the comments in the misleading manner

petitioner urges, there is not a reasonable probability that an objection would have affected the

outcome of the penalty phase.  In addition, counsel had already elected not to present a lingering

doubt argument to the jury.  Having made that choice (whether the choice was ineffective

assistance or not), it would not make sense for counsel to object to a comment which, in

petitioner's view, impacted a lingering doubt argument not presented to the jury.  Accordingly,

the record establishes that petitioner was not deprived of his constitutional rights by the court's

response or by counsel's decision not to object to it, and summary adjudication of Claim X must

be granted in favor of respondent.

        xx.     *Claim Y – Trial Court's Penalty Phase References to Ballistics Evidence*

        In Claim Y of the Amended Petition, petitioner argues that the trial court deprived him of

his rights to confront and cross-examine witnesses against him and to due process when, in

response to a jury question raised during deliberations, the trial court referred to evidence from

the guilt phase which had not been presented by either side in the penalty phase.  Petitioner seeks

an evidentiary hearing on Claim Y on the grounds that it is interrelated with Claims W and X.

Claim Y was rejected by the California Supreme Court on petitioner's direct appeal.  That court

stated:

> During the second penalty phase trial, as discussed above, the prosecutor did not
> present evidence of the Hedlund murder other than the verdict form showing that
> defendant was found guilty of the murder in the first degree, and evidence
> regarding the condition in which Hedlund's body was found.  He did not present
> to the second penalty phase jury the ballistics evidence linking the gun used to
> murder Hedlund to the gun used to kill Hicks.  The trial court, however, in
> response to an inquiry from the jury during their deliberations, made a passing

reference to the ballistics evidence, to which defense counsel did not object. Defendant now contends that this misstatement by the trial court was reversible error.  We disagree.

The second penalty phase jury, directing a question to the trial court during its deliberations, asked the trial court to define special circumstances and also asked: "[P]ertaining to special circumstances No. 2, multiple murders, should this become a special circumstance only after Mr. Hicks was killed, or did Mr. Hedlund's death have separate special circumstances?"  In clarifying the use of the term "special circumstances," the court explained that there were no special circumstances arising from the Hedlund murder alone, and then stated: "The only special circumstances as to the Hedlund murder – that's the one that happened earlier, March 4, under details we don't know – You simply heard testimony of the finding of the body and . . . *ballistics matchup of the weapons*.  The only special circumstance referable with that one is the so-called multiple murder, the fact that there were convictions of two murders in this one case, this one proceeding here in court."  Defendant did not raise any objection to the trial court's mistaken reference to the ballistics evidence.

Defendant claims that the trial court's comment on evidence of the ballistics testimony without permitting him to cross-examine the ballistics experts who were the source of that testimony amounts to a violation of the confrontation clause under the Sixth Amendment of the United States Constitution, and article I, section 15 of the California Constitution.  (*See Delaware v. Van Ardsdall* (1986) 475 U.S. 673, 679-680 [89 L. Ed. 2d 674, 683-684, 106 S.Ct. 1431]).  He also contends that the trial court's remarks violated his due process right under the Fourteenth Amendment of the United States Constitution and article I, section 15 of the California Constitution in having the penalty phase verdict determined by evidence other than  that presented at trial. (*See United States v. Schuler* (9th Cir. 1987) 813 F.2d 978, 981-982 [prosecutor's comment on nontestifying defendant's conduct in the courtroom violates Fifth Amendment due process right].)  Defendant argues that such violations of his constitutional rights amount to reversible error, unless it can be shown beyond a reasonable doubt that the error was not prejudicial.  (*Chapman v. California* (1967) 386 U.S. 18, 24 [17 L. Ed. 2d 705, 710-711, 87 S.Ct. 824, 24 A.L.R.3d 1065].)

Defendant failed to object to the trial court's remark, and therefore waives the claim of constitutional error on appeal. (*Cf. People v. Benson, supra*, 52 Cal. 3d 754, 788.)

Further we find that, under whatever harmless error standard is employed, defendant was not prejudiced by the trial court's remark regarding the "ballistic matchup of weapons."  Defendant's argument to the contrary is based on the premise that the second penalty phase jury may have been harboring some lingering doubt as to defendant's guilt in the Hedlund murder that might have influenced its verdict at the penalty phase, and that the trial court's comment on the ballistics evidence in the Hedlund murder would have served to remove or diminish that lingering doubt.  That premise is erroneous.  The jurors in the second penalty phase trial had no basis for entertaining any lingering doubt as to defendant's identity as Hedlund's murderer, having only been told of defendant's conviction but not the evidence supporting it.  Indeed, defendant argues elsewhere

1      . . . that his sentencing by a second penalty phase jury unfamiliar with the guilt
       phase evidence deprived him of the lingering doubt about the Hedlund murder
2      that the first jury might have entertained.  The trial court's scarcely intelligible
       remark regarding a "ballistics matchup" could not, therefore, have reduced a
3      lingering doubt that could not plausibly be deemed to have existed.  Accordingly,
       even under the strictest harmless error standard, the trial court's reference to the
4      ballistics evidence in the Hedlund case cannot have been prejudicial.

5   *Hawkins*, 10 Cal.4th at 969-70.

6          Contrary to petitioner's assertions, Claim Y can be decided on the record alone.  Unlike

7   Claim W, the resolution of which depends on a determination regarding the reasonableness of

8   trial counsel's decision not to pursue a lingering doubt strategy, resolution of Claim Y does not

9   depend on the reasonableness of that decision.  As with Claim X, once that decision was made

10  (whether the choice was ineffective assistance or not), it would not make sense for counsel to

11  object to a comment which, in petitioner's view, impacted a lingering doubt argument not

12  presented to the jury.  The court's comment itself, as the California Supreme Court reasonably

13  held, could not have impacted a lingering doubt argument not presented to the jury.  Because

14  petitioner has no clearly established federal constitutional right to have his penalty-phase jury

15  consider lingering doubt, and because it was not deficient for counsel not to object to a comment

16  which may have impacted a lingering doubt argument that counsel had not presented, summary

17  adjudication of Claim Y should be granted in favor of respondent.

18          xxi.    *Claim Z – Failure to Define Terms "Aggravation" and "Mitigation" in the
                   California Death Penalty Statute*
19

20          In Claim Z of the Amended Petition, petitioner contends that the trial court deprived him

21  of his rights under the Fifth, Sixth, Eighth, and Fourteenth Amendments by:  (1) failing to define

22  "mitigation" and "aggravation"; (2) failing to instruct the jury as to which factors in California

23  Penal Code § 190.3 are aggravating and which are mitigating; and (3) failing to provide the jury

24  with the elements of first degree murder.  This claim was rejected by the California Supreme

25  Court on petitioner's direct appeal.  The parties agree to summary adjudication of Claim Z.

26  ////

                                              92

1    The U.S. Supreme Court has clearly established that the Eighth Amendment requires that

2    a capital sentencing jury's discretion be "guided and channeled by requiring examination of

3    specific factors that argue in favor of or against imposition of the death penalty" in order to

4    eliminate arbitrariness and capriciousness.  *Proffitt v. Florida*, 428 U.S. 242, 258 (1976).  That

5    channeling requirement applies to those factors which make a defendant eligible for the death

6    penalty ("eligibility criteria" – such as the special circumstances provided for by California

7    Penal Code § 190.2), but not to those factors which guide a jury in determining whether to

8    impose the death penalty on a defendant who has been found eligible for that punishment

9    ("selection criteria" – such as the list of aggravating and mitigating factors provided for by

10   California Penal Code § 190.3).  *Buchanan v. Angelone*, 522 U.S. 269, 276 (1998).

11    Further, the Eighth Amendment provides a capital defendant with the right to have his

12   sentencer consider all relevant mitigating evidence he wishes to present regarding his character,

13   his record, or the circumstances of the crime.  *California v. Brown*, 479 U.S. 538, 541 (1987).

14    In rejecting petitioner's Claim Z, the California Supreme Court stated:

15   Defendant contends that the trial court erred by failing to define, sua sponte, the
     terms "aggravating" and "mitigating" when instructing the jury during the penalty
16   phase. . . .   The failure to properly instruct is, defendant claims, an error of
     constitutional dimension, violating his right to a reliable penalty determination
17   under the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States
     Constitution.

18
     Defendant's claim fails . . . . [because] it is well established that the words
19   "'aggravating' and 'mitigating' are commonly understood terms that the trial
     court need not define for the jury."  (*People v. Kirkpatrick* (1994) 7 Cal. 4th 988,
20   1018 [30 Cal. Rptr. 2d 818, 874 P.2d 248].)  Accordingly, a court need not give
     an instruction clarifying these terms on defendant's request, and therefore
21   certainly has no sua sponte obligation to do so.  (*People v. Johnson* (1993) 6 Cal.
     4th 1, 50 [23 Cal. Rptr. 2d 593, 859 P.2d 673].)

22

23   *Hawkins*, 10 Cal.4th at 965.  While brief, this analysis was not contrary to the clearly established

24   principles summarized above.  No U.S. Supreme Court case has required trial courts to define

25   "aggravating" or "mitigating" or similar terms.  Rather, the Supreme Court has rejected the

26   argument that a capital defendant has a right under the Eighth Amendment to a jury instruction

1    providing express guidance on the concept of mitigation.  *Buchanan*, 522 U.S. at 275-78; *see*

2    *also Mason v. Mitchell*, 320 F.3d 604, 638 & n.19 (6th Cir. 2003) (stating that there is no clearly

3    established federal law establishing a right to a definition of "mitigation"); *Clark v. Johnson*, 202

4    F.3d 760, 769-70 (5th Cir. 2000) (denying a certificate of appealability on petitioner's claim that

5    the trial court violated his Eighth Amendment rights by not defining "mitigating evidence"

6    where the jury was not limited in its consideration of such evidence).  Petitioner's argument that

7    the court should have instructed the penalty-phase jury on the elements of first degree murder so

8    that it could consider the potentially mitigating aspects of the crimes is also without merit.  The

9    absence of an instruction on the elements of first-degree murder did not prevent the jury from

10   considering any mitigating evidence about the circumstances of the crime that petitioner wished

11   to offer.  Accordingly, the California Supreme Court's determination that the trial court did not

12   err by failing to define the terms "mitigating" and "aggravating" or to provide the elements of

13   first-degree murder did not contravene clearly established federal law, and summary adjudication

14   of Claim Z must be granted in favor of respondent.

15          xxii.    *Claim AA – Flawed Penalty Phase Instruction on Reasonable Doubt*

16          In Claim AA of the Amended Petition, petitioner contends that he was deprived of his

17   state-created liberty interest in having unadjudicated criminal acts proved beyond a reasonable

18   doubt when the trial court left a phrase out of the standard jury instruction on reasonable doubt.

19   The parties agree to summary adjudication of Claim AA.  This claim was rejected by the

20   California Supreme Court on petitioner's direct appeal.

21          As discussed with regard to Claims T and FF, *supra*, most errors of state law are not

22   cognizable by a federal habeas court, even if phrased as deprivations of state-created liberty

23   interests.  A state-court error may rise to a due process or equal protection violation in

24   exceptional circumstances, however.  In this instance, the California Supreme Court concluded

25   that no error of state law had occurred:

26   ////

A trial court must properly instruct the jury at the penalty phase that uncharged crimes must be proved true beyond a reasonable doubt before they can be considered by the jury as aggravating factors in the penalty determination. (*People v. Pinholster* (1992) 1 Cal. 4th 865, 965 [4 Cal. Rptr. 2d 765, 824 P.2d 571].)  In this case, defendant contends that the trial court prejudicially erred by giving the jury an erroneous reasonable doubt instruction.

At the penalty phase, reasonable doubt as to uncharged crimes was defined as follows: "[I]t is not a mere possible doubt; because everything relating to human affairs, and depending upon moral evidence, is open to some possible or imaginary doubt.  It is that state of the case which, *after the evidence*, leaves the minds of jurors in that condition that they cannot say that they feel an abiding conviction, to a moral certainty, of the truth of the charge." (Italics added.)  The definition follows verbatim the one found in CALJIC No. 2.90, except that it erroneously omitted several words from the second sentence of the instruction.  That sentence should read: "It is that state of the case which after *the entire comparison and consideration of all the evidence*, leaves the minds of the jurors in that condition that they cannot say that they feel an abiding conviction, to a moral certainty, of the truth of the charge."  (Omitted portion in italics.)

Defendant contends that this omission rendered the reasonable doubt instruction unintelligible and that the reversal of the penalty phase verdict is required.  We disagree.  Small errors in the reasonable doubt instruction that are not likely to confuse or mislead the jury are harmless.  (*See People v. Simpson* (1954) 43 Cal. 2d 553, 566 [275 P.2d 31]; *People v. Castro* (1945) 68 Cal. App. 2d 491, 498 [157 P.2d 25].)  In this case, the jury was likely to interpret the phrase "after the evidence" to mean "after the evidence is considered," and to understand by this instruction the almost self-evident principle that the determination of defendant's culpability beyond a reasonable doubt for an uncharged crime must be based on a review of the evidence presented.  There was no likelihood, in short, that the trial court's elision would result in significant juror misunderstanding of the reasonable doubt standard.

*Hawkins*, 10 Cal. 4th at 963.  That determination was objectively reasonable.  California state law does not require that the statutory instruction on reasonable doubt be given.  *People v. Simpson*, 43 Cal.2d 553, 565-66 (1954).  Where the trial court gives the instruction erroneously, only a discrepancy that will mislead the jury is cause for reversal.  *Id.*; *People v. Castro*, 68 Cal.App.2d 491, 498 (1945).  Such a discrepancy did not occur in petitioner's case, as the California Supreme Court reasonably held.  Thus, petitioner has not established that a state law error occurred, much less the type of exceptional error that would be cognizable as a federal due process violation, and summary adjudication of Claim AA must be granted in favor of respondent.

xxiii.   *Claim BB – Trial Court's Responses to Jury Questions Regarding Execution of Punishment*

In Claim BB of the Amended Petition, petitioner contends that his sentencing was rendered fundamentally unfair and he was deprived of his Eighth Amendment right to a reliable and individualized penalty determination by the trial court's response to a jury query about the possibility that a life without parole sentence could be changed in the future. The parties agree to summary adjudication of Claim BB.

In denying petitioner's second state habeas petition, the California Supreme Court rejected Claim BB both on the merits (without reasoning provided) and for two procedural reasons – that petitioner could have raised it on appeal but did not, *In re Dixon*, 41 Cal.2d 756, 759 (1953), and that petitioner could have raised it in his first habeas petition but did not, *In re Robbins*, 18 Cal.4th 770, 788 n.9 (1998). Consequently, respondent argues that Claim BB has been procedurally defaulted. However, the court has already rejected that argument in the March 27, 2002 ruling on respondent's motion to dismiss. Dckt. No. 133. Respondent also argues that petitioner has waived Claim BB because his counsel failed to object to the trial court's responsive instruction at trial. This argument fails as well. The California Supreme Court did not rely on waiver as a procedural bar to Claim BB and therefore this court may not do so. *Harris*, 489 U.S. at 263.

Turning to the merits, Claim BB is based on an exchange between the trial judge and the jury during its deliberations at petitioner's penalty phase retrial. The jury submitted three questions to the court, asking in one question whether a sentence of life without the possibility of parole would be "subject to change later." RT 6889-90. The trial court responded:

> No judicial authority, no judge in the State of California, no administrative authority within the Department of Corrections or Parole Board or anything like that could change it later.
>
> Under the present status of the law, it means exactly what it says, life without possibility of parole, subject, however, to the basic constitutional right of the Chief Executive, in the case of the state, that's the Governor. It would be

comparable to the president of the United States in a federal situation – the Chief Executive always has the inherent power of commutation of any sentence, either death or life without parole.

Having told you that, there's always that inherent power within the governor to change either one of these two sentences.  I then hasten to add, as the law directs me to tell you, that it would be a violation of your duty to consider the possibility of commutation in determining any appropriate sentence.

RT 6890.  Petitioner argues that this response misled the jury into thinking that the Governor, without impediment, could parole petitioner when, in fact, approval of four judges of the California Supreme Court would be necessary because petitioner is a twice-convicted felon.  Cal. Const. Art. 5, § 8.  Relying on four pre-AEDPA Ninth Circuit cases, petitioner contends that the instruction was misleading and violated his federal constitutional rights.  *Coleman v. Calderon*, 150 F.3d 1105 (9th Cir. 1998), *reversed in part by Calderon v. Coleman*, 525 U.S. 141 (1998), *on remand at Coleman v. Calderon*, 210 F.3d 1047 (9th Cir. 2000); *McLain v. Calderon*, 134 F.3d 1383 (9th Cir. 1998); *Gallego v. McDaniel*, 124 F.3d 1065 (9th Cir. 1997); *Hamilton v. Vasquez*, 17 F.3d 1149 (9th Cir. 1994).  In these four cases, the Ninth Circuit followed its rule that "[a] commutation instruction is unconstitutional when it is inaccurate."  *Coleman*, 150 F.3d at 1118.  However, in all four cases the court was unconstrained by the deference required under 28 U.S.C. § 2254(d), and could therefore apply its own constitutional jurisprudence without determining whether that analysis was compelled by U.S. Supreme Court precedent.  The Ninth Circuit did, however, rely on *California v. Ramos*, 463 U.S. 992 (1983).  Under section 2254(d), this court must therefore determine whether *Ramos* or other U.S. Supreme Court cases provide clearly established law on the question presented here, and if so, whether under that established law the trial court's response to the jury's question on commutation violated the federal Constitution.  As explained below, this court finds that the response to the jury's question did not violate petitioner's constitution rights.

In *Ramos*, the Court addressed the constitutionality of the so-called "Briggs Instruction," an instruction given under former California law stating that the Governor had the power to

1    commute a sentence and that, under that power, could commute a sentence of life without the

2    possibility of parole into a lesser sentence that would include the possibility of parole.  463 U.S.

3    at 995-96.  The habeas petitioner in *Ramos* argued that the instruction impermissibly misled the

4    jury by selectively informing it of the Governor's power to commute one of its sentencing

5    choices but not the other.  *Id.* at 998.  The Court rejected that argument, concluding that the

6    instruction was relevant, accurate, would not skew a jury toward selecting death, and did not

7    preclude a defendant from offering evidence or argument on the Governor's commutation power.

8    *Id.* at 1010-12.

9         In *Caldwell v. Mississippi*, 472 U.S. 320 (1985), the Court vacated a death judgment

10   where the prosecutor's argument, in referencing the availability of appellate review, had misled

11   the jury into believing that they were not the final decisionmakers in determining whether the

12   defendant would actually receive the death penalty.  *Id.* at 341.  The argument, and the trial

13   court's comment in allowing it, created a bias in favor of the death sentence and undermined the

14   reliability of the proceedings to a degree that was intolerable under th Eighth Amendment.  *Id.* at

15   331, 341.  *Ramos* did not compel a different result.  *Id.* at 335 (four-justice plurality) & 342-43

16   (O'Connor, J., concurring).  The Court characterized *Ramos* as resting "on a determination that

17   th[e] instruction was both accurate and relevant to a legitimate state penological interest – that

18   interest being a concern for the future dangerousness of the defendant should he ever return to

19   society."  *Id.* at 335 (four-justice plurality) & 342-43 (O'Connor, J., concurring).  Because the

20   information that the prosecutor and trial court provided in *Caldwell* was misleading, the Court's

21   decision in *Ramos* did not sanction it.  *Id.*

22        In addition, it is clearly established in general that an instruction which prevents the jury

23   from considering constitutionally relevant mitigating evidence is unconstitutional.  *Buchanan*,

24   522 U.S. at 276.  In reviewing whether a challenged instruction satisfies that standard, the court

25   must determine whether there is a reasonable likelihood that the jury applied the instruction in a

26   way that prevented the consideration of constitutionally relevant mitigating evidence.  *Id.*  The

1    four Ninth Circuit cases cited by petitioner, while not controlling under AEDPA, are indeed

2    instructive on this issue.

3            In *Hamilton*, the trial court first provided the Briggs instruction, but then added some

4    additional information: (1) that the written recommendation of at least four justices of the

5    California Supreme Court was necessary to commute the sentence of a person with two felony

6    convictions; (2) that a life sentence required a minimum incarceration of 25 years, minus one-

7    third for good time credits, before parole could be considered by the authorities; and (3) that the

8    jurors had a duty not to speculate about commutation in determining the sentence.  17 F.3d at

9    1161-62.  The Ninth Circuit held that the instruction violated due process and the Eighth

10   Amendment and required a new penalty phase trial.  *Id.* at 1160.  Unlike *Ramos*, the instruction

11   given in *Hamilton* was inaccurate because it failed to inform the jury of the difficult process for

12   obtaining commutation – the defendant would first have to apply to the Governor, who would

13   then obtain a recommendation from the Board of Prison Terms and, once in receipt of that

14   recommendation, would need the agreement of four California Supreme Court justices to

15   commute the sentence.  *Id.* at 1162.  The instruction further incorrectly suggested that the

16   defendant would be eligible for release even if given a sentence of life without the possibility of

17   parole.  *Id.*  These inaccuracies invited the jury to speculate that the only way to avoid the

18   defendant's release from prison was to impose the death penalty.  *Id.*  The prosecutor had

19   increased the likelihood that the jury would so speculate by arguing that, once confined, the

20   defendant would be "conniving and devising ways to manipulate the system to get out."  *Id.*

21   Further, while in *Ramos* the Supreme Court assumed that the instruction had not precluded the

22   defendant from offering evidence on the Governor's commutation power, in *Hamilton*,

23   California law in place at the time of the defendant's sentencing prevented defense counsel from

24   arguing the actual likelihood of parole if sentenced to life imprisonment.  *Id.* (citing *People v.*

25   *Morse*, 60 Cal.3d 631 (1964)).

26   ////

99

1    These defects in the instruction diverted the jury from considering defendant's significant

2  mitigating evidence by instead focusing its attention on commutation procedures instead of

3  mitigating evidence. *Hamilton*, 17 F.3d at 1162-63.  The long (three-day) deliberation by the

4  jury on penalty, in combination with the substantial mitigating evidence introduced, indicated to

5  the court that the modified Briggs instruction had prevented the jury from properly considering

6  the penalty.  *Id.* at 1163.  The court noted that the trial court's modification of the Briggs

7  instruction to inform the jury of the necessity of agreement by four California Supreme Court

8  justices did not help, because at the same time the trial court had also modified the instruction to

9  suggest that the defendant could come up for parole in only 17 years when, in fact, there was no

10  likelihood of parole.  *Id.*  The court further concluded that the admonition to the jury not to

11  speculate about commutation did not cure the constitutional error because the jury was not going

12  to disregard what it had just been instructed were relevant considerations.  *Id.*

13    The Ninth Circuit again found a commutation instruction unconstitutional in *Gallego*.

14  124 F.3d 1065.  There, the instruction informed the jury that:  (1) life without the possibility of

15  parole did not exclude executive clemency; (2) executive clemency involved a decision by the

16  Nevada Board of Pardon Commissioners, consisting of the Governor, Attorney General, and the

17  five justices of the state Supreme Court, to commute a defendant's sentence from life without the

18  possibility of parole to life with the possibility of parole and/or to shorten the time in which a

19  defendant is eligible for parole; (3) that the Board could commute a sentence only by a vote of a

20  majority that included the Governor; and (4) that, under a sentence of life with the possibility of

21  parole, parole eligibility began after a minimum of 10 years had been served.  *Id.* at 1074.  The

22  defendant in *Gallegos* argued that his chances for executive clemency in Nevada were much

23  smaller than the instruction suggested, because he was already under a death sentence in

24  California.  *Id.* at 1074-75.  The Ninth Circuit agreed.  Applying *Hamilton* and *Ramos*, the court

25  again noted the Supreme Court's emphasis on accuracy in *Ramos* in upholding the Briggs

26  instruction.  *Id.* at 1075.  While the instruction given in *Gallegos* was an accurate statement of

the law, it was misleading and inaccurate as applied to the defendant's case – Nevada laws provided that, due to his background, he could not be paroled until serving a minimum of 20 years, and further made any likelihood of parole very small due to the California judgment. *Id.* at 1076. Thus, the instruction could have prompted the jury to make erroneous speculations about the kind of sentence the defendant might actually serve. *Id.* The court also noted that *Ramos* was based partially on the fact that the defendant could counter the Briggs instruction with his own evidence or argument and concluded that the *Gallegos* defendant had been prevented from doing so, presumably because the trial court had declined to give his proffered instruction on the matter (which had merely stated that life without the possibility of parole meant no parole and life with the possibility of parole meant eligible for parole after a minimum of 10 years). *Id.*

*McLain* reversed a death sentence for similar reasons. 134 F.3d 1383. There, the challenged instruction was essentially the same as that provided in *Hamilton*, but without the information about the necessary agreement of four justices of the California Supreme Court and without reference to the time in which a defendant under a life sentence with the possibility of parole would become parole-eligible. *Id.* at 1385-86. The court concluded that the instruction was even more inaccurate than the one in *Hamilton*, because it suggested that the Governor, acting alone, could commute the sentence. *Id.* at 1386. And while the instruction did not include the misleading information about parole eligibility disapproved in *Hamilton*, it still suggested that the defendant might someday be released by the Governor's unilateral action, which was inaccurate. *Id.* This defect improperly focused the jury's attention on commutation procedures instead of the question of mitigation and was therefore unconstitutional. *Id.*

In *Coleman*, the Ninth Circuit again adhered to its rule that, under *Ramos*, an inaccurate instruction on commutation is unconstitutional. In that case, the challenged instruction informed the jury that the Governor had the power to commute sentences and could use that power to modify a sentence of life without the possibility of parole to a sentence of life with the

1    possibility of parole.  150 F.3d at 1117-18.  The trial court further instructed the jury not to

2    consider commutation or speculate about if or when the Governor would exercise his

3    commutation power.  *Id.*  The Court of Appeals found the instruction inaccurate, because the

4    defendant had numerous prior felony convictions and thus the Governor could not, alone,

5    commute his sentence.  *Id.* at 1118.  Thus, the instruction dramatically overstated the possibility

6    of commutation and invited the jury to speculate that the only way to remove the defendant from

7    the community was to impose death.  *Id.*  "Such an instruction inappropriately minimizes the

8    viability of all sentencing options other than death and prevents the jury from deliberating with

9    the guided discretion required by the Eighth Amendment."  *Id.*  The court rejected the state's

10   argument that the instruction was merely incomplete (as was the instruction approved of in

11   *Ramos*), stating that the instruction was inaccurate as applied to the defendant because it falsely

12   implied that the Governor, alone, could commute the sentence.  *Id.*  The court further found the

13   error not harmless:  "When the inaccuracy undermines the jury's understanding of sentencing

14   options, 'there is a reasonable likelihood that the jury has applied the challenged instruction in a

15   way that prevents the consideration of constitutionally relevant evidence.'"  *Id.* (quoting *Boyde*,

16   494 U.S. at 380).  On remand from the Supreme Court following reversal of that harmless error

17   analysis, the Ninth Circuit again found the error was not harmless, concluding that the jury had

18   been diverted from its proper task in evaluating whether death was warranted on the facts of the

19   case and characteristics of the defendant to speculating that the only way to prevent the

20   defendant's release was to impose death.  *Coleman v. Calderon*, 210 F.3d 1047, 1051 (2000).

21   This potential harm was increased by the prosecutor's future dangerousness argument, which

22   had not been confined to the defendant's possible future conduct in prison, but had stated that, if

23   not given the death penalty, the defendant would remain a danger to "all of us" because he was

24   unable to coexist in society.  *Id.*

25        The Supreme Court reversed *Coleman* on the issue of harmless error review only and did

26   not address the Ninth Circuit's holdings that an inaccurate commutation instruction is *per se*

1   unconstitutional or that the specific instruction used in that case was unconstitutional.  *Calderon*

2   *v. Coleman*, 525 U.S. 141 (1998).  However, the high court characterized the Ninth Circuit's

3   statement that "[a] commutation instruction is unconstitutional when it is inaccurate" as a

4   "sweeping pronouncement" and stated that "the Court of Appeals' constitutional analysis, and

5   the Circuit precedent on which it relied, have not been approved by this Court." *Id.* at 144 &

6   145.  Given the Supreme Court's statements in *Coleman*, this court must conclude that the *per se*

7   rule is not clearly established Supreme Court law for the purposes of federal habeas review.

8   However, from the Supreme Court authorities (and the Ninth Circuit's persuasive application of

9   those authorities) discussed above, it is apparent that the Constitution is violated where a trial

10  court provides misleading information to a jury about post-sentencing procedures that is

11  reasonably likely to cause the jury to act in an unconstitutional fashion, such as by ignoring a

12  defendant's mitigating evidence.  It is on this question that the court must focus.

13          This case does not present such a scenario.  There is no question that the jury was faced

14  with significant evidence and argument concerning petitioner's propensity for criminal violence.

15  It was clearly concerned by the possibility that a sentence of life without parole might be subject

16  to change later, as demonstrated by its question to the trial court.  But it is not reasonably likely

17  that the trial court's answer to that question diverted the jury from its central task of weighing

18  aggravating and mitigating circumstances to determine whether, on the facts of the case and the

19  characteristics of petitioner, death was the appropriate penalty.  Unlike the instructions in

20  *Hamilton, McLain, Gallego,* and *Coleman*, which focused on the Governor's power to commute

21  a sentence of life without the possibility of parole (although informing generally that he had the

22  power to commute "a sentence" in *Hamilton, McLain,* and *Coleman*), the court's comment here

23  emphasized that either sentence – death or life without parole – could be commuted.  Thus, even

24  with an inaccurate implication that the Governor could unilaterally commute petitioner's

25  sentence, it is not reasonably likely that the jury would have been misled to believe that

26  petitioner was any more likely to be released due to a commutation if given a life sentence than

                                                    103

if given a death sentence.  Therefore, the instruction did not bias the jury in favor of the death penalty by creating the impression that a death sentence was the only sure way to prevent petitioner's release or otherwise mislead the jury in a manner that would cause it to ignore petitioner's mitigating evidence.[18]  *See Caldwell,* 472 U.S. at 331 (holding that prosecutor's argument violated the Eighth Amendment, in part, because it created a bias in favor of the death penalty).  Indeed, the trial court emphasized to the jury that the option of a life sentence "means exactly what it says, life without possibility of parole."  Including in its answer to the jury that, whichever sentence was chosen, it would be subject to the "inherent power within the governor to change either one of these two sentences" does not alter the unbiased emphasis of the trial court.  In the very next sentence it admonished the jury: "I then hasten to add, as the law directs me to tell you, that it would be a violation of your duty to consider the possibility of commutation in determining any appropriate sentence."  Thus, rather than divert the jury from considering defendant's mitigating evidence by instead focusing its attention on commutation procedures instead of mitigating evidence, *see e.g., Hamilton*, 17 F.3d at 1162-63, the trial court here brought the jury's focus back to where it belonged.  The fact that the trial court neglected to include the additional information that any commutation, of either sentence, would include the concurrence of four justices of the California Supreme Court did not skew the jury toward selecting death.  Nor did the trial court's answer to the jury's question suggest to the jury that they were not the final decisionmakers in determining whether the petitioner would actually receive the death penalty as occurred in *Caldwell*, 472 U.S. at 341.  In short, the instruction did not minimize the viability of all sentencing options other than death, nor did it prevent the jury from deliberating with the guided discretion required by the Eighth Amendment.

---

[18] Petitioner offers the declarations of jurors Cam Lewis Henry, Diana Scales, and Sharon Lynn Threatt in support of Claim BB, which he claims show that the jury focused on the likelihood that petitioner would be released if sentenced to life without parole.  These declarations are inadmissible under Federal Rule of Evidence 606(b).  Pet., Exs. 18-20; *see* Analysis of Claim O, *supra*.

For these reasons, this court cannot find that the trial court's answer to the jury's question likely diverted the jury from its sole appropriate task of weighing the aggravating and mitigating factors to determine whether death was the appropriate penalty, given the extent of the evidence of petitioner's violent character, both in and out of confinement. The court therefore finds that the instruction did not have a substantial and injurious effect on the jury's verdict.

Accordingly, the state court's denial of Claim BB was not objectively unreasonable, and summary adjudication of the claim should be granted in favor of respondent.

xxiv. *Claim CC – Effect of Probation Report on Trial Court's Refusal to Set Aside the Death Verdict*

In Claim CC of the Amended Petition, petitioner contends that the trial court improperly considered facts contained in the pre-sentence report and evidence received at the guilt phase but not at the penalty phase in ruling on his motion to modify the sentence under California Penal Code § 190.4(e). According to petitioner, these errors deprived him of his state-created liberty interest in an independent determination by the trial judge as to the appropriateness of the sentence and also violated the Eighth Amendment by making the verdict less reliable. The parties agree to summary adjudication of Claim CC. The California Supreme Court denied Claim CC on petitioner's direct appeal, stating:

> Defendant contends that the trial court erred in its review of the death penalty verdict under section 190.4, subdivision (e), by reading the probation report before making its determination under that section, and by making reference to material contained therein. The record does indeed show that the court had read the report, and referred at the outset of its section 190.4, subdivision (e) review to material in that report pertaining to defendant's juvenile criminal record. We conclude, however, that the error was harmless.
>
> As we have explained, when the trial court reviews a death penalty verdict under section 190.4, subdivision (e), it is limited to consideration of the evidence presented to the penalty phase jury, which does not include the probation report. (*People v. Williams* (1988) 45 Cal. 3d 1268, 1329 [248 Cal. Rptr. 834, 756 P.2d 221].) Nonetheless, it is presumed that the court was not influenced by irrelevant matters in the probation report, absent evidence to the contrary. (*Ibid.*; *People v. Adcox* (1988) 47 Cal. 3d 207, 274 [253 Cal. Rptr. 55, 763 P.2d 906].)

////

In this case, that presumption of lack of prejudice is well supported in the record. At the outset of its section 190.4, subdivision (e) review, the trial court referred briefly to several instances of defendant's criminal activity found in the probation report, including at least one occurring when he was still a juvenile. The prosecutor was quick to remind the court, however, that it was obliged to consider only the evidence before the jury. After that, the trial court continued the review, properly confining itself to the evidence presented at the second penalty phase. The trial court found after this review that "the aggravating circumstances [in this case] immensely, not just by a narrow margin, but to a profound degree outweighed the mitigating circumstances," and that therefore the jury verdict was not contrary to law or to the evidence presented. Thus, the record indicates that the trial court promptly cured its initial error, and did not rely improperly on matters in the probation report in making its section 190.4, subdivision (e) determination.[7]

FOOTNOTES

[7] The trial court also made a passing reference during its section 190.4, subdivision (e) review to the ballistics evidence in the Hedlund murder. As explained in part III. D., ante, such evidence was not before the second penalty phase jury, and therefore should not have been considered by the trial court when reviewing the case under section 190.4, subdivision (e). But defendant's claim that prejudicial error resulted from this brief remark outside the evidentiary record is without conceivable basis.

*Hawkins*, 10 Cal.4th at 970-71. That determination was not objectively unreasonable. As discussed regarding Claims T and FF, *supra*, a pure state law error cannot form the basis for federal habeas relief, even if presented as a deprivation of a state-created liberty interest, except in exceptional circumstances. The facts here do not present exceptional circumstances. Rather, the trial court's initial error in relying on facts in the pre-sentence report was almost immediately corrected by the prosecutor. The trial court's brief mention of the ballistics evidence in tying petitioner to the Hedlund murder was not prejudicial to petitioner, as the trial court already had before it the guilt-phase jury's conviction of petitioner for that crime, and the ballistics match evidence did not heighten the aggravating circumstances of the crime. In addition, no clearly established federal law requires that, in order to pass muster under the Eighth Amendment, a state's death penalty scheme must provide independent review of the death verdict by the trial judge. Petitioner's citation on this point, *Pulley v. Harris*, 465 U.S. 37 (1984) merely noted that the trial judge's review of the verdict operated as one of many checks on arbitrary imposition of

the death penalty under California's statutory scheme; it did not hold that such review is mandatory under the Eighth Amendment.  Thus, petitioner's due process and Eighth Amendment claims fail.

Petitioner also contends that his trial counsel rendered ineffective assistance by not objecting to the trial court's improper consideration of the pre-sentence report and reference to the ballistics evidence.  However, because the trial court's error with regard to the pre-sentence report was immediately corrected and because the ballistics evidence did not increase the aggravating circumstances weighing in favor of the death penalty, petitioner cannot show that he was prejudiced by counsel's failure to object.

Accordingly, summary adjudication of Claim CC should be granted in favor of respondent.

xxv.   *Claim DD – Trial Court Bias*

In Claim DD of the Amended Petition, petitioner contends that the trial court was biased against him from the inception of trial.  This claim was rejected without reasoning in petitioner's state habeas petitions, and the court must therefore independently review the record to determine whether the state court's denial of the claim was objectively unreasonable.  The parties agree to summary adjudication of Claim DD.

Claim DD is based primarily on a memo sent by the trial judge to jail personnel in the course of ordering the production of petitioner's legal materials that had been removed from petitioner's cell during the episode in which petitioner flooded his cell while drinking prison-made wine.  The judge wrote:

> You left no stone unturned and accomplished exactly the cage-rattling I had in mind to remind a few of the newer troops of the ripple effect that a little thoughtlessness can have on any felony record, but re-doubled, in spades, in a capital case where appellate attorneys comb the record and Supreme Court reviews are incredibly painstaking.  It's just within recent months that we finally completed certifying a record in such a case that I tried a good three or four years ago! [There were literally hundreds of nitpicking "additions and corrections" the appellate counsel insisted on, and the clerk of the Supreme Court kept badgering me and the trial attorneys for.]

1
2
3

> You know where I stand in principle in the unending square dance between the White Hats and the Black Hats, but I do have a record to preserve in any death penalty case; my complaint and your response are, I believe, adequate for the purpose.

4   CT 217.  According to petitioner, the "White Hats"/"Black Hats" comment, in combination with

5   the trial court's examination of the ballistics expert (Claim K) and consideration of the pre-

6   sentence report and ballistics evidence in ruling on the motion to modify sentence (Claim CC),

7   shows that the judge was biased in violation of petitioner's rights to due process, an impartial

8   judge, and a reliable determination of guilt and penalty.

9        This court, having determined that the trial judge did not act improperly in examining the

10   ballistics expert (see Claim K, *supra*), does not agree that the "White Hats"/"Black Hats"

11   comment, even in combination with the trial court's errors in the sentence modification hearing,

12   arose to the level of bias that would establish a constitutional violation.  Rather, the court's

13   independent review of the record reveals a conscious effort by the trial judge to be fair to

14   petitioner and to provide a fair trial.  *See Aetna Life Ins. Co. v. Lavoie*, 475 U.S. 813, 821 (1986)

15   (holding that an insurance company's allegation that the trial judge harbored a general frustration

16   with insurance companies did not amount to a constitutional violation); *see also Liteky v. United*

17   *States*, 510 U.S. 540, 555-56 (1994) (noting that bias under 28 U.S.C. § 455(a), which governs

18   recusal in federal proceedings, is not established by "expressions of impatience, dissatisfaction,

19   annoyance, and even anger, that are within the bounds of what imperfect men and women, even

20   after having been confirmed as federal judges, sometimes display.").  Accordingly, the state

21   court's denial of Claim DD was not objectively unreasonable and summary adjudication of this

22   claim must be granted in favor of respondent.

23        xxvi.   *Claim GG – California Supreme Court Bias*

24        In Claim GG of the Amended Petition, petitioner contends that the California Supreme

25   Court violated its constitutional obligations to meaningfully review his case on both direct

26   appeal and collateral attack by ignoring prejudicial violations of the law with quick cites to past

1    rulings.  He further contends that the California Supreme Court, since the retention election of

2    1986, has adopted a policy of affirming nearly all death sentences.  The parties agree to summary

3    adjudication of Claim GG, which was denied without reasoning in petitioner's state habeas

4    proceedings.

5           Respondent contends that "there is no federal constitutional right to an *adequate* review"

6    of death penalty cases by the state appellate courts.  Resp.'s Mot. for Summ. Adj. at 105

7    (emphasis in original).  However, as petitioner asserts here, the state, having provided for

8    appellate and collateral review, must implement such review in accord with due process.  This

9    fundamental proposition is hardly controversial.  *Evitts v. Lucy*, 469 U.S. 387, 401 (1983);

10   *Campbell v. Blodgett*, 997 F.2d 512, 523 (9th Cir. 1992).  Thus, the court reviews the record to

11   determine whether due process was satisfied under the procedure that was followed.

12          The court rejects petitioner's argument that the California Supreme Court has adopted a

13   blanket policy to affirm death sentences since the 1986 retention election as without sufficient

14   evidentiary support.  Petitioner relies solely on the affirmance rates for periods pre- and post-

15   dating the election, but does not address the impact that changes in the law would have had on

16   the validity of death penalty judgments reviewed during those periods.  Pet., Exs. 71-73.  Nor

17   does petitioner show that the justices on the California Supreme Court suddenly reversed course

18   without explanation from their pre-1986 precedents in death penalty cases.

19          The court further concludes that petitioner has not shown that the California Supreme

20   Court failed to meaningfully review his case in particular, either on direct or collateral review.

21   On direct appeal, the court provided a detailed, 50-page opinion responding to petitioner's

22   claims.  There is no indication that the court was "cursory" in the face of errors.  Rather, this

23   court has reviewed many of the same claims of error and found no cause for reaching a

24   conclusion different from that reached by the California Supreme Court.  Moreover, an appellate

25   court need not provide exhaustive analysis of all claims presented in order to provide fair review

26   – many claims may be disposed of quickly, particularly where controlling precedent precludes

1   relief or the claim is otherwise patently meritless. *See Campbell,* 997 F.2d at 523 ("The amount

2   of ink expended in disposing of an issue bears no necessary correlation with the degree of care

3   lavished upon it in reaching that conclusion.")

4          Nor is there any indication that the California Supreme Court failed to adequately review

5   petitioner's habeas petitions.  The court's decision to review the petitions using the informal

6   briefing process provided by California Rule of Court 60 does not establish a basis for federal

7   habeas relief.  There is no clearly established federal constitutional requirement that, in order to

8   comport with due process, state courts provide habeas petitioners with evidentiary hearings, full

9   merits briefings, or discovery.  The California Supreme Court's dispositions of petitioner's state

10  habeas petitions, while brief and without merits reasoning, show that the court individually

11  considered the claims presented therein.

12          As petitioner has not shown that the California Supreme Court provided constitutionally

13  inadequate review in his post-conviction proceedings, summary adjudication of Claim GG

14  should be granted in favor of respondent.

15          xxvii.          *Claim HH – Ineffective Assistance of Appellate Counsel*

16          In Claim HH of the Amended Petition, Petitioner contends that "should any of his claims

17  be procedurally barred from federal review because of prior appellate counsel's failure to raise

18  them at an earlier stage of the proceedings, such failure constituted ineffective assistance of

19  counsel."  As the Court has not found any of petitioner's claims to be procedurally barred, Claim

20  HH is moot.

21  D.  Conclusion – Motions for Summary Adjudication

22          For the foregoing reasons, the undersigned recommends that respondent's motion for

23  summary adjudication be granted in its entirety.

24  ////

25  ////

26  ////

1          II. <u>Petitioner's Motion for Evidentiary Hearing</u>

2     A. <u>Evidentiary Hearing Standard</u>

3          Evidentiary hearings in federal habeas proceedings are authorized by Rule 8 of the Rules

4     Governing § 2254 Cases.  To determine whether such a hearing may be granted, a federal habeas

5     court must resolve several issues.  First, a hearing will not be granted where the record contains

6     an adequate factual basis supporting the claim on which a hearing is sought.  *Baja v. Ducharme*,

7     187 F.3d 1075, 1078 (9th Cir. 1999).  If the record does not contain an adequate factual basis,

8     the court must determine whether the petitioner was diligent in developing the factual basis in

9     state proceedings.  *Id.*; 28 U.S.C. § 2254(e)(2).

10         If the petitioner was diligent, the court must determine whether a hearing is appropriate

11    or required under *Townsend v. Sain*, 372 U.S. 293 (1963).  *Earp v. Ornoski*, 431 F.3d 1158,

12    1166-67 (9th Cir. 2005).  Under *Townsend*, a petitioner is entitled to an evidentiary hearing if

13    any one of the following circumstances is present:

14         (1)    The merits of the factual dispute were not resolved in the state hearing;

15         (2)    The state factual determination is not fairly supported by the record as a whole;

16         (3)    The fact-finding procedure employed by the state court was not adequate to afford

17                a full and fair hearing;

18         (4)    There is a substantial allegation of newly-discovered evidence;

19         (5)    The material facts were not adequately developed at the state-court hearing; or

20         (6)    For any reason it appears that the state trier of fact did not afford the habeas

21                applicant a full and fair hearing.

22    *Townsend*, 372 U.S. at 313; *Earp*, 431 F.3d at 1166-67.  "Because the deferential standards

23    prescribed by § 2254 control whether to grant habeas relief, a federal court must take into

24    account those standards in deciding whether an evidentiary hearing is appropriate."  *Schriro v.*

25    *Landrigan*, 550 U.S. 465, 474 (2007).  Thus, "a federal court may not grant an evidentiary

26    hearing without first determining whether the state court's decision was an unreasonable

111

determination of the facts." *Earp*, 431 F.3d at 1166-67.  The presence of any of the six

*Townsend* circumstances establishes that the state court's decision was unreasonable, and the

federal court can therefore independently review the merits of that decision by conducting an

evidentiary hearing.  *Id.* at 1167.  In sum, an evidentiary hearing must be provided if:  (1) the

petitioner has alleged facts that, if proven, would entitle him to habeas relief (i.e., the petitioner

has alleged a "colorable claim" to relief) and (2) he did not receive a full and fair opportunity to

develop those facts in state proceedings.  *Id.*

      Where one of the circumstances enumerated in *Townsend* is not presented and a hearing

is thus not mandated, the court may nevertheless grant an evidentiary hearing in its discretion

where facts are disputed.  *Townsend*, 372 U.S. at 318.  In deciding whether to grant a

discretionary evidentiary hearing, the court considers the thoroughness of the state court

proceedings (generally deferring to state court determinations made after a full and fair hearing)

and the strength of the claim (generally denying a hearing on frivolous claims).  *See id.*

      If the petitioner failed to develop the claim's factual basis in state court, the court may

not hold an evidentiary hearing on the claim unless

    (A) the claim relies on –

> (I) a new rule of constitutional law, made retroactive to cases on collateral
> review by the Supreme Court, that was previously unavailable; or

> (ii) a factual predicate that could not have been previously discovered
> through the exercise of due diligence; and

(B) the facts underlying the claim would be sufficient to establish by clear and
convincing evidence that but for the constitutional error, no reasonable factfinder
would have found the applicant guilty of the underlying offense.

28 U.S.C. § 2254(e)(2).  Section 2254(e)(2)'s provisions apply only where the petitioner's

failure to develop the factual basis of the claim is attributable to a lack of diligence.  *Williams v.*

*Taylor*, 529 U.S. at 432.  "Diligence" in developing a claim's factual basis requires that the

petitioner "ma[k]e a reasonable attempt, in light of the information available at the time, to

investigate and pursue claims in state court."  *Id.* at 435.  "Diligence will require in the usual

1   case that the prisoner, at a minimum, seek an evidentiary hearing in the state court in the manner

2   prescribed by state law." *Id.* at 437.

3   B. Analysis

4       I. *Claim A – Counsel's Alleged Conflict of Interest*

5       In Claim A of the Amended Petition, petitioner argues that his trial counsel, William

6   Lyons, had a conflict of interest when representing petitioner – to wit, his concurrent

7   representation of defense witness Carmen Greenfield in several civil matters – that adversely

8   affected his performance as petitioner's attorney.  Petitioner raised Claim A in both state habeas

9   petitions.  In the first petition, petitioner provided copies of two personal injury lawsuits and an

10   answer to a municipal court complaint showing Lyons's representation of Carmen Greenfield,

11   her husband, and her sister during 1988, 1989, and 1990.  The California Supreme Court denied

12   the claim on the merits with no reasoning provided.  In the second petition, petitioner provided

13   additional documentary support in the form of declarations by trial co-counsel Michael Brady,

14   Carmen Greenfield, and her husband Terry Greenfield.  The claim was again denied on the

15   merits and for the additional reason that it had been raised and rejected in the first petition.  As

16   the state court provided no reasoning for its merits denials of Claim A, this curt must review the

17   record independently to determine whether the state court's determination was objectively

18   unreasonable.

19       Petitioner alleges the following facts in support of Claim A.  At the time Hedlund was

20   killed, petitioner was working on a ranch owned and operated by Carmen Greenfield and her

21   husband, Terry.  The ranch was about halfway between the Uptown Saloon, where Hedlund was

22   last seen, and the ditch in which his body was found.  Police investigating the crime believed that

23   Hedlund may have been killed at the Greenfield ranch, because his body was wrapped in a

24   blanket with horse hairs on it and appeared to have been placed in the ditch after the killing.

25   Police interviewed Carmen Greenfield after the murder and made it clear that they believed she

26   was involved.  Pet., Ex. 2 (Decl. of Carmen Greenfield) at ¶ 4 & Ex. 6 (Decl. of Terry

Greenfield) at ¶ 4.  In April 1987, they searched the ranch, taking blood samples from a stall in the barn and confiscating two guns.  The same month, Greenfield met Lyons, who developed a close personal and professional relationship with her.  Pet., Ex. 2 at ¶ 2.  They discussed a malpractice case she wanted to bring against another attorney, agreeing to sue once she had received some payment from the other attorney.  *Id.*  Lyons filed the suit in June 1987.  *Id.*  Lyons also represented Greenfield and her sister, Susy Della Casa, in two separate personal injury suits stemming from injuries incurred in September 1987.  *Id.* at ¶ 3; Pet., Exs. 3-5.  Lyons also represented Greenfield and her husband in a suit brought against them by Della Casa and in a motion for return of the guns that had been confiscated by police and represented Terry Greenfield in a suit against the California Department of Corrections and Rehabilitation.  Pet., Ex. 2 at ¶ 3.

Petitioner further alleges that Lyons began representing petitioner in September 1987.  Lyons believed that Greenfield had detailed knowledge of how and where Hedlund was killed.  Pet., Ex. 2 at ¶ 5.  Nevertheless, claims petitioner, Lyons did not investigate Greenfield's possible involvement in the murder.  Instead, he instructed her to take the Fifth Amendment during the preliminary hearing and steered her trial testimony away from anything that might inculpate her, declining to elicit her activities on the night of the murder.  Accordingly to petitioner, Lyons told Greenfield he wanted to protect her and her civil lawsuits because she would not win them if charged criminally in connection with the Hedlund murder.  *Id.*

Respondent disputes those facts, relying in part on declarations made by Lyons in 1994 and 1998.  Answer, Ex. 6.  Lyons claims that he did investigate Greenfield's possible involvement and found that she was not involved.  *Id.*, 1998 Decl. at ¶ 11; 1994 Decl. at ¶¶ 3, 16.  He did not instruct her to take the Fifth Amendment, but merely told her that she could do so if concerned that her answers might incriminate her.  *Id.*, 1998 Decl. at ¶ 11.  According to respondent, the record supports this assertion by showing that Greenfield took the Fifth on the advice of a different attorney, because Greenfield invoked the privilege against self-

incrimination using only broad terms when she first took the stand at the preliminary hearing, but used a detailed recitation of the privilege once she had consulted with a court-appointed attorney. CT 90-96.  Further, respondent argues, Lyons did not use Greenfield's testimony to inculpate petitioner and thereby steer suspicion away from her, but rather to attempt to show that Gerald Hawkins was in the vicinity at the time of the murder and thus may have been the murderer.  *See* Answer, Ex. 6, 1994 Decl. at ¶ 16 ("Carmen Greenfield testified to a third party/misidentification defense, giving testimony to show Gerald Hawkins Jr. was the one in the vicinity of her ranch when the Hedlund murder occurred, not Jeffrey Hawkins."); *but see* RT 4989 ("I am not saying that, that Gerry committed these crimes.  I am not saying that at all.  All I am telling you is . . . [h]e was in Sacramento, and he found out about the [Sonny's market] crime[s] while he was here.").

As to the first inquiry in determining whether an evidentiary hearing is called for, the curt concludes that the record does not contain an adequate factual basis for resolving Claim A. There is nothing in the record regarding Lyons's representation of Carmen Greenfield, her husband, and her sister during the time that he represented petitioner in his trial.  All the information relevant to Claim A is found outside the record.

Thus, the curt must move on to the second inquiry – whether petitioner was diligent in presenting the facts underlying Claim A to the state court.  Respondent contends that petitioner was not diligent in presenting Claim A to the state court because:  (1) he did not provide sufficient supporting documentary evidence and (2) the state court found the claim procedurally barred when raised in the second habeas petition.  Respondent argues that, because California law requires that a habeas claim be supported by reasonably available documentary evidence in order to state a prima facie case and thus advance to a stage at which an evidentiary hearing may be provided, a petitioner who has not complied with that requirement has not diligently pursued

////

////

1  evidentiary hearing in state court.[19]

2       Respondent's citations in support of this position, however, are not on point as to the

3  facts of this case.  In *Davis v. Lambert*, 388 F.3d 1052, 1060-61 (7th Cir. 2004), the court merely

4  noted that the petitioner had complied with state law regarding the submission of documentary

5  evidence.  It did not hold that, had the petitioner failed to comply, he would have been

6  considered not "diligent" under federal habeas law.  The same situation occurred in *Griffey v.*

7  *Lindsey*, 345 F.3d 1058, 1066 n.11 (9th Cir. 2003), *vacated as moot by Griffey v. Lindsey*, 349

8  F.3d 1157 (9th Cir. 2003) (following the petitioner's death).  In *Smith v. Bowersox*, 311 F.3d

9  915, 921-22 (8th Cir. 2002), the state court had specifically held that the petitioner had not

10 complied with its procedural requirements for obtaining an evidentiary hearing.  The same was

11 true in *Baja v. Ducharme*, 187 F.3d 1075, 1079 (9th Cir. 1999).  Here, in contrast, the California

12 Supreme Court never indicated that it considered petitioner's submissions deficient for failure to

13 attach reasonably available documentary evidence or any other procedural requirement for

14 obtaining an evidentiary hearing.  Rather, it denied the claim on the merits in the initial petition

15 and as successive in the second petition.  Because the court ordered informal briefing and never

16 ordered full briefing, it never reached the evidentiary hearing issue.  *See Duvall*, 9 Cal.4th at

17 478; *Horton v. Mayle*, 408 F.3d 570, 582 n.6 (9th Cir. 2005) (stating that, where full briefing is

18 not ordered in a California habeas proceeding, the petitioner did not show a lack of diligence

19 because he "never reached the stage of the proceedings at which an evidentiary hearing should

20 be requested.").

21 _____

22    [19]  In California, the first step toward obtaining an evidentiary hearing is to state a prima facie case for relief (alleging facts which, if true, would entitle the petitioner to relief).  *People v.*

23 *Duvall*, 9 Cal.4th 464, 474-79 (1995).  To state a prima facie case, a petitioner must state fully and with particularity the facts on which relief is sought and to include copies of reasonably

24 available documentary evidence supporting the claim.  *Id.* at 474.  Only where a prima face case has been stated will the state court order the respondent to file a return to the petition (and allow

25 petitioner to file a traverse to the return), and only after this full briefing has been submitted will the court consider whether an evidentiary hearing may be appropriate.  *Id.* at 474-79.  The state

26 court may sometimes order informal, rather than full briefing, however, as it did in petitioner's two state petitions.  Cal. R. Ct., Rule 4.551(b).

1    Moreover, petitioner did submit documentary evidence supporting the claim.  This court

2    declines to conclude that petitioner was not diligent for failing to submit reasonably available

3    documentary evidence in support of the claim where he did, in fact, submit supporting

4    documentary evidence and where the state court did not expressly conclude that the evidence

5    was insufficient to state a prima facie case.  Nor does petitioner's submission of additional

6    documentary evidence with his second petition indicate that he was not diligent in state court – it

7    is quite possible that the declarations submitted with the second petition were not reasonably

8    available at the time the first petition was filed.  In addition, the "failure to develop" standard of

9    28 U.S.C. § 2254(e)(2) does not require that all evidence received by the federal court must have

10    been presented to the state court.  Provisions in the habeas statute for discovery, expansion of the

11    record, and evidentiary hearings show that evidence not presented at all to the state court may be

12    accepted in federal court.  *Cf.* Rules Governing § 2254 Cases, Rules 6 & 7; 28 U.S.C. § 2254(e).

13    Instead, the petitioner must have "made a reasonable attempt, in light of the information

14    available at the time, to investigate and pursue claims in state court."  *Williams v. Taylor*, 529

15    U.S. at 435.  The court finds that petitioner made such a reasonable attempt, by presenting the

16    facts underlying the claim along with evidence showing Lyons's allegedly conflicting

17    representation to the state court and requesting an evidentiary hearing.

18    Having found that petitioner did not fail to develop the factual basis of Claim A in state

19    court, the court must determine whether an evidentiary hearing is mandatory under one of the

20    *Townsend* factors or should otherwise be granted in the court's discretion.  As mentioned above,

21    no evidentiary hearing was provided by the state court.  Claim A presents a number of factual

22    disputes – e.g., whether Lyons believed that Carmen Greenfield was involved in the Hedlund

23    murder or had knowledge of it, whether he instructed her to take the Fifth Amendment, whether

24    he avoided inculpating her in the crime to preserve his financial interest in her pending civil

25    lawsuits – which cannot be resolved on the record but require credibility determinations.

26    ////

1   Accordingly, the court finds that petitioner was not accorded a full and fair opportunity to

2   develop the facts underlying Claim A in the state proceedings.  *See Earp*, 431 F.3d at 1169

3   (finding that no full and fair opportunity was provided where no evidentiary hearing was given

4   on a claim that rested on a credibility determination).  He may therefore obtain an evidentiary

5   hearing here if he has presented a colorable claim to relief – i.e., if Claim A alleges facts that, if

6   proven, would entitle him to relief.  *Id.* at 1167.  Presentation of a colorable claim to relief "is a

7   low bar."  *Id.* at 1170.

8          In determining whether the facts alleged by petitioner raise a colorable claim, the court

9   must apply § 2254.  *Schriro*, 550 U.S. at 474.  Thus, the court must determine what clearly

10  established federal law, if any, governs the claim.

11         As discussed with regard to Claim C, *supra*, it is clearly established federal law under

12  *Strickland* that, to establish that a petitioner's Sixth Amendment right to counsel has been

13  violated by counsel's ineffective assistance, the petitioner must ordinarily show both deficient

14  representation and prejudice.  However, prejudice may be presumed in some instances where

15  counsel has effectively been denied, such as where counsel was actively representing conflicting

16  interests.  *Mickens v. Taylor*, 535 U.S. 162, 166 (2002); *Cuyler v. Sullivan*, 446 U.S. 335, 348

17  (1980); *Earp*, 431 F.3d at 1182-83.  This specific situation is known as the *Sullivan* rule or

18  *Sullivan* exception.  Where it applies, rather than establishing prejudice under *Strickland*, the

19  petitioner must show that a conflict of interest adversely affected the attorney's performance.

20  *Mickens*, 535 U.S. at 172 n.5; *Sullivan*, 446 U.S. at 348.  The Supreme Court has emphasized

21  that the *Sullivan* rule is limited to a conflict that arises from active (i.e., concurrent)

22  representations and thus does not clearly establish an exception to *Strickland*'s prejudice prong

23  for conflicts arising from romantic entanglements, financial conflicts, or former representations.

24  *Mickens*, 535 U.S. at 174-75.

25         As the facts alleged by petitioner, if true, establish that Lyons was actively representing

26  Greenfield and petitioner at the same time, he has established a colorable claim to relief if the

                                              118

1   facts further show that the representation created a conflict that adversely affected Lyons's

2   performance. *Mickens*, 535 U.S. at 171-72 & n.5; *Sullivan*, 446 U.S. 348. According to

3   petitioner, his and Greenfield's interests were conflicting because she was a potential witness

4   against him as well as a "prime alternative suspect." The court agrees that Lyons's

5   representation of Greenfield while representing petitioner possibly created a conflict of interest.

6   Lyons may have had incentives – financial, or from loyalty, or both – not to pursue a defense

7   strategy of pointing to Greenfield as Hedlund's possible killer. As there were no witnesses to

8   Hedlund's murder, a plausible third-party responsibility defense may have carried some weight

9   with the jury.[20]

10      While Lyons's 1994 declaration states that he investigated and determined that

11  Greenfield had not been involved in the crime, other witnesses declare that Lyons believed that

12  she was involved, and the court cannot gauge the credibility of these witnesses solely on the

13  basis of the written declarations. Pet., Ex. 2 (Decl. of Carmen Greenfield) at ¶ 5, Ex. 6 (Decl. of

14  Terry Greenfield) at ¶ 4; *see Earp*, 431 F.3d at 1169 (stating that a state court's summary denial

15  of a claim is objectively unreasonable where the claim rests on credibility determinations that

16  cannot be made solely on the basis of documentary evidence and the record). The court

17  therefore must conclude that petitioner has presented a colorable claim that Lyons represented

18  actively conflicting interests and that the conflict adversely impacted his performance, and an

19

20      [20] As mentioned earlier, Lyons possibly attempted to show that a third party was
    Hedlund's murderer when he elicited from Greenfield that Gerald Hawkins, Jr. had been in the
21  area at the time of the murder. *Compare* Answer, Ex. 6, 1994 Decl. at ¶ 16 ("Carmen Greenfield
    testified to a third party/misidentification defense, giving testimony to show Gerald Hawkins Jr.
22  was the one in the vicinity of her ranch when the Hedlund murder occurred, not Jeffrey
    Hawkins.") *with* RT 4989 ("I am not saying that, that Gerry committed these crimes. I am not
23  saying that at all. All I am telling you is . . . [h]e was in Sacramento, and he found out about the
    [Sonny's market] crime[s] while he was here."). However, this story was somewhat short on
24  credibility in the face of other evidence, which showed that, when Hedlund was killed, Gerald Jr.
    was a huffing addict living on the streets of southern California. Greenfield, on the other hand,
25  presented a more believable alternative suspect – she was living at a ranch in the area at the time
    of the murder, and it could be inferred from the evidence that the blanket in which Hedlund's
26  body was wrapped came from her ranch.

1  evidentiary hearing on Claim A must be granted.

2          ii.  _Claim B – Counsel's Alleged Breach of the Duty of Loyalty_

3          In Claim B of the Amended Petition, petitioner alleges that Lyons breached his duty of

4  loyalty to petitioner by abandoning him at various points of trial and by making false

5  representations to the trial court.  Petitioner raised Claim B in both petitions to the California

6  Supreme Court.  In the first petition, he did not submit any documentary evidence in support of

7  the claim, but relied instead on the trial record.  The state court denied Claim B on the merits.  In

8  the second petition, petitioner submitted additional evidence in support of Claim B – a

9  declaration by trial co-counsel Michael Brady and cruise ship records.  The state court again

10 denied Claim B on the merits and for the additional reason that it was barred as having been

11 raised and rejected in the first petition.  As the state court provided no reasoning for its merits

12 denials of Claim B, this Court must review the record independently to determine whether the

13 state court's determination was objectively unreasonable.

14         Respondent again contends that petitioner was not diligent in presenting the factual basis

15 of Claim B to the state court because he did not submit the documentary evidence along with the

16 initial state petition.  Again, however, the state court did not conclude that petitioner failed to

17 comply with California's requirement of presenting reasonably available documentary evidence

18 in support of the claim.  Accordingly, this court finds that petitioner did not fail to diligently

19 present the factual basis of the claim to the state court.  Accordingly, this court must determine

20 whether an evidentiary hearing is mandatory under one of the _Townsend_ factors or should

21 otherwise be granted in the court's discretion.

22         No evidentiary hearing was provided by the state court.  The parties dispute numerous

23 factual allegations contained in Claim B, as discussed below, which cannot be resolved on the

24 record but require credibility determinations.  Therefore, the court finds that petitioner was not

25 accorded a full and fair opportunity to develop the facts underlying Claim B in the state

26 proceedings.  He may therefore obtain an evidentiary hearing here if he has presented a colorable

1    claim to relief – i.e., Claim B alleges facts that, if proven, would entitle him to relief.  *Earp*, 431

2    F.3d at 1167.

3            In support of Claim B, petitioner alleges as follows:  Lyons, who was appointed lead

4    counsel for petitioner, moved to have Brady appointed as second counsel.  RT 7-8.  In support of

5    the motion, Lyons declared that Brady was "known in the community for his skills in death

6    penalty cases."  CT 122.  However, Brady had limited experience in only a single capital case at

7    the time of his appointment – he had served as second counsel to Lyons in the case against

8    Wayne Richardson, which was run by Lyons and ended without a penalty trial when Richardson

9    plead guilty in exchange for a life sentence after the jury hung in the guilt phase.  Pet., Ex. 1 at

10   ¶ 3.  At the time of his appointment, Brady had been practicing law for three years and had

11   actually tried only one homicide case.  *Id.*

12           After the first jury deadlocked on penalty, Lyons sought a continuance, claiming that

13   defense counsel needed time to follow up on some new evidence and witnesses.  CT 345-46.

14   Brady later filed a supplemental declaration in support of the motion, noting as additional

15   grounds that Lyons had a pre-paid vacation scheduled for the end of October and would not be

16   able to proceed with the penalty retrial unless it was rescheduled.  CT 354.  Petitioner implies

17   that Lyons's proffered reasons for the continuance were false and that his true purpose in

18   seeking the continuance and giving Brady sole responsibility for the penalty phase was to go on

19   the vacation.

20           Petitioner alleges that Lyons made further misrepresentations to the trial court about time

21   spent working on petitioner's case.  Lyons submitted bills to the court for time spent consulting

22   with Brady when Brady was on his honeymoon on a cruise and unavailable for consultation.  *Id.*

23   at ¶ 18; Pet., Ex. 7.

24           After the jury sentenced petitioner to death, Lyons submitted a written motion for new

25   trial but did not attend court to argue the motion orally.  CT 467-73; RT 6926-30.  Brady,

26   although present, did not argue the motion, stating that it was "Mr. Lyons' motion for new trial

as to the guilt phase."  RT 6930.

While petitioner alleges that Lyons left the penalty phase to Brady so that he could go on his pre-paid vacation, respondent counters that Brady took over lead counsel duties after the guilt verdict due to strategic considerations and petitioner's wishes.  Answer, Ex. 6, 1994 Decl. at ¶¶ 3, 9 & 1998 Decl. at ¶¶ 14-15.  Respondent cites articles indicating that Brady was esteemed in the legal community at the time of petitioner's trial, which occurred prior to his well-publicized downward spiral involving drug use and theft in the 1990s.  *Id.*, Exs. 26-28.  Respondent further argues that, even if true, petitioner's allegations of false bills are irrelevant to whether Lyons breached his duty of loyalty to petitioner.

The U.S. Supreme Court has clearly established that the Sixth Amendment's right to counsel encompasses a duty of loyalty owed by counsel to the defendant.  *Strickland*, 466 U.S. at 692.  Where caused by a conflict of interest or resulting in either (1) a complete denial of the right to counsel or (2) a complete failure of counsel to subject the prosecution's case to meaningful adversarial testing, a breach of the duty of loyalty constitutes the kind of attorney malfeasance in which no showing of prejudice is required to establish a constitutional violation.  *Id.*; *United States v. Cronic*, 466 U.S. 648, 658-69 (1984).  In all other situations, a breach of the duty of loyalty is merely another type of allegedly deficient performance for which prejudice must be shown under the general *Strickland* rule discussed more fully in regard to Claim C, *supra*.  *Strickland*, 466 U.S. at 693.

The allegations raised by petitioner in Claim B do not present the type of situation in which prejudice may be presumed.  Petitioner does not allege in Claim B that counsel operated under a conflict created by active, concurrent representation.  Although petitioner does allege that Lyons's interests in "financial remuneration and for taking personal vacations" presented a conflict, no clearly established federal law provides that prejudice is presumed where counsel operated under those types of conflicts.  *Mickens*, 535 U.S. at 174-75; *see* discussion of Claim A, *supra*.  Nor do the allegations in Claim B show that petitioner was entirely deprived of counsel

1    or that counsel failed to subject the prosecution's case to meaningful adversarial testing.  While

2    Lyons may have gone on vacation and otherwise failed to appear at certain trial or post-trial

3    proceedings, Brady provided representation on those occasions, and petitioner's allegations,

4    even if proven true, would not establish that Brady completely failed to subject the prosecution's

5    case to meaningful adversarial testing.  Thus, to obtain an evidentiary hearing on Claim B,

6    petitioner must state a colorable claim that Lyons rendered deficient performance by:  (1)

7    seeking Brady's appointment as second counsel; (2) leaving the penalty phase to Brady; (3)

8    making misrepresentations to the trial court; and/or (4) failing to appear to argue the motion for

9    new trial, and that, absent the error(s), there is a reasonable likelihood that petitioner would have

10   obtained a more favorable outcome.

11          Taking petitioner's allegations as true, Brady lacked qualifications under the American

12   Bar Association's Guidelines for the Appointment and Performance of Counsel in Death Penalty

13   Cases in 1989 – the year of petitioner's trial – to act as lead or second counsel in death penalty

14   cases.  ABA Guidelines  for the Appointment and Performance of Counsel in Death Penalty

15   Cases 5.1 (1989) (hereinafter "ABA Guidelines") (recommending that lead counsel possess at

16   least five years of criminal defense experience, including lead counsel experience in nine jury

17   trials of serious and complex cases and that second counsel have been lead or co-counsel in at

18   least three jury trials of serious and complex cases, including at least two murders or one murder

19   and one felony jury trial); *Wiggins*, 539 U.S. at 524.  Thus, petitioner has stated a colorable claim

20   that a reasonably competent attorney would not have sought Brady's appointment or left Brady

21   to run the penalty phase.  Because petitioner has also stated a colorable claim that Brady's

22   penalty phase presentation constituted ineffective assistance, *see* Claim R, *infra*, petitioner has

23   stated a colorable claim that, but for Lyons's decisions to seek Brady's appointment and to leave

24   him in charge of the penalty phase, there is a reasonable probability that he would have obtained

25   a more favorable outcome.  Accordingly, an evidentiary hearing is appropriate on Claim B.

26   ////

iii.     *Claim J – Prosecution's Alleged Withholding of Exculpatory Information*

In Claim J of the Amended Petition, petitioner contends that the prosecution failed to disclose material, exculpatory evidence – information from an individual named Eliazar Al Aguilar, Jr. – in its possession, custody, or control at the time of trial in violation of due process under *Brady v. Maryland*, 373 U.S. 83, 87 (1963).  Petitioner further alleges that trial counsel rendered ineffective assistance by failing to discover information about Aguilar after his name appeared on the prosecution's witness list.

Petitioner alleges the following facts in support of Claim J:  On or about March 15, 1987, Sacramento County Sheriff's Detective Costella interviewed Aguilar, who had been arrested for robbery.  Aguilar told Costella that he had information about the Sonny's Market crimes.  According to Costella's report:

> Aguilar [] related that he may have information concerning a recent robbery homicide in the Rancho Cordova area. . . .  He wanted to know if he could trade that information for a reduced sentenced [sic] for the crimes he had committed.  I explained to him that I had no authority to make that kind of trade, but that it had been my experience in the past that the District Attorney's office would take that into consideration if the information he gave led to the arrest and conviction of the homicide suspect.  He then stated that he would not testify to any of the information he had.  I requested that he give me the information and that I would pass it on to the homicide detectives.  Aguilar related the following summary:

> I have no proof of any of this, but the day that the murder happened, a guy I know only as Rick called me on the phone.  He told me to turn the television on and see what he had done.  I turned the television on to channel 13 like he said and watched the news of the homicide.  I just assumed that Rick shot the people until the news said that the suspect had a tattoo on the left side of his neck.  I know for a fact that Rick doesn't have a tattoo on his neck, but a friend of his who I know only as Uncle Tom, does have a tattoo on the left side of his neck.  I know this because I put it there just before Christmas.  It is a tattoo of a rose.  I put it on his neck to cover up the word Mary.  I don't know if Rick and his friend Uncle Tom actually did this, but I strongly suspect that they did.

Pet., Ex. 66.  The prosecution did not provide Costella's report or any other information about Aguilar to the defense, although it did list him as a witness for trial.  Pet., Ex. 67.  Defense counsel did not seek any discovery with respect to Aguilar.

1    The record does not contain any information upon which the merits of Claim J may be

2    determined.  Accordingly, the court must consider whether petitioner diligently presented the

3    factual basis of Claim J to the state courts and, if so, whether Claim J presents a colorable claim

4    to relief upon which he was not afforded a full and fair hearing in state court.

5    Respondent alleges that petitioner was not diligent in presenting the factual basis of

6    Claim J to the state courts because he failed to raise it in his initial state habeas petition and the

7    California Supreme Court accordingly denied it as successive in ruling on his second petition.

8    (The court also denied the claim on the merits without providing reasoning.)  Petitioner counters

9    that this court's March 27, 2002 Memorandum and Order, rejecting respondent's motion to

10   dismiss Claim J (among other claims) as procedurally barred for not having been raised in the

11   first state petition forecloses relitigation of that issue here.  In that order, the court determined

12   that the state's successive petition rule was not an independent state ground at the time of the

13   alleged procedural default, because the rule contained an exception based on federal

14   constitutional law.  That determination is separate from, although related to, the question of

15   whether petitioner's failure to raise the claim in the first petition shows lack of diligence in

16   presenting Claim J's factual basis to the state court.

17   Here, the facts underlying Claim J were likely discoverable at the time that petitioner

18   prepared his initial habeas petition, as all parties agree that Aguilar appeared on the

19   prosecution's witness list and, presumably, petitioner could have investigated his connection to

20   the case upon review of that list.  Petitioner's motion for evidentiary hearing does not include an

21   explanation of why he did not present Claim J in the initial petition, which raises questions about

22   whether he could have presented the claim earlier had he been more diligent.  However, it is

23   possible that, even with investigation, petitioner would only have discovered that Aguilar

24   appeared on the witness list because his prints had been compared to prints taken from the

25   Sonny's Market crime scene.  *See* Answer, Ex. 5 (1998 Decl. of Prosecutor Christopher T.

26   Cleland) at ¶¶ 2-3 (stating that he placed Aguilar's name on the witness list only because of the

125

1   fingerprint report and was unaware of Aguilar's statement to Detective Costella).  Moreover, the

2   court has reservations about concluding that, while petitioner's state procedural default was not

3   based on an independent state ground and thus does not bar federal review of Claim J, petitioner

4   may not obtain an evidentiary hearing on the claim.  Such a rationale would, where a claim

5   depends on evidence not contained in the record, effectively preclude federal review of claims

6   raised in successive petitions even where the federal review of the claims is not barred by

7   procedural default based on their successive presentation (except where § 2254(e)(2)'s stringent

8   requirements are met).  In addition, respondent cites no cases, and this court has found none,

9   holding that a petitioner has not diligently presented the factual basis of a claim if he presented

10  the factual basis in a successive state petition.  Petitioner's presentation of the claim in the

11  second petition gave the state court an opportunity to review the factual basis and rule on the

12  merits of the claim, which it did.  On such facts, the court declines to find that petitioner did not

13  diligently present the factual basis of the claim to the state court.

14        Nevertheless, the court concludes that the facts presented by Claim J and its supporting

15  exhibits do not present a colorable claim to relief.  Under *Brady*, "suppression by the prosecution

16  of evidence favorable to an accused upon request violates due process where the evidence is

17  material either to guilt or punishment."  373 U.S. at 87.  A prosecutor only has a duty to disclose

18  information that, if suppressed, would deprive the defendant of a fair trial.  *United States v.*

19  *Bagley*, 473 U.S. 667, 675-76 (1985).  Evidence is material where its suppression undermines the

20  court's confidence in the outcome of trial.  *Id.*  In other words, evidence is material under *Brady*

21  where there is a reasonable probability that, had the evidence been disclosed to the defense, the

22  result of the proceeding would have been different.  *Kyles v. Whitley*, 514 U.S. 419, 433-34

23  (1995).  On the other hand, there is "no constitutional requirement that the prosecution make a

24  complete and detailed accounting to the defense of all police investigatory work on a case."

25  *Moore v. Illinois*, 408 U.S. 786, 795 (1972).

26  ////

1    Taking petitioner's allegations as true, the facts do not establish that the prosecutor's

2  failure to provide information about Aguilar's tip to the defense deprived him of a fair trial.  It is

3  not reasonably probable that, had the prosecutor informed the defense of the tip, petitioner would

4  have been acquitted of the Sonny's Market offenses.  Therefore, the tip did not constitute

5  material evidence subject to *Brady*'s disclosure obligation.  Rather, as in *Moore*, the tip

6  constituted an "early lead" in the case pointing to a perpetrator other than petitioner, which did

7  not yield fruit.  *See id.* at 795-97.  The tip was directly contrary to the evidence obtained from

8  eyewitnesses to the Sonny's Market crimes (who stated that a single perpetrator committed the

9  offenses and positively identified petitioner as that perpetrator).  The tip bore other marks of

10  unreliability – Aguilar told authorities he would not testify to the information and reported it

11  only in the hopes of leniency in his own criminal cases.  Accordingly, the facts alleged by

12  petitioner do not show that the information provided by Aguilar was material.  For the same

13  reasons, he has not stated a colorable claim that he was prejudiced by his attorney's failure to

14  seek information on Aguilar after his name appeared on the witness list.  Petitioner is thus not

15  entitled to an evidentiary hearing on Claim J.

16    iv.    <u>*Claim K – Trial Court's Supplemental Examination of Ballistics Expert*</u>

17    In Claim K of the Amended Petition, as described more fully in response to the

18  cross-motions for summary adjudication, *supra*, petitioner contends that the trial court's

19  examination of one of the prosecution's ballistics experts violated his constitutional rights by

20  improperly indicating that the testimony was reliable.  Petitioner claims that an evidentiary

21  hearing is necessary on Claim K because the trial court's questions "strongly implied that the

22  fact that there were no standardized procedures did not affect the reliability of the experts'

23  opinions in this case in direct contravention of the defense's questioning and proffer of scholarly

24  articles."  Pet'r's Mot. for Evid. Hrg. at 34-35.  According to petitioner, this implication was

25  incorrect, and he wishes to present evidence showing that the ballistics evidence was not

26  reliable.

1    The court finds that Claim K can be determined on the record and thus no evidentiary

2    hearing is called for.  The record shows that the trial court did not express an opinion on the

3    reliability of the expert's comparison or ballistics comparison in general; instead, the court

4    elicited from the expert the expert's own opinion that his comparison was reliable.  RT 4776-77.

5    In essence, petitioner wishes to do at an evidentiary hearing what perhaps should have been done

6    at the trial itself – present a ballistics expert to rebut the experts who testified for the prosecution.

7    However, the actual reliability of the comparison is irrelevant to whether the court erred in

8    eliciting that opinion from the expert – either way, the trial court acted within its discretion as

9    discussed in response to the cross-motions for summary adjudication, *supra*.  Because the factual

10   dispute asserted by petitioner regarding the reliability of the expert's ballistics comparison is not

11   relevant to whether the trial court erred in eliciting from the expert the expert's personal opinion

12   that his comparison was reliable, Claim K may be resolved on the record and no evidentiary

13   hearing is necessary.

14        v.    *Claim P – Counsel's Performance Regarding Evidence of Self Defense on*
                *Hicks Murder*

15

16        In Claim P of the Amended Petition, petitioner argues that his trial counsel rendered

17   ineffective assistance by "failing to consult a criminalist in support of a theory of self-defense to

18   the Hicks murder" and failing to establish that the shooting of Hicks "occurred when Hicks came

19   at the shooter."  According to petitioner, such evidence would have shown that he lacked intent

20   to kill Hicks, which would have precluded the finding of the felony murder special circumstance

21   under California Penal Code § 190.2.[21]

22        Petitioner alleges the following facts in support of Claim P:  Jerry Stevens testified that,

23   before the robbery, Hicks was standing near the front of the store looking out the door.  RT

24

25        [21] As the Hicks murder occurred between the California Supreme Court's decisions in
     *Carlos v. Superior Court*, 35 Cal.3d 131 (1983) and *People v. Anderson*, 43 Cal.3d 1104 (1987),
     intent to kill was required for the felony murder special circumstance.  *People v. Ashmus*, 54

26   Cal.3d 932, 980-81 (1991).

3795-96.  He last saw Hicks leaning against the slush machine at the end of the counter.  RT

3799.  The slush machine was within one foot of the door leading out to the parking lot.  When

he got up after being shot, he saw Hicks lying on the floor.  RT 3807.  Investigating officers

testified that Hicks's feet were four feet from the front door and that his body had fallen into the

store, away from the door, so that his head was about eight feet from the door.  RT 38444, 4110,

6651-53; Answer, Ex. 25.  The autopsy of Hicks revealed that he was 5 feet, eleven inches tall

and was shot in the left cheek, six inches below the top of the head.  RT 4290.  A metal fragment

was removed from his right hand.  RT 4290-91.  The coroner opined that Hicks was shot at close

range.  RT 4295-96.

A bullet was recovered from a clock hanging on the wall behind the counter.  RT 4099.

Police reconstructed the path that the bullet had traveled, which was about five feet, eight inches

from the floor.  RT 4099-4100.

If, as Stevens testified, Hicks was leaning against the slush machine, his left cheek faced

the window and his right cheek faced into the store.  In this position, Hicks could not have been

shot in the left cheek.  Thus, Hicks likely moved from this position.  However, if he had moved

to escape the store, he would have been shot from the back, which he was not.  If he simply

turned his head to face the shooter, the bullet would have struck him "face on," but the autopsy

showed that the bullet did not do so.  "Instead, the position which the bullet struck and the path

of the bullet after it struck indicates that Hicks was moving into the store, towards the shooter

who was in all likelihood right handed."  Pet'r's Mot. for Evid. Hrg. at 43.

Based on the foregoing reasoning, petitioner claims that an expert could have opined at

trial that it was most probable that, after Stevens was wounded, Hicks moved at the shooter and

attempted to grab or push the shooter.  As he came toward the shooter, the shooter turned from

the counter toward Hicks and fired two shots.  Hicks was between the shooter and the counter

when the last shot was fired, explaining the entry wound to the left side of the head, the angle of

the bullet path, and the location of Hicks's body four feet into the store.  Such expert opinion

1   would have squared with Gerald Hawkins's testimony that petitioner told him that he shot a

2   witness who had come up behind him and tried to stop him.  RT 3949.  It also would have

3   squared with additional evidence that counsel should have adduced, according to petitioner, to

4   establish that he suffered from post-traumatic stress disorder ("PTSD").  Startled by Hicks's

5   approach, petitioner, due to the effects of PTSD, did not have time to formulate an intent to kill

6   but rather simply reacted to the perceived attack.

7          Petitioner raised Claim P in his second state habeas petition.  The California Supreme

8   Court denied the claim on the merits and for the additional reason that it could have been, but

9   was not, raised in the initial petition.  As with Claim J, *supra*, respondent argues that petitioner's

10  failure to raise Claim P in his initial state petition shows that he did not diligently present the

11  factual basis of the claim to the state court.  For the reasons discussed with respect to Claim J,

12  the court concludes that petitioner was sufficiently diligent by presenting the factual basis of

13  Claim P in his second state habeas petition and thereby affording the state court an opportunity

14  to review the claim, which it did.  Respondent further argues that petitioner may not introduce

15  evidence to support Claim P that he did not offer to the state court.  As stated earlier with regard

16  to Claim A, however, petitioner is not precluded on federal habeas review from submitting

17  evidence not considered by the state court.  Contrary to respondent's claims, the evidence

18  offered – testimony of a criminalist – does not place Claim P "in a significantly different and

19  stronger evidentiary posture than it was when the state court[] considered it."  *Aiken v. Spalding*,

20  841 F.2d 881, 883 (9th Cir. 1988) (internal quotation marks and citations omitted).  The

21  evidence offered merely supports factual allegations which were raised in the state petition, and

22  thus does not render Claim P unexhausted.  *Vasquez v. Hillery*, 474 U.S. 254, 258-59 (1986)

23  (holding a claim properly exhausted even where supported by additional evidence in federal

24  court because the new evidence "introduced no claim upon which the state courts had not

25  passed.").

26  ////

1    However, the court finds that petitioner is not entitled to an evidentiary hearing on Claim

2  P because he has not stated a colorable claim to relief.  As provided in more detail with respect

3  to Claim C, *supra*, the familiar *Strickland* standard governs petitioner's claim that he was

4  deprived of his constitutional right to counsel because his trial counsel was ineffective.  Under

5  *Strickland*, "[j]udicial scrutiny of counsel's performance must be highly deferential." *Strickland*,

6  466 U.S. at 689.  "[T]he defendant must overcome the presumption that, under the

7  circumstances, the challenged action might be considered sound trial strategy." *Id.* (internal

8  quotation marks omitted).  Here, the record reveals that petitioner's trial counsel adopted a

9  strategy of misidentification in defense of the Sonny's Market charges.  *See also* Answer, Ex. 6,

10  1994 Decl. of William Lyons at ¶ 8.  The court must indulge a strong presumption that counsel's

11  decision to adopt that strategy was made in the exercise of reasonable professional judgment.  *Id.*

12  at 690.  Even if counsel could have hired a criminalist who would testify in a manner suggesting

13  that the shooter lacked intent to kill, such testimony would have contradicted and weakened

14  counsel's strategy of trying to convince the jury that petitioner was not the shooter.  Thus,

15  counsel's decision to follow a misidentification strategy made consultation with a criminalist

16  unnecessary, as the criminalist's testimony would have run against the chosen strategy.  *See id.*

17  at 691 ("[C]ounsel has a duty to make reasonable investigations or to make a reasonable decision

18  that makes particular decisions unnecessary.")  The facts alleged by petitioner, even if proven,

19  would not establish that trial counsel's decisions to employ a misidentification defense to the

20  Sonny's Market charges and thus not to obtain testimony from a criminalist supporting the

21  theory that the Sonny's Market shooter lacked an intent to kill amounted to constitutionally

22  deficient performance.  Accordingly, the motion for an evidentiary hearing on Claim P should be

23  denied.

24    vi.    *Claim R – Counsel's Investigation and Presentation of Mitigating Evidence*

25    In Claim R of the Amended Petition, petitioner alleges that trial counsel rendered

26  ineffective assistance by failing to investigate and present available mitigating evidence at the

1    penalty phase of his trial.  Petitioner claims that counsel's investigation "was at best preliminary,

2    superficial and omitted a series of basic penalty phase investigative steps."  Pet'r's Mot. for

3    Evid. Hrg. at 47.  Counsel's presentation "completely lacked any coherent vision of mitigation,"

4    did not organize mitigating themes, and "avoided or overlooked a series of powerful mitigating

5    issues."  *Id*.  According to petitioner, had counsel done a proper investigation and presentation of

6    mitigating evidence, it is reasonably probable that he would have been sentenced to life without

7    the possibility of parole.

8         Petitioner raised Claim R in his second state habeas petition.  The California Supreme

9    Court denied the claim on the merits and for the additional reason that it could have been, but

10   was not, raised in the initial petition.  As with Claim J, *supra*, respondent argues that petitioner's

11   failure to raise Claim R in his initial state petition shows that he did not diligently present the

12   factual basis of the claim to the state court.  For the reasons discussed with respect to Claim J,

13   the court concludes that petitioner was sufficiently diligent by presenting the factual basis of

14   Claim R in his second state habeas petition and thereby affording the state court an opportunity

15   to review the claim, which it did.  Respondent also again argues that petitioner may not introduce

16   evidence to support Claim R that he did not offer to the state court.  As discussed with regard to

17   Claim P, *supra*, petitioner is not barred from offering evidence not considered by the state court.

18   The court finds that the evidence – testimony of mental health experts – does not place Claim R

19   in a significantly different posture than it was in when the state court considered it but rather

20   merely supports factual allegations which were raised in the state petition, and thus does not

21   render Claim R unexhausted.  Because petitioner did not fail to present the factual basis of Claim

22   R to the state court, and because the state court provided no opportunity for hearing on Claim R,

23   an evidentiary hearing is called for if petitioner has alleged a colorable claim to relief.

24        Claim R encompasses numerous sub-claims of attorney incompetence.  Petitioner alleges

25   that Brady was unqualified to conduct the penalty phase trials and that he did not competently

26   prepare for them.  Specifically, petitioner alleges that Brady failed to competently investigate

1  petitioner's background and gather readily available life history documents, that he did not

2  competently analyze those life history documents he obtained through discovery, and that he did

3  not consult with a competent mental health expert.  Petitioner further claims that counsel's

4  presentation at the second penalty phase was deficient in a number of aspects:  he did not make

5  an opening statement and made an allegedly poor and prejudicial closing statement, he did not

6  organize his presentation around mitigating themes, he did not present an expert on the realities

7  of life for a life-term prisoner, he did not present evidence of petitioner's traumatic background

8  to corroborate the testimony of those family members who did testify and to show petitioner's

9  life story from ages eight to eighteen, he did not present a social historian or psychologist to put

10 that evidence into context for the jury, and he did not present a mental health expert to establish

11 that petitioner suffers from a number of mental illnesses.

12      A short summary of the evidence that was presented at the second penalty trial is

13 necessary to provide context to petitioner's claims of ineffective assistance.  The prosecutor

14 offered the following evidence:  (1) the verdict forms from the penalty phase; (2) a stipulation to

15 eight prior felony convictions sustained by petitioner (robbery, two incidents of auto theft,

16 assault with a deadly weapon, battery causing serious bodily injury, two incidents of felon in

17 possession of a firearm, and assault with a deadly weapon on a peace officer); (3) the testimonies

18 of former Linwood Police Officers that petitioner had resisted arrest by physical combat in 1974;

19 (4) evidence that petitioner had shot Frank Ruopoli in the back with a shotgun and then struck

20 him several times with the gun over the head in 1980; (5) the testimony of a Costa Mesa Police

21 Officer that petitioner attempted to pull a gun on him during a pat-down search in 1981; (6) the

22 testimony of several law enforcement officers to establish petitioner's stabbing of his brother

23 Gerald Hawkins, Jr. in 1987; (7) the testimony of Sacramento County Sheriff's deputies that,

24 while in jail awaiting trial in 1989, petitioner had flooded the cell of another inmate, plugged his

25 own sink and toilet, had to be forcibly removed from his cell after refusing to leave it, and

26 threatened and assaulted correctional personnel; (8) the testimony of a Sacramento Sheriff's

1    Detective who investigated the Hedlund and Hicks murders and learned from Gerald Hawkins,

2    Jr. that petitioner had told Gerald that he had committed a robbery-homicide in Sacramento; (9)

3    evidence regarding the scene at which Hedlund's body was discovered, the condition of the

4    body, and details regarding the bullet wounds; (10) evidence regarding the wounds sustained by

5    Hicks and the scene at Sonny's Market after the crimes; and (11) the testimony of Jerry Stevens

6    as to the events at Sonny's Market.  RT 6363-6679.

7         In his mitigation case, petitioner offered four witnesses – his grandmother, Una West,

8    (testifying by videotape), his mother, Sally Wilson, his uncle, Danny Newberry, and his father,

9    Gerald Hawkins, Sr.  RT 6683-6769.   Una West testified that she cared for petitioner and his

10   brothers, Gerald Jr. and Danny, for 18 months when petitioner was about three years old.  RT

11   5308.[22]  Petitioner's father did not offer to take him in.  RT 5309.  Petitioner's father was an

12   alcoholic with a violent temper.  RT 5309-11.  He was "pretty rough" with petitioner, although

13   not "violent."  RT 5313.

14        Sally Wilson testified that Gerald Hawkins drank frequently and physically abused her in

15   front of their three young children (petitioner, Gerald Jr., and Danny).  RT 6685-86.  Before the

16   children were born, while in the stockade after going AWOL from the Army, Gerald tried to

17   commit suicide.  RT 6686-87.  The pair split up after she obtained an illegal abortion for her

18   fourth pregnancy.  RT 6687-88.  Wilson "got in with the wrong crowd" and "could see that [she]

19   wasn't going to be able to take care of the three boys," so she placed them in foster care.  RT

20   6688-89.  Her mother also watched her children for some small amount of time during that

21   period, but Gerald never visited.  RT 6689-90.  Petitioner was about four years old.  RT 6689.

22   While her children were in foster care or with her mother, Wilson went to prison for three years

23   for cashing a stolen check.  RT 6689.  By the time she got out, Gerald had taken the children and

24

25        [22]  West's videotaped testimony was transcribed at the first penalty trial but not the
     second.  RT 6682; RT 5303-21.  The citations herein are to the transcription of the testimony in
26   the first penalty trial.

would not let her have them.  RT 6691.  Wilson remarried and moved to Alabama, where she remained for the next 12 years.  RT 6691.  The children visited her there, but always returned to their father's home.  RT 6692.  Her son, Danny, spent a year living with her when he was 13 or 14, in which she realized that he couldn't read or write.  RT 6692-93.  Danny had attempted suicide by that time.  RT 6693.  When Wilson returned to California in 1976, petitioner was in prison.  RT 6693.  She wrote to him a few times but did not visit him.  RT 6693.  She had not been to visit him in the Sacramento County Jail following his arrest for the charged murders.  RT 6694.

Danny Newberry testified that, when petitioner and his brothers were small, their parents neglected them.  RT 6722-23.  Wilson smoked marijuana and slept until noon.  RT 7623.  Gerald Hawkins, Sr. beat Wilson and drank heavily.  RT 6724.  Newberry witnessed Wilson with black eyes and fat lips and recalled that she had had to go to the hospital once or twice.  *Id.*  Newberry saw Hawkins "smack the kids around quite a bit," and had seen resulting bruises on them, including petitioner.  RT 6724-25.  Newberry saw petitioner at age 10 running out in the street and smoking with his brothers, unsupervised.  RT 6725-26.  He also saw Wilson give petitioner marijuana at age three or four.  RT 6728.  Gerald Jr. became a paint sniffer, and Danny had trouble with the law and attempted suicide.  RT 6729.  Petitioner received no emotional support from his parents.  RT 6730-31.

Gerald Hawkins, Sr. testified that he spent time in a mental institution before his children were born.  RT 6745.  In the 1950s, when the children were born, he was a heavy drinker, drinking every day.  RT 6745.  His relationship with Wilson was violent.  RT 6746.  He beat her often.  RT 6747-48.  He once stuck her with a fork in the presence of the children.  RT 6748.  He pointed guns at her and the children and shot them in the floor and ceiling close to them.  RT 6748-49.  Once, when petitioner would not get up, Hawkins Sr. took a gun and shot through the mattress, "right by him, so he would get up."  Rt 6749.  He hit the kids with whatever was handy, like ironing cord, paddles, sticks, or switches.  RT 6749.  When his kids were in foster care after

the couple broke up, Hawkins Sr. was not interested in getting them out. *Id.* Petitioner started having trouble with the law around ages eight through ten. RT 6750. At age 11 or 12, he became involved with drugs. RT 6750-51. He overdosed once, and Hawkins Sr. had to call the paramedics to pump his stomach. RT 6751-52. Hawkins never tried to get petitioner counseling or assist him with his schoolwork. RT 6751. Petitioner was in and out of juvenile hall and foster homes since age 11, but Hawkins Sr. did nothing to help him because he didn't care. RT 6751-52. He never visited petitioner in juvenile hall. RT 6752. He never visited or wrote to petitioner during any of his adult incarcerations, either. RT 6752-53. Petitioner ran away many times while living with his father. RT 6754. Hawkins Sr. nailed the windows shut so his children couldn't get out and sometimes locked them in the basement or closet. *Id.* His son, Danny, died after Hawkins Sr. ran over him in a boat while drunk. RT 6756. His other son, Gerald Jr., had been homeless for years and was "virtually brain dead." *Id.*

In support of his claim that counsel's penalty-phase representation amounted to ineffective assistance, petitioner alleges as follows. He claims that his appointed counsel, William Lyons, requested that Michael Brady be appointed second counsel despite Brady's lack of experience in capital litigation. Pet., Ex. 1 (Decl. of Michael Brady) at ¶¶ 2-4; *see* CT 122. At the time of the appointment, Brady allegedly had no experience in conducting a penalty phase investigation or trial and had limited experience in non-capital homicide trials. Pet., Ex. 1 at ¶ 3. Nevertheless, Lyons left Brady with the responsibility for conducting the penalty phase investigation and developing the mitigation case. *Id.* at ¶¶ 5-8, 13.

Petitioner alleges that Lyons employed Charles Pacheco as an investigator and that Pacheco performed no penalty phase investigation. After Pacheco left the case to begin practicing law himself in mid-1988, Robert Wilcox began serving as the investigator. *Id.* at ¶¶ 11-12; Pet., Ex. 13 (Decl. of Robert Wilcox) at ¶ 2. Wilcox's employee, Jerry Phillips, actually performed most of the investigative work. *Id.* In August 1988, Philips conducted some interviews of petitioner's family members. *Id.* at ¶ 3. Philips resigned two months later, and no

1   more investigation of significance was performed by Wilcox or anyone in his office.  *See id.* at

2   ¶ 2.  According to Mr. Wilcox's declaration, he had no involvement in the case after the guilt

3   phase was completed.  *Id.* at ¶ 4.

4         After the mistrial in the first penalty phase (which Brady had presented), Brady hired

5   another investigator, David Deragisch.  Deragisch had been licensed for less than two years and

6   had not worked on a murder case.  Pet., Ex. 14 (Decl. of David Deragisch) at ¶ 2.  He allegedly

7   did very little investigation on the case, spending most of the time transporting family members

8   around Sacramento for the penalty phase.  *Id.* at ¶ 3.  Having no experience in capital cases,

9   Deragisch relied on Brady to direct his investigation.  *Id.* at ¶ 4.  But, claims petitioner, Brady

10  did not direct the investigation and instead just read the information provided by the

11  investigators and by the prosecution in discovery.  Pet., Ex. 1 at ¶ 24.

12        Because of this allegedly incompetent investigation, Brady did not track down witnesses

13  and records who would have provided mitigating evidence about petitioner's background.  That

14  evidence allegedly would have showed that petitioner: (1) was genetically predisposed to

15  alcoholism and mental illness; (2) suffered a history of childhood physical abuse, neglect,

16  abandonment, and poverty; (3) suffered from untreated mental illnesses, including depression,

17  post-traumatic stress disorder ("PTSD"), attention deficit-hyperactivity disorder, and

18  polysubstance abuse; (4) had sought mental health treatment but failed to receive it; (5) had

19  endured traumatizing conditions while incarcerated; and (6) could favorably adjust to

20  institutionalization.  Petitioner names numerous individuals who could have testified in support

21  of the mitigation case but were not contacted.  Pet., Exs. 8,47, 51-60, 64.  Petitioner further

22  claims that counsel failed to obtain the medical, school, criminal, and vital records of petitioner

23  and his family.  Pet., Exs. 15-16, 21-44, 61-63, 65.

24        Petitioner argues that the mitigating evidence not presented by counsel would have

25  shown that petitioner was born "into a family marked by extreme pathology and dysfunction

26  over multiple generations."  Mot. for Evid. Hrg. at 82.  Alcoholism and violence were pervasive.

1    Petitioner's parents were physically abusive and neglectful from the time that petitioner was an

2    infant.  He was regularly left in dirty diapers and without adequate nutrition or supervision.  His

3    mother abandoned him when he was a young child, and his father was "virtually absent" for

4    some years.  He spent some time in foster placements where he also was not adequately fed or

5    supervised.  Once his father, a violent and unpredictable alcoholic, took him in, he beat

6    petitioner with electric cords, paddles, and a baseball bat.  Petitioner's father also locked him in a

7    closet for hours and shot at him with a gun, selecting petitioner for the worst abuse.  In addition

8    to subjecting his children to physical abuse, petitioner's father also forced them to steal for him

9    and made them drink alcohol with him.  Petitioner ran away, "sleeping on the streets, and

10   preferring detention to the terror of his own home."  Mot. for Evid. Hrg. at 74; *see* Pet., Exs. 45-

11   60, 64.

12          With regard to the information he did review, Brady failed to recognize and follow up on

13   potentially mitigating information.  The documents obtained from the prosecution included

14   petitioner's California Department of Corrections file, which contained evidence that petitioner

15   had sought treatment for his alcohol addiction and mental health issues.  Pet., Ex. 16 (prison

16   psychological evaluation dated July 20, 1983 noting petitioner's alcohol abuse and stating that

17   petitioner "demonstrates a high level of motivation for self-examination and change at this

18   time.").  However, Brady allegedly did not seek to develop further information on petitioner's

19   mental illnesses or inability to obtain treatment in prison.  While he contacted mental health

20   professional Dr. Luigi Piciucco to evaluate petitioner, he did not do so until the weekend before

21   the first penalty trial started.  Brady selected Dr. Piciucco because his office was across from

22   Brady's and he had served as a consultant on a few personal injury cases of Brady's.  Pet., Ex. 1

23   at ¶ 15.  Brady allegedly had no knowledge of whether Dr. Piciucco had worked on any other

24   death penalty cases.  *Id.*  Dr. Piciucco interviewed petitioner twice over the weekend before the

25   first penalty phase began, administering some psychological tests which were scored by

26   computer.  Brady told the jury during his opening statement at the first penalty trial that he

1    would present Dr. Piciucco as a witness, to assist the jury to understand why petitioner behaved

2    the way that he did.  RT 5143.  He did not call Dr. Piciucco or any other mental health expert at

3    either penalty trial, however.  Brady states now that he was unable to give Dr. Piciucco

4    appropriate guidance due to his own inexperience and that he gave Dr. Piciucco few records

5    pertaining to petitioner because he had not obtained many.  Pet., Ex. 1 at ¶¶ 15-17.

6         Petitioner further alleges that, in addition to his deficient investigation, Brady's penalty-

7    phase presentation was incompetent.  First, he challenges Brady's decision not to give a full

8    opening statement.  Instead, Brady gave what he referred to as a "quick statement" to the jury,

9    which did not telescope the mitigation case at all but instead merely summarized the list of

10   aggravating evidence against petitioner.  RT 6362-63.  Further, petitioner argues, Brady failed to

11   organize the case around themes supported by the mitigating evidence, such as "the traumatic

12   effects of familial instability, violence and abandonment, physical abuse, over extensive and

13   early juvenile institutionalization, a long and continuous history of institutional failure that

14   continued into adulthood, and the adult psychological, emotional, and behavioral consequences

15   of this history."  Mot. for Evid. Hrg. at 100.  Petitioner asserts that such organization would have

16   given the evidence presented a context in which the jury could thoughtfully consider it.

17        Petitioner also faults Brady for failing to present the testimony of Dr. Jiro "Jerry"

18   Enomoto at the second penalty-phase trial.  Dr. Enomoto had testified at the first penalty trial as

19   an expert on the institutional realities for a prisoner sentenced to life without the possibility of

20   parole.  He had "assur[ed] the jurors that sentencing petitioner to life without possibility of

21   parole would not, as the prosecutor argued, [leave him] 'free to kill the yet unborn.'" Mot. for

22   Evid. Hrg. at 69.  Brady states that Dr. Enomoto's testimony was very helpful and that he had no

23   strategic reason for not using him in the second penalty trial.  Pet., Ex. 1 at ¶ 19.

24        Petitioner also argues that Brady failed to present evidence that would corroborate or

25   elaborate on the testimony of the family members who did testify and would provide the jury

26   with petitioner's life history from ages 8 to 18.  According to petitioner, he spent most of those

years "in institutions which had a profound impact on who he [] bec[a]me."  Mot. for Evid. Hrg.

at 74.  Nor did Brady present:  a social historian who, argues petitioner, could have explained to

the jury how petitioner's background (and that of his immediate and extended family) influenced

his behavior.  Such testimony allegedly would have shown that: (1) abuse and neglect such as

that suffered by petitioner causes severe dysfunction in adulthood; (2) petitioner was housed as a

juvenile in institutions that produced dysfunctional adults; (3) petitioner received no help as a

child to cope with his maltreatment; (4) petitioner's family tree included many alcoholics,

indicating a family genetic predisposition to alcoholism; and (5) petitioner's family tree included

many violent, abusive, and mentally ill or handicapped persons.  Petitioner argues that Brady

also did not present a psychiatrist who could have testified to petitioner's many mental illnesses

and impairments, listed above, and explained how those factors affected petitioner's

development and impacted his behavior.  A psychiatrist allegedly could have also explained how

their upbringing had caused petitioner and most of his siblings to be "suicidal, drug-addicted,

and unable to function in society" to rebut the prosecutor's argument that, of all the children,

only petitioner became a violent criminal.

Lastly, petitioner faults Brady's closing argument for failing to explain:  (1) why

petitioner should not receive a death sentence; (2) how the evidence could legally be used in

mitigation; (3) how the prosecutor's evidence in aggravation could be mitigated; (4) why the

prosecutor's argument for death was incorrect; (5) why the jury did not need to worry that

petitioner would be violent in prison; (6) that sentencing petitioner to death was each juror's

individual responsibility; and (7) that sympathy and mercy were appropriate considerations for

the jury in determining penalty.  Petitioner argues that Brady did not explain the statutory

framework of California Penal Code § 190.3 and the mitigating factors provided therein, and that

he further informed the jury not to consider sympathy – that such consideration would be

inappropriate.  RT 6827.  He compared petitioner to an animal, stating that, based on petitioner's

many years of institutionalization, "does it really surprise you that when he's free for the very

1   short periods of time that he's free that he can't cope with freedom?  That he is somewhat like

2   taking a wild animal out of a forest?  Do you really expect him not to bite somebody?"  And,

3   argues petitioner, because Brady had not investigated or presented sufficient evidence about

4   petitioner's social history and mental disorders, he could not convincingly argue that those

5   factors mitigated petitioner's moral culpability for the crimes.[23]

6           Respondent counters petitioner's allegations by arguing that various items of evidence

7   show that petitioner does not suffer from mental illness or impairment.  Answer, Ex. 22.  Had

8   petitioner put on a mental health expert, the prosecution would have introduced those documents

9   in rebuttal.  Further, respondent relies on Lyons' 1998 declaration, in which he states that he

10  believed, at the time of trial, that the mental health documentary evidence would be "extremely

11  damaging" in rebutting any mental health expert testimony presented at either the guilt or

12  penalty phases.  Answer, Ex. 6 at ¶ 8.  Lyons further states that Hawkins was opposed to being

13  portrayed as mentally unstable or having his psychiatric records exposed.  *Id.*  Respondent

14  further counters that the supplemental evidence of petitioner's social history proffered by

15  petitioner now "is nothing but amplification of the same themes presented at the penalty trial."

16  Resp.'s Opp'n to Pet'r's Mot. for Evid. Hrg. at 47-48.  Respondent argues that the evidence

17  regarding extended family members was not relevant and that a true picture of petitioner would

18  include not only his dysfunctional background but his gang affiliation and additional violent acts.

19  Lastly, respondent contends that Brady's decision not to call Dr. Enomoto in the second penalty

20  phase trial was a reasonable tactical choice due to some purportedly damaging cross-examination

21  that had occurred in the first penalty trial.

22          Respondent strongly disputes petitioner's characterization of his trial counsel's

23  performance.  At this stage of the proceedings, however, petitioner need only allege facts, which,

24

25          [23] Petitioner submits the declarations of jurors Obadiah Dudley, Cam Lewis Henry, Diana
        Scales, and Sharon Lynn Threatt in support of Claim R.  Those declarations are inadmissible
26      under Federal Rule of Evidence 606(b).  Pet., Exs. 17-20; *see* Analysis of Claim O, *supra*.

1    if true would entitle him to relief – which that Ninth Circuit has described as "a low bar." *Earp*,

2    431 F.3d at 1170.  It is clearly established federal law that defense counsel in a capital trial has

3    "an obligation to conduct a thorough investigation of the defendant's background." *Williams v.*

4    *Taylor*, 529 U.S. at 396; *see also Porter v. McCollum*, __ U.S. __, 130 S. Ct. 447, 452-53 (2009);

5    *Wiggins*, 539 U.S. at 521-22; *Strickland*, 466 U.S. at 690-91.  Prevailing norms established by

6    the 1989 ABA Guidelines provided for a degree of experience in lead counsel in death penalty

7    cases which Brady (who was effectively lead counsel for the penalty phases) did not possess.

8    ABA Guidelines 5.1; *Wiggins*, 539 U.S. at 524; *see* Claim B, *supra*.  The ABA Guidelines

9    further provided that counsel should make "efforts to discover all reasonably available mitigating

10   evidence" and to present such evidence absent a strong strategic reason not to.  *Id.* at 11.4.1,

11   11.8.6.  As alleged by petitioner, Brady did not investigate petitioner's mental health status or

12   make efforts to discover other reasonably available mitigating evidence.  Brady presented a

13   relatively minimal mitigation case consisting only of four family member witnesses, a very short

14   opening statement and a closing argument that contained much which could be considered

15   actually harmful to the defense.  This meager presentation allowed the prosecutor to effectively

16   argue that petitioner would be a danger in prison if given a life sentence and that his family

17   members were motivated to paint a dire picture of his upbringing in hopes that such testimony

18   would spare him from the death penalty (implying that the picture was perhaps more dire than

19   the reality).  It also left the jury without explanation as to how petitioner's background could

20   have affected his behavior, mitigating his moral culpability for the murders.  While some

21   evidence proffered by petitioner does appear to be cumulative to that already presented or only

22   marginally relevant, the petitioner has alleged facts sufficient to state a colorable claim that there

23   is a reasonable probability that presentation of a more robust and corroborated social history and

24   evidence establishing mental impairments affecting behavior, along with stronger advocacy by

25   Brady, would have caused one juror to "strike a different balance."  *See Wiggins*, 539 U.S. at

26   537.  Whether petitioner can actually demonstrate these facts at an evidentiary hearing remains

1    to be seen, but an evidentiary hearing is appropriate on Claim R.

2         vii.    _Claim S – Counsel's Investigation and Refutation of Aggravating Evidence_

3         In Claim S of the Amended Petition, petitioner alleges that Brady rendered ineffective

4    assistance by failing to investigate, challenge or rebut the testimony of Frank Ruopoli, who

5    testified at the penalty phase that petitioner had beaten and shot him.

6         Petitioner raised Claim S in his second state habeas petition.  The California Supreme

7    Court denied the claim on the merits and for the additional reason that it could have been, but

8    was not, raised in the initial petition.  As with Claim J, _supra_, respondent argues that petitioner's

9    failure to raise Claim S in his initial state petition shows that he did not diligently present the

10   factual basis of the Claim to the state court.  For the reasons discussed with respect to Claim J,

11   the court concludes that petitioner was sufficiently diligent by presenting the factual basis of

12   Claim S in his second state habeas petition and thereby affording the state court an opportunity

13   to review the claim, which it did.  Because petitioner did not fail to present the factual basis of

14   Claim S to the state court, and because the state court provided no opportunity for hearing on

15   Claim S, an evidentiary hearing is called for if petitioner has alleged a colorable claim to relief.

16        Petitioner alleges the following in support of Claim S.  He asserts that the prosecution

17   provided defense counsel with notice that it intended to present evidence of an assault allegedly

18   committed by petitioner on Frank Ruopoli in 1980 as an aggravating factor.  Defense counsel

19   received in discovery several documents regarding the assault.  First, a police report created after

20   the incident indicated that Ruopoli had been shot in the right side of the head and in the back

21   with a shotgun and had told police that petitioner shot him while others held him down.  Second,

22   Ruopoli's preliminary hearing testimony (in the proceeding against petitioner and three others

23   charged with attempted murder and assault for the incident) stated that petitioner beat him with

24   the gun after shooting him.  Third, a disposition report from the District Attorney's Office

25   included a memorandum from Deputy District Attorney Richard Jenkins stating that:  (1)

26   Ruopoli had gone to the residence of Robert Arnold on the night of the assault to buy drugs; (2)

1    shortly after he arrived, an argument occurred, and Ruopoli was shot by a shotgun; (3) Ruopoli

2    identified petitioner and the three other defendants in the case as participating in the assault; and

3    (4) Ruopoli testified falsely in the murder case of *People v. Shirelle Crane* as to several material

4    points and the *Crane* case was dismissed during jury trial.  Pet., Ex. 68.  According to Jenkins,

5    the Ruopoli attempted murder and assault case against petitioner and his co-defendants

> rest[ed] entirely on Ruopoli's testimony with respect to the identity of the
> individuals charged with shooting or aiding and abetting in the shooting of the
> victim, Ruopoli.  Interviews with Ruopoli by L[os] A[ngeles] S[heriff's]
> D[epartment] homicide detectives disclosed a willingness to testify falsely about
> material matters to protect friends and relatives, and perhaps himself.  There is no
> safeguard available to verify any of Ruopoli's identification of the defendants
> [including petitioner] as [the] perpetrators in the shooting episode.

10   *Id.*  Accordingly, the case was dismissed.

11       During the first penalty phase, Brady told the court that, based on the information

12   provided by the discovery documents, Ruopoli was unreliable and a perjurer and he intended to

13   cross-examine Ruopoli on his inconsistent statements and call Jenkins to testify.  RT 5325-26.

14   Brady did not make a motion under *People v. Phillips*, 41 Cal.3d 29 (1985) to determine whether

15   there was substantial evidence of the assault before it could be presented to the jury, but did

16   request a similar hearing under California Evidence Code § 402, governing foundational

17   challenges to evidence.  RT 5329.  At the hearing, however, Brady did not question Ruopoli

18   about his prior false statements to authorities and in the *Crane* case or about the dismissal of the

19   criminal prosecution of the assault.  Instead, he asked Ruopli only whether he planned to plead

20   the Fifth Amendment, whether he had made any deals with the prosecution in exchange for his

21   testimony, and whether he had any felony convictions.  RT 5335-36.

22       Brady stated in a 1997 declaration that he did not undertake any investigation of the

23   Ruopoli incident.  Pet., Ex. 1 at ¶ 21.  Petitioner claims that the case file in *Crane*, which was

24   readily available, would have informed counsel that evidence developed in investigating the case

25   indicated that, contrary to Ruopoli's statements, Shirelle Crane had not committed the murder

26   and perhaps Ruopoli himself had.  Pet., Ex. 69.

Petitioner further argues that despite Brady's statements to the trial court indicating awareness of Ruopoli's credibility problems, Brady averred in 1997:

> I do not recall having any evidence with which I could have impeached Mr. Ruopoli's credibility as a witness. If I had been aware that the prosecution believed Mr. Ruopoli to be unreliable and that there was any information concerning his unreliability and veracity which was of the type that could have been used to attack his credibility, I certainly would have used it. I had no strategic reason for not using any information on Ruopoli's credibility or lack of veracity at a 402 hearing or at trial.

*Id.* In any event, Brady did not seek to exclude Ruopoli's testimony or to impeach Ruopoli at either the first or second penalty trials with the evidence of his prior false statements in the *Crane* case. Ruopoli testified that petitioner shot him in the back and then brutally beat him with the handle of the shotgun. RT 6386-97.

Clearly established federal law provides that petitioner's Claim S is governed by the *Strickland* standard. *See* discussion of Claim C, *supra*. Petitioner alleges that Brady's performance was deficient because he did not adequately investigate the Ruopoli incident, did not seek to exclude Ruopoli's testimony, and did not present evidence to show that Ruopoli had perjured himself in the *Crane* case and also provided false information to authorities. Thus, petitioner asserts, Brady's deficient performance prejudiced petitioner because it failed to provide the jury with a substantial reason to doubt Ruopoli's testimony that petitioner had brutally assaulted him and left him for dead – "far and away the most significant and most violent episode" of prior criminal conduct other than the capital offenses themselves.[24]

Alternatively, petitioner alleges that counsel was deficient for not presenting evidence that, if petitioner had attacked Ruopoli, it was in retaliation for an attack by Ruopoli on petitioner's family. Had Brady investigated, petitioner argues, he would have discovered that Ruopoli had severely beaten petitioner's wife, Louella, in front of her children, then ages 10 and

---

[24] Petitioner submits the declaration of juror Sandra Redding in support of Claim S. That declaration is inadmissible under Federal Rule of Evidence 606(b). Pet., Ex. 70; *see* Analysis of Claim O, *supra*.

3.  It is argued that such evidence, if presented, would have mitigated the Ruopoli assault by providing a sympathetic explanation.

Respondent argues that it was a reasoned tactical choice by Brady not to bring out information on the *Crane* case, because such a line of inquiry would have revealed that petitioner shot Ruopoli to retaliate against him for testifying against Aryan Brotherhood members in that case.

Assuming the truth of petitioner's allegations, however, Brady did not make an informed tactical choice in failing to elicit Ruopoli's prior perjury.  Rather, petitioner's allegations, if proven, would show that Brady simply negligently failed to pursue an obvious line of inquiry which could have lessened the impact of Ruopoli's harmful testimony.  Brady's conduct in that regard fell below the prevailing professional norms provided by the ABA at the time of petitioner's trial.  ABA Guidelines 11.4.1 (stating that defense counsel should endeavor to discover all "evidence to rebut any aggravating evidence that may be introduced by the prosecutor."); *see also Porter*, 130 S.Ct. at 453 (finding deficient performance where counsel "ignored pertinent avenues for investigation of which he should have been aware"); *Wiggins*, 539 U.S. at 524 (using the ABA Guidelines as a benchmark in determining that defense counsel's performance was deficient for failure to conduct an adequate investigation).  Without Ruopoli's testimony, and if petitioner's allegations are true (and perhaps with a more robust mitigation presentation, *see* Claim R), there is a reasonable likelihood that at least one juror would have voted for life without parole, as the evidence of the attack on Ruopoli was highly damaging.  Thus, taking the allegations as true, Brady's performance was deficient under *Strickland*, and petitioner has stated a colorable claim to relief on Claim S supporting an evidentiary hearing on the claim.  *See Wiggins*, 539 U.S. at 537.  Again, it remains to be seen whether petitioner can establish these facts at the evidentiary hearing.

////

////

viii.   *Claims W, X, and Y – Counsel's Failure to Present Evidence to Establish Lingering Doubt at Penalty Phase*

For the reasons provided in response to the parties' cross-motions for summary adjudication, the Court finds that resolution of the ineffective assistance of counsel sub-claims contained within Claim W depends on the resolution of Claim R, on which an evidentiary hearing is appropriate.  Accordingly, the court recommends deferring resolution of those particular sub-claims of Claim W until after the evidentiary hearing on Claim R.  Claims X and Y, on the other hand, do not depend on the resolution of Claim R and can be decided on the record, as discussed in response to the cross-motions for summary adjudication, *supra*.  Accordingly, the motion for an evidentiary hearing should be denied on those claims.

ix.   *Claim EE and II – Cumulative Ineffective Assistance of Counsel and Cumulative Error*

Petitioner states that resolution of Claims EE and II, alleging cumulative ineffective assistance of counsel and cumulative error, must be deferred pending resolution of the individual claims of error.  The court agrees and will accordingly defer resolution of Claims EE and II until after the evidentiary hearing.

CONCLUSION

Accordingly, IT IS HEREBY RECOMMENDED that:

1.   Respondent's motion for summary adjudication (Docket No. 173) be granted as to Claims C, D, E, F, G, H, I, J, K, L, M, N, O, P, Q, T, U, V, X, Y, Z, AA, BB, CC, DD, FF, GG, and the trial court error sub-claims of Claim W and otherwise be denied.

2.   Petitioner's motion for summary adjudication (Docket No. 182) be denied.

3.   Petitioner's motion for an evidentiary hearing (Docket No. 215) be granted as to Claims A, B, R, S, and the ineffective assistance of counsel sub-claims of Claim W and otherwise denied.

These findings and recommendations are submitted to the United States District Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l).  Within twenty-one

days after being served with these findings and recommendations, any party may file written objections with the court and serve a copy on all parties.  Such a document should be captioned "Objections to Magistrate Judge's Findings and Recommendations."  Any reply to the objections shall be served and filed within ten days after service of the objections.  The parties are advised that failure to file objections within the specified time may waive the right to appeal the District Court's order.  *Martinez v. Ylst*, 951 F.2d 1153 (9th Cir. 1991).

Dated:  September 2, 2010.

EDMUND F. BRENNAN
UNITED STATES MAGISTRATE JUDGE